No. 25-2509

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PWGG, LP, et al.,

*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California, et al.,

*Defendants-Appellees.*

## On Appeal from United States District Court for the Southern District of California
Civil Case No. 3:19-cv-01226-L-AHG
The Honorable M. James Lorenz, Judge

### OPENING BRIEF OF PLAINTIFFS-APPELLANTS'

John William Dillion
DILLON LAW GROUP, APC
2647 Gateway Road
Suite 105
Carlsbad, CA 92009
Telephone:(760) 642-7150
jdillon@dillonlawgp.com

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER AND KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

June 30, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..............................................................ii

INTRODUCTION ............................................................................ 1

STATEMENT OF JURISDICTION ................................................. 3

STATEMENT OF ISSUES AND STANDARD OF REVIEW ................. 4

STATEMENT OF THE CASE ......................................................... 5

  I.   California's Restrictions On the Acquisition of Firearms............. 5

  II.  The Ban's Effect On Plaintiffs........................................... 8

 III.  Procedural History............................................................. 10

SUMMARY OF ARGUMENT....................................................... 15

ARGUMENT ............................................................................... 17

  I.   The Second Amendment's Plain Text Covers Plaintiffs' Right to
Acquire Firearms. ............................................................ 19

      A. 18-to-20-Year-Olds Are Part of "The People." ...................... 19

      B. The Right to Acquire Firearms Is Inherent In The Right to
"Keep and Bear" Them. ................................................ 28

  II.  There Is No Historical Justification for the Semiautomatic Rifle
Ban or the Hunting License Requirement.................................... 39

      A. History Demonstrates That The Second Amendment
Protects 18-to-20-Year-Olds. ......................................... 45

      B. The District Court's Contrary Approach to History Is Deeply
Flawed. ..................................................................... 48

      C. The State's 19th-Century Restrictions Are Too Little And
Too Late. .................................................................. 59

CONCLUSION ........................................................................... 65

## TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Andrews v. State*,
 50 Tenn. 165 (1871) .......................................................... 29, 30

*Armstrong v. Exceptional Child Ctr., Inc.*,
 575 U.S. 320 (2015) ........................................................ 21

*B&L Prods., Inc. v. Newsom*,
 104 F.4th 108 (9th Cir. 2024) .................... 28, 29, 30, 31, 33, 35, 36

*Brown v. Ent. Merchs. Ass'n*,
 564 U.S. 786 (2011) ........................................................ 58

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ... 1, 17, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 40

*Duncan v. Bonta*,
 133 F.4th 852 (9th Cir. 2025) ........................................... 41

*Eldred v. Ashcroft*,
 537 U.S. 186 (2003) ............................................... 24, 25

*Espinoza v. Mont. Dep't of Revenue*,
 591 U.S. 464 (2020) ........................................................ 42

*Hirschfeld v. ATF*,
 14 F.4th 322 (4th Cir. 2021) ........................................... 21

*Hirschfeld v. ATF*,
 5 F.4th 407 (4th Cir. 2021) ................................... 21, 22, 49

*Hoopa Valley Indian Tribe v. Ryan*,
 415 F.3d 986 (9th Cir. 2005) ........................................... 4

*Ill. Ass'n of Firearm Retailers v. City of Chicago*,
 961 F. Supp. 2d 928 (N.D. Ill. 2014) ................................ 29, 30

*Jackson v. City & Cnty. of San Francisco*,
 746 F.3d 953 (9th Cir. 2014) ........................................... 29

*Jones v. Becerra*,
 498 F. Supp. 3d 1317 (S.D. Cal. 2020) ................................ 10, 11

*Jones v. Bonta*,
    34 F.4th 704 (9th Cir. 2022) .................. 5, 11, 12, 19, 23, 24, 26, 36,
                                           38, 43, 45, 46, 54, 63, 64

*Jones v. Bonta*,
    47 F.4th 1124 (9th Cir. 2022) ............................................... 5, 12, 13

*Jones v. Bonta*,
    2023 WL 8530834 (S.D. Cal. Dec. 8, 2023) .................................... 13

*Lara v. Comm'r Pa. State Police*,
    125 F.4th 428 (3d Cir. 2025)...................... 19, 22, 39, 43, 46, 47, 59

*Luis v. United States*,
    578 U.S. 5 (2016) ....................................................................... 28

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................... 37

*McCoy v. ATF*,
    No. 23-2085, 2025 WL 1702193 (4th Cir. June 18, 2025) ............ 55

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012)....................................................... 43

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985) ................................................................ 21, 22

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    597 U.S. 1 (2022) .................................. 11, 17, 18, 20, 21, 39, 40, 41,
                                         42, 43, 44, 45, 49, 58

*Nguyen v. Bonta*,
    No. 24-2036, slip op (9th Cir. June 20, 2025) .................... 31, 32, 36

*NRA v. Bondi*,
    133 F.4th 1108 (11th Cir. 2025) .................................................. 55

*Nunn v. State*,
    1 Ga. 243 (1846).......................................................................... 20

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) ................................................ 24, 25

*Peters v. Fleming*,
    6 M. & W. 42 (Ex. 1839)............................................................. 56

*Reese v. ATF,*
    127 F.4th 583 (5th Cir. 2025) .............. 19, 22, 27, 28, 29, 46, 47, 54

*Rocky Mountain Gun Owners v. Polis,*
    121 F.4th 96 (10th Cir. 2024) ....................................... 19

*Saunders Glover & Co. v. Ott's Adm'r,*
    12 S.C.L. 572 (S.C. Const. Ct. App. 1822) ...................... 55

*Staples v. United States,*
    511 U.S. 600 (1994) ..................................................... 62

*Teixeira v. County of Alameda,*
    873 F.3d 670 (9th Cir. 2017) ........................................ 28

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) ..................................................... 21

*United States v. Duarte,*
    137 F.4th 743 (9th Cir. 2025) .................................. 40, 41

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) ........................................... 29

*United States v. Perez-Garcia,*
    96 F.4th 1166 (9th Cir. 2024) ...................................... 18

*United States v. Rahimi,*
    602 U.S. 680 (2024) ................................ 41, 44, 45, 49, 51

*Van Valkinburgh v. Watson & Watson,*
    13 Johns. 480 (N.Y. Sup. Ct. 1816) ............................. 56

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ................................................ 21, 22

*Wolford v. Lopez,*
    116 F.4th 959, (9th Cir. 2024) .................................. 40, 41

*Worth v. Jacobson,*
    108 F.4th 677 (8th Cir. 2024) .............................. 19, 22, 43

*Yukutake v. Lopez,*
    130 F.4th 1077 (9th Cir. 2025) ................... 1, 31, 32, 33, 34

iv

## Statutes and Constitutional Provisions

18 U.S.C. § 922(b)(1) ................................................................. 8

CAL. FAM. CODE
    § 6500 ................................................................................ 6
    § 6501 ................................................................................ 6

CAL. PENAL CODE
    § 26840(a) .......................................................................... 7
    § 27500 .............................................................................. 7
    § 27505(b)(3) ...................................................................... 7
    § 27510(a) .......................................................................... 5
    § 27510(b)(1) ...................................................................... 6
    § 27510(b)(2) ...................................................................... 5
    § 27510(b)(3) ................................................................. 5, 6
    § 27545 .............................................................................. 8
    § 29800 .............................................................................. 7
    § 31615(a) .......................................................................... 7
    § 31640(c) ...................................................................... 7, 8

Co. Litt. 172a ................................................................... 54, 55

FED. R. APP. P.
    4(a)(1)(A) ........................................................................... 4

Mo. Rev. Stat
    § 1274 (1879) ................................................................... 64

The Militia Act of 1792, ch. 33 § 1, 1 Stat. 271 .................... 24, 46

U.S. CONST.
    amend. II .................................................................... 17, 23
    art. I, § 2, cl. 2 ................................................................. 21
    art. I, § 8, cl. 16 .............................................................. 24

1856 Ala. Acts. 17 ........................................................... 62, 63

1860 Ky. Acts 245 ............................................................... 63

1883 Wis. Sess. Laws 290 ..................................................... 64

1885 Nev. Stat. 51 ............................................................... 64

1893 N.C. Sess. Laws 468–69 ................................................ 64

## Other Authorities

1 THE LAWS OF THE STATE OF VERMONT, DIGESTED AND COMPILED (Wright 1808) (enacted 1797) ...................................................................... 57

2 ANNALS OF CONGRESS (Joseph Gales ed., 1834) ................................... 25

AN ACT FOR SETTLING THE MILITIA, 3 WILLIAM W. HENING, THE STATUTE AT LARGE OF VIRGINIA (1823) (enacted 1705) ................................ 57

PEREGRINE BINGHAM, THE LAW OF INFANCY AND COVERTURE (1816)...... 52

HENDRIK BOORAEM, YOUNG HICKORY: THE MAKING OF ANDREW JACKSON (2001) ...................................................................................... 56

WILLIAM BLACKSTONE, 1 COMMENTARIES ON THE LAWS OF ENGLAND (1765) ................................................................................... 51, 52

Brief of Amicus Curiae The Second Amendment Foundation in Support of Petitioner, *NRA v. Glass*, No. 24-1185 (U.S. June 20, 2025) ............................................................... 57, 58

JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW (1854) ......................... 49

THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA (1880) ......................................... 22

*FAQ, Minimum Qualifications*, JOIN SFPD, https://perma.cc/WC8V-L7F6 ....................................................................................... 37, 38

BRAD FITZPATRICK, SHOOTER'S BIBLE GUIDE TO CONCEALED CARRY (2013) ....................................................................................... 6, 7

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U.L.J. 495 (2019) .................... 26, 47, 48

James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 Wm. & Mary L. Rev. 1777 (2002) ............................................. 57

EDWARD LIVINGSTON, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY (1803) .......................................................................... 60

*Hunting Licenses: Hunter Education Requirements*, CAL. DEP'T OF FISH & WILDLIFE, https://perma.cc/A2FD-EWV4....................................... 38

vi

*Hunting License Items and Fees*, CAL. DEP'T OF FISH & WILDLIFE, https://perma.cc/K4RQ-V76C.................................................. 38, 39

SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1755) .... 20

JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW (1848)..................... 56

ORDINANCES OF THE TOWN OF COLUMBIA, (S. C.) PASSED SINCE THE INCORPORATION OF SAID TOWN: TO WHICH ARE PREFIXED, THE ACTS OF THE GENERAL ASSEMBLY, FOR INCORPORATING THE SAID TOWN, AND OTHERS IN RELATION THERETO (1823) ..................................... 63

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://perma.cc/75MP-MHFS .............................. 40

DAVID STEIER, GUNS 101: A BEGINNERS GUIDE TO BUYING AND OWNING FIREARMS (2011) ......................................................... 6, 7

OLIVER H. STRATTAN, A COLLECTION OF THE STATE AND MUNICIPAL LAWS, IN FORCE, AND APPLICABLE TO THE CITY OF LOUISVILLE, KY. (1857) ...................................................................... 61

*Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON (John C. Fitzpatrick, ed. 1938) ...................................... 26

NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ............................................................... 20

vii

## **INTRODUCTION**

This case, in essence, presents a simple yet profound question: may a peaceable citizen of this Nation, legally dependent on no one but himself or herself for care and protection, nevertheless be deprived of the right to keep and bear arms on account of age? The Second Amendment, which is premised on the understanding that the peaceable citizens of this Nation are entitled to bear arms for their own defense, demands that the answer to this question be no.

The Second Amendment "right to possess and carry weapons in case of confrontation" presumptively "belongs to all Americans," not "an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580–81, 592 (2008). And 18-to-20-year-old adult Americans, as part of that group, necessarily have full enjoyment of their Second Amendment rights. Furthermore, if "keeping arms" is equivalent to "having weapons," then the Second Amendment must equally well protect the right to *acquire* weapons, or else it would be meaningless, protecting "only the possession of those guns that thereafter either suddenly and miraculously appear in one's home or that the state *allows* you to acquire." *Yukutake v. Lopez*, 130 F.4th 1077, 1091 (9th Cir. 2025).

1

The district court acknowledged all of this and yet nevertheless found that the law challenged here, which bans ordinary 18-to-20-year-olds from purchasing *any* firearms unless they first acquire a hunting license (even if they have no wish to hunt) and bans them from purchasing semiautomatic centerfire rifles *no matter what*, did not even implicate the Second Amendment's plain text because it did not fully preclude all 18-to-20-year-olds in California from acquiring any firearms at all.

That was an error under this Court's and the Supreme Court's precedents, and so was the district court's alternative holding that, even if the Second Amendment is implicated, historical restrictions on the contracting power of minors can justify the modern limitations California places on adults. At the Founding, 18-to-20-year-olds were *required* by law to possess arms that were the equivalent of the guns California forbids them to purchase today. None of the district court's scattered historical evidence can overcome that undisputable fact. To the extent *any* of the district court's evidence demonstrates real restrictions on access to common firearms by individuals in this age group (and what little does comes very late), it is all irrelevant because it regulated

2

firearm acquisition by minors. California has not identified a *single* historical restriction that limited the rights of legal adults to acquire firearms on account of their age. And 18-to-20-year-olds are adults today. The State's insistence on treating them as if they are not does not comport with the Supreme Court's requirement that modern and historical restrictions must be "relevantly similar" for the modern restrictions to stand. The district court's decision should be reversed.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over this case under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States and thus raises a federal question. The district court also had jurisdiction under 28 U.S.C. § 1343 and 42 U.S.C. § 1983 because the action seeks to redress the deprivation under color of the laws and statutes of the State of California of the rights, privileges, and immunities secured by the Second and Fourteenth Amendments to the United States Constitution.

This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's decision and order denying Plaintiffs' motion for summary

3

judgment and granting the State's cross-motion disposed of all the claims in this case.

The district court's judgment granting summary judgment to the State was filed on March 26, 2025. 1-ER-002. Plaintiffs filed a notice of appeal on April 14, 2025 and a corrected notice of appeal on April 15, 2025, 2-ER-0027. Plaintiffs' notice of appeal was timely because it was filed within 30 days of the district court's judgment. FED. R. APP. P. 4(a)(1)(A).

## STATEMENT OF ISSUES AND STANDARD OF REVIEW

Whether the Second Amendment permits California to prohibit 18-to-20-year-old adults from acquiring centerfire, semiautomatic rifles. 4-ER-0710; 1-ER-0025.

Whether the Second Amendment permits California to ban 18-to-20-year-old adults from acquiring any long gun without having first obtained a hunting license. 4-ER-0710; 1-ER-0025.

This Court reviews the district court's decision to grant summary judgment to the State and deny the summary judgment to Plaintiffs on both of these issues *de novo*. *See Hoopa Valley Indian Tribe v. Ryan*, 415 F.3d 986, 989 (9th Cir. 2005).

4

Pertinent constitutional and statutory provisions are reproduced verbatim and with appropriate citation in an addendum to this brief.

## STATEMENT OF THE CASE

### I.  California's Restrictions On the Acquisition of Firearms.

"California regulates the acquisition, possession, and ownership of firearms with a multifaceted scheme." *Jones v. Bonta*, 34 F.4th 704, 710 (9th Cir. 2022), *vacated on reh'g and remanded in light of Bruen*, 47 F.4th 1124 (Mem.) (While *Jones* has been vacated, we cite it for its persuasive value.). "[E]xcept for some intrafamily transfers and loans," (a very narrowly drawn category) "the state requires that all transfers of firearms happen at a licensed firearms dealer." *Jones*, 34 F.4th at 710 (citing CAL. PENAL CODE §§ 27545, 28050).

Yet even that avenue is severely restricted for 18-to-20-year-olds— and entirely closed for semiautomatic rifles. California law provides that a licensed firearm dealer "shall not sell, supply, deliver, or give possession or control of a firearm to any person who is under 21 years of age." CAL. PENAL CODE § 27510(a). There are exceptions to this restriction, but they generally do not permit ordinary 18-to-20-year-olds to acquire firearms in the commercial market. For instance, 18-to-20-

5

year-old law enforcement officers or military members may acquire firearms despite their ages. *See id.* § 27510(b)(2)–(b)(3). And while parents (or grandparents, with the parents' permission) may transfer non-handgun firearms to their minor children, *id.* § 27505(b)(3), even this avenue is closed to 18-to-20-year-olds since they are legal adults. *See* CAL. FAM. CODE § 6500 ("A minor is an individual who is under 18 years of age."); *id.* § 6501 ("An adult is an individual who is 18 years of age or older.").

The one exception that does potentially apply to 18-to-20-year-olds generally still does not allow them to acquire centerfire, semiautomatic rifles, and it requires them to get a hunting license that is irrelevant to someone interested in self-defense before they can acquire any other long gun. In particular, California allows the sale or delivery "of a firearm that is not a handgun or semiautomatic centerfire rifle … to a person 18 years of age or older who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife." CAL. PENAL CODE § 27510(b)(1). This exception, by its terms, applies only to three types of firearms: (1) non-semiautomatic rifles, (2) shotguns, and (3) semiautomatic "rimfire" rifles that are, principally, small-caliber rifles suitable for nothing other

6

than target shooting or hunting very small animals, *see* DAVID STEIER, GUNS 101: A BEGINNERS GUIDE TO BUYING AND OWNING FIREARMS 13 (2011) (noting that such firearms have "poor stopping power" and thus are "not recommended" for self-defense); *see also* BRAD FITZPATRICK, SHOOTER'S BIBLE GUIDE TO CONCEALED CARRY 33 (2013) (".22s are great practice guns, fun, and economical, but they are largely regarded as too small for self-defense."). And of course, to even take advantage of this exception, an 18-to-20-year-old must obtain a hunting license—a time consuming, pointless endeavor for someone with no interest in hunting but who does wish to defend self, home, and family.

These restrictions are independent of other limitations California places on who can have or acquire firearms. *See, e.g.*, CAL. PENAL CODE §§ 27500, 29800 (barring purchase or possession by individuals convicted of felonies). And the hunting license requirement is in addition to other prerequisites to firearm purchase that California places on individuals of all ages. Specifically, anyone (of any age) in California who wishes to purchase or acquire *any* kind of firearm must first obtain a Firearms Safety Certificate, *id.* §§ 26840(a), 31615(a), which requires completing a safety training program and final written exam covering various firearms

7

safety topics like safe storage, "[i]ssues associated with bringing a firearm into the home," and the contours of California's regulatory scheme. *Id.* § 31640(c).

California's law therefore requires 18-to-20-year-olds to jump through the unnecessary hoop of acquiring a hunting license to be able to purchase any firearm, and it prohibits them from legally acquiring handguns and centerfire, semiautomatic rifles altogether. However, because California law, as noted above, requires essentially all firearms transactions to take place through a licensed dealer, *see id.* § 27545, and federal law independently prohibits licensed dealers from selling handguns to individuals under 21 years of age, *see* 18 U.S.C. § 922(b)(1), Plaintiffs' challenge to the ban on all acquisition of centerfire, semiautomatic rifles and handguns in this case is limited to California's ban on centerfire, semiautomatic rifles, *see* 4-ER-0695.

## II.   The Ban's Effect On Plaintiffs.

Plaintiffs-Appellants include two licensed firearms dealers and shooting ranges, Poway Weapons and Gear and North County Shooting Center. Both sell and rent firearms and provide a place for their customers to train for proficiency and safety with firearms at their

8

ranges. 4-ER-0748–55. They would, if not for the Semiautomatic Rifle Ban, sell or rent semiautomatic rifles (and facilitate other transfers of the same) to 18-to-20-year-old adults. *Id*. Furthermore, they would, if not for the Hunting License Requirement, sell long guns to 18-to-20-year-old adults who have not acquired hunting licenses. *Id*. Because of these laws, however, both Poway and North County Shooting Center do not rent or sell firearms to 18-to-20-year-olds and do not permit them to take part in hunter education or firearm safety courses that call for attendees to handle, use, and control firearms. *Id*.

Plaintiffs-Appellants Firearms Policy Coalition, California Gun Rights Foundation, and Second Amendment Foundation are all nonprofit organizations who seek to promote and defend the Second Amendment protected rights of their 18-to-20-year-old adult members in California who are harmed by the Semiautomatic Rifle Ban and the Hunting License Requirement. 4-ER-0620–26, -0631–39.

Throughout this case the Organizational Plaintiffs and Poway and North County Shooting Center have been joined as plaintiffs by individual 18-to-20-year-olds who are members of each of the Organizational Plaintiffs and would, if not for the laws at issue here,

9

acquire firearms that they are forbidden from acquiring by the Semiautomatic Rifle Ban and the Hunting License Requirement. *See, e.g.*, 4-ER-0631–39. Though none of these individual Plaintiffs are still under 21 (and hence are not appellants before this Court), the Organizational Plaintiffs have standing to sue on behalf of their other members, including Destiny Garcia, who currently is 20 years old and, other than her age, eligible under all applicable laws to purchase and possess firearms. 4-ER-592–93. Garcia would, if she were not forbidden from doing so by the Semiautomatic Rifle Ban at issue here, acquire a semiautomatic centerfire rifle. 4-ER-592. Moreover, she desires to acquire a semiautomatic shotgun, but she cannot do so because she does not have a hunting license and has no interest in hunting or acquiring a license to do so. 4-ER-593.

## III. Procedural History.

Plaintiffs filed this case on July 1, 2019, challenging California's Semiautomatic Rifle Ban and Hunting License Requirement as unconstitutional under the Second and Fourteenth Amendments. *See* Compl., Doc. 1 (S.D. Cal. July 1, 2019). Plaintiffs sought a preliminary injunction on November 12, 2019. *See* 4-ER-0745. The district court

10

denied that motion over a year later, on November 3, 2020. 4-ER-0726; *see Jones v. Becerra*, 498 F. Supp. 3d 1317 (S.D. Cal. 2020). Plaintiffs appealed and on May 11, 2022, a panel of this Court affirmed in part and reversed in part the district court's denial of Plaintiffs' initial preliminary injunction. *Jones*, 34 F.4th at 733.

After first assuring itself of its jurisdiction and concluding that the organizational plaintiffs had standing to bring this action on behalf of their members, *id.* at 713, the Court moved on to applying the "two-step framework" that prevailed in this Circuit prior to the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). Under that framework, this Court first "ask[ed] 'whether the challenged law burdens conduct protected by the Second Amendment.'" *Jones*, 34 F.4th at 714 (quoting *Fyock v. Sunnyvale*, 779 F.3d 991, 996 (9th Cir. 2015)). Answering that question involved "explor[ing] the amendment's reach based on a historical understanding of the scope of the Second Amendment right." *Jones*, 34 F.4th at 714 (quoting *Mai v. United States*, 952 F.3d 1106, 1114 (9th Cir. 2020)). In conducting the first step of this analysis, the Court concluded that history demonstrated that the Plaintiffs' desired conduct fell within the scope of

11

the Second Amendment because the types of firearms at issue, "long guns and semiautomatic rifles[,] are not dangerous and unusual weapons" and therefore are protected, *Jones*, 34 F.4th at 716, and the people in question, 18-to-20-year-olds, "have Second Amendment protections as 'persons who are a part of a national community.' " *Jones*, 34 F.4th at 723 (quoting *Heller*, 554 U.S. at 580).

The Court therefore moved on to the second step of the old Second Amendment framework and scrutinized the burden California's law placed on the Second Amendment right. Noting that the law placed different burdens on different firearms, the Court agreed with the district court that the requirement to have a hunting license before purchasing certain long guns would likely pass intermediate scrutiny, but it held that the flat ban on purchasing semiautomatic rifles should have been subject to strict scrutiny as a "rule that banned the purchase of a major category of firearm," and that, under any standard, the law likely failed to pass muster. *Jones*, 34 F.4th at 724–25, 727–28.

The State sought rehearing and on September 7, 2022, following the Supreme Court's decision in *Bruen*, this Court granted the request for panel rehearing, vacated the panel opinion, and remanded the case

12

for further proceedings consistent with *Bruen*. *Jones*, 47 F.4th at 1125. On remand, the district court found that "*Bruen* represents a change in the legal framework this Court applied when deciding Plaintiffs' preliminary injunction motion, therefore, pursuant to the appellate court's direction, [it] DENIE[D] Plaintiffs' motion for a preliminary injunction as MOOT," but permitted Plaintiffs to refile their motion. 4-ER-0722.

On January 16, 2023, Plaintiffs filed their second motion for preliminary injunction or, in the alternative, summary judgment. 4-ER-0718. On February 16, 2023, Plaintiffs sought leave to amend the complaint to add new 18-to-20-years-old individual plaintiffs and to dismiss the three individual plaintiffs who had turned 21 and so were no longer subject to the complained-of ban. 4-ER-0715 (motion); 4-ER-0713 (order granting motion). On March 22, 2023, Plaintiffs filed the operative Third Amended Complaint. 4-ER-0677. On December 8, 2023, the Court denied Plaintiffs' second motion for preliminary injunction. 4-ER-0595; *Jones v. Bonta*, 2023 WL 8530834, at *3 n.4 (S.D. Cal. Dec. 8, 2023).

On March 26, 2025, the district court denied Plaintiffs' motion and granted the State's. 1-ER-003. Although the district court concluded that

13

"individuals aged 18 to 20 fall within the plain meaning of 'the people' for purposes of the Second Amendment," 1-ER-0010, it nevertheless held that Plaintiffs' claims fell entirely outside the scope of the Second Amendment's "plain text" because, it concluded, "Section 27510 is a commercial restriction that does not meaningfully impair 18-to-20-year-olds' access to firearms," 1-ER-0014.  Although it need not have done so, given this conclusion, the district court went on to analyze history and concluded that even if Plaintiffs' desired conduct was covered by the plain text of the Second Amendment, history would justify the State's restrictions, because 18-to-20-year-olds were considered minors at the Founding and they were, as a result, restricted in their abilities to make binding contracts including, as the district court believed, for firearms. 1-ER-0019–20. The district court further held that the various Founding-era militia laws that required 18-year-olds to possess firearms and participate in the militia were consistent with this view because, in some cases, the states put the onus on parents to ensure their sons were properly equipped with firearms. 1-ER-0020–21. Finally, the district court held that nineteenth century restrictions on purchasing firearms by minors confirmed its understanding that, at the time the Second

14

Amendment was ratified, it was understood not to extend to 18-to-20-year-olds. 1-ER-0022.

On April 15, 2025, Plaintiffs timely filed a notice of appeal.

## SUMMARY OF ARGUMENT

The Second Amendment's plain text extends to cover the right of "the people to keep and bear arms." "The people" encompasses, as the Supreme Court has already held, all Americans. In alignment with every circuit court to consider the question, the district court below correctly held that "the people" includes 18-to-20-year-old Americans. That decision was undoubtedly correct, as all the typical tools of constitutional interpretation point toward that result.

The district court erred, however, in analyzing the second textual question raised by this case: to what extent does the plain text of the Second Amendment cover the *acquisition* of firearms. Although the district court purported to apply this Court's precedent that makes it clear that laws restricting the ability of any group to acquire arms falls within the plain text of the Second Amendment, it erred and concluded that, because neither the Semiautomatic Rifle Ban nor the Hunting License Requirement entirely precludes all 18-to-20-year-olds from

15

acquiring any type of firearm, the case did not merit any constitutional scrutiny.

The district court likewise erred in its alternative holding that, even if the text of the Second Amendment is implicated, our nation's historical tradition of firearm regulation sanctions California's restrictions. In fact, there are zero restrictions, from any time before the 20th century, that similarly restricted the rights of adults to acquire firearms. And at the Founding, the critical era for *Bruen*'s historical analysis, there were zero restrictions of any kind on 18-to-20-year-olds, period. The district court's attempt to find such restrictions by pointing to common law limitations on minors must be rejected for multiple reasons, including that 18-to-20-year-olds are not minors today, those limitations did not, in fact, prevent 18-to-20-year-olds at the Founding from acquiring firearms, and the one relevant type of historical evidence from the period, the militia statutes, uniformly demonstrate that 18-to-20-year-olds were required to possess firearms at the time.

In light of this Founding-era evidence, nothing the district court could have pointed to at later periods could possibly justify the State's restrictions. But even so, the district court's reliance on 19th-century

16

evidence was misplaced because those laws, also, are not "relevantly similar" to California's ban. There were, again, no laws in this period that limited the rights of adults to acquire any firearms on account of their age or required them to do anything like acquire a hunting license. The handful of laws, from a minority of jurisdictions, in the latter half of the century, that limited the rights of 18-to-20-year-olds to acquire arms applied only to minors and were frequently limited in application to prevent the acquisition of only purportedly "dangerous" or concealable weapons, which the semiautomatic rifles that California bans 18-to-20-year-old adults from acquiring are not.

## ARGUMENT

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The right presumptively "belongs to all Americans," not "an unspecified subset." *Heller*, 554 U.S. at 580–581, 592. The Amendment enshrines " 'the right of law-abiding, responsible citizens to use arms' for self-defense" (in addition to other lawful purposes) and "demands our unqualified deference." *Bruen*, 597 U.S. at 26 (first quoting *Heller*, 554 U.S. at 635).

17

For that reason, no important governmental interest can justify legislation that conflicts with the protections of the Second Amendment. Following the Supreme Court's decision in *Bruen*, the following standard governs cases challenging the constitutionality of laws under the Second Amendment:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 24 (quotation marks omitted). Here, the district court erred in answering the "threshold question" about the scope of the Second Amendment's text, *United States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024), concluding that the text of the Amendment does not encompass the right of 18-to-20-year-olds right to acquire common firearms so that Plaintiffs' claims do not even implicate constitutional protections. The district court further erred in its alternative holding, that even if Plaintiffs did have a right to acquire firearms, the restrictions California places upon that right are historically justified.

18

## I. The Second Amendment's Plain Text Covers Plaintiffs' Right to Acquire Firearms

"The threshold question in a Second Amendment claim is whether the Amendment presumptively protects the individual's conduct." *Id*. The district court concluded that in this case the "plain text" question posed two possible hurdles: whether 18-to-20-year-olds are part of "the people" to whom the right extends, and whether "the plain text of the Amendment encompasses the individuals' proposed course of conduct," the acquisition of firearms. 1-ER-008–09 (quoting *Perez-Garcia*, 96 F.4th at 1178). The district court correctly concluded that 18-to-20-year-olds are part of "the people" but it erred in deciding that acquiring firearms is not protected conduct.

### A. 18-to-20-Year-Olds Are Part of "The People."

Every circuit court to rule on the question since *Bruen* has, like the district court below, held that 18-to-20-year-olds are part of "the people" within the meaning of the Amendment. *See Reese v. ATF*, 127 F.4th 583, 595 (5th Cir. 2025); *Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 437 (3d Cir. 2025); *Worth v. Jacobson*, 108 F.4th 677, 690 (8th Cir. 2024); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 116 (10th Cir. 2024); *accord Jones*, 34 F.4th at 718–20. Two key elements of the Amendment's

19

text, as conclusively interpreted by the Supreme Court, remove any doubt that those courts are correct.

*First*, the Amendment refers to a right of "the people" to keep and bear arms without mentioning age. The " 'normal and ordinary' meaning" of "the people" includes *all* of the people. *Bruen*, 597 U.S. at 20 (quoting Heller, 554 U.S. at 576–77). In other words, the American "people" simply are the persons who make up our Nation. *See* SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE 1503 (1755) (defining "people" as "A nation; those who compose a community."); NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (defining "people" as "The body of persons who compose a … nation."). Thus, as the Supreme Court held in *Heller*, "the Second Amendment right is exercised individually and belongs to *all* Americans." 554 U.S. at 581 (emphasis added); *Nunn v. State*, 1 Ga. 243, 250 (1846) ("The right of the whole people, old and young, men, women[,] and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree." (emphases in original)). Quoting *Heller*, *Bruen* reiterated that "the Second Amendment guaranteed to 'all Americans' the right to bear

20

commonly used arms in public subject to certain reasonable, well-defined restrictions." 597 U.S. at 70.

Furthermore, construction of the Constitution requires reading individual amendments and clauses "in the context of the Constitution as a whole." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325–26 (2015). In context, the Constitution elsewhere explicitly considers and prescribes limits based on age. *See, e.g.*, U.S. CONST. art. I, § 2, cl. 2 (must be 25 years old to serve in the House of Representatives). "In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment." *Hirschfeld v. ATF*, 5 F.4th 407, 421 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021). And in the two other provisions in the Bill of Rights that explicitly describe a right of "the people" generally—the First and the Fourth Amendments—the protections include 18-year-olds and in fact extend to *the whole people*, even those under 18. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) ("Students . . . are 'persons' under our Constitution … [who] are possessed of fundamental rights which the State must respect"); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624,

21

639 (1943); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) ("Equally indisputable is the proposition that the Fourteenth Amendment protects the [incorporated Fourth Amendment] rights of students against [unreasonable searches and seizures] by public school officials."); *see also Reese*, 127 F.4th at 591; *Lara*, 125 F.4th at 437; *Worth*, 108 F.4th at 691. It would make no sense to interpret "the people" in the Second Amendment to have a different meaning than it does in the First and Fourth Amendments, particularly when it "seems to have been a term of art employed in select parts of the Constitution." *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). And "[w]hen the term *the people* is made use of . . . in all the enumerations and guaranties of rights [in the Constitution] the whole people are intended." THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68 (1880); *accord Heller*, 554 U.S. at 580–81. Even where "the people" does not appear, *every other* constitutionally protected right includes *at least* those 18 and older. *Hirschfeld*, 5 F.4th at 422–23 (noting that the right to jury trial, voting, marriage, and sex apply at least to those 18 years old).

22

*Second*, the Amendment includes a "prefatory clause" which begins: "[a] well regulated Militia, being necessary to the security of a free State . . . ." U.S. CONST. amend. II. As *Heller* explained, this clause "announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599. As such, although the right is not limited to those who were in the militia or eligible for militia service at the Founding (it is unquestionably broader and includes, for example, women), "[l]ogic demands that there be a link between the stated purpose and the command." *Id.* at 577. Accordingly, if an individual would have been a member of the "militia," *at least* he must be part of "the people" protected by the Amendment. Indeed, "*Heller* confirmed that the 'militia' in colonial America consisted of '*a subset* of the people—those who were male, able bodied, and within a certain age range.' " *Jones*, 34 F.4th at 718 (quoting *Heller*, 554 U.S. at 580) (emphasis added). If "the militia" was a subset of "the people," it necessarily follows that all members of the militia also were members of "the people." Indeed, no other reading makes any sense—if the stated purpose of the Second Amendment is to protect the existence of the "militia," then those in the militia *must* be protected.

23

That means that the Second Amendment extends to protect the rights of 18-year-olds. When the Second Amendment was ratified, the "militia" was understood to include, in the unanimous judgment of the federal government and every state in the union, all male citizens of at least 18 years of age, *Jones*, 34 F.4th at 718–19 & App'x 2 (collecting post-ratification state militia laws). This is apparent from Congress's initial exercise of its power to "provide for organizing, arming, and disciplining, the Militia." U.S. CONST. art. I, § 8, cl. 16. The Militia Act of 1792, ch. 33 § 1, 1 Stat. 271, passed by the Second Congress just months after the Second Amendment was ratified. That law generally "commanded that every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." *Jones*, 34 F.4th at 719 (quoting *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (alterations omitted)). As a contemporaneous act of Congress, the Militia Act provides extraordinarily powerful evidence that individuals by 18 were understood to be part of the militia and therefore among the people protected by the Second Amendment.

> [M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying

24

state legislatures as to what was meant by 'Militia' in the Second Amendment.

*Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570; *see also Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) ("[T]his Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given the Constitution's provisions." (cleaned up)).

The legislative history of the Militia Act lends further support. In 1790, Secretary of War Henry Knox submitted a militia plan to Congress providing that "all men of the legal military age should be armed," and that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen." 2 ANNALS OF CONGRESS 2145–46 (Joseph Gales ed., 1834). Representative Jackson explained "that from eighteen to twenty-one was found to be *the best* age to make soldiers of." *Id.* at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended for beginning militia enrollment. In an enclosure to a 1783 letter to

25

Alexander Hamilton, General Washington—who as President in 1792 signed the Militia Act into law—wrote that "the Citizens of America … from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at Short Notice on any very interesting Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938).

Shortly after the federal age for militia participation was set at 18, every state set the age at 18 as well. *Jones*, 34 F.4th at 719 & App'x 2. Plaintiffs are unaware of even a single state that exempted 18-to-20-year-olds from militia service at the time the Second Amendment was ratified. Indeed, a comprehensive survey of over 250 separate state and colonial provisions enacted from the seventeenth through the end of the eighteenth century found that the minimum "age for militia duty" was never higher than 18 "except for one 19-year period in Virginia [between 1738 and 1757]." David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 533 (2019).

To be clear, Plaintiffs do not contend that these militia laws somehow *extended* Second Amendment rights to 18-year-olds. Indeed,

26

*Heller* made clear that the Second Amendment enshrines "an individual right unconnected with militia service." 554 U.S. at 582. Instead, the point is that "the well-regulated Militia" referred to in the Amendment's prefatory clause, which the Constitution understood to be an entity "already in existence" made up of "all able-bodied men," is the "pool" from which

> Congress has plenary power to organize the units that will make up an effective fighting force. That is what Congress did in the first Militia Act, which specified that each and every free able-bodied white male citizen . . . who is or shall be of the age of eighteen years . . . shall severally and respectively be enrolled in the militia.

*Id.* at 596 (quoting Act of May 8, 1792, ch. 33 § 1, 1 Stat. 271) (quotation marks omitted). Given that "the federally organized militia may consist of a subset of" the "militia" referenced in the Second Amendment, but nevertheless *must* draw from that larger body, the unanimous inclusion of 18-to-20-years-old in organized militias at or shortly after the ratification of the Second Amendment establishes that they *must* have been within the militia referenced by the Second Amendment. *Heller*, 554 U.S. at 596. "Eighteen-to-twenty-year-olds therefore must be covered by the plain text of the Second Amendment, as they were compulsorily enrolled in the regiments that the Amendment was written to protect."

27

*Reese*, 127 F.4th at 583. As the district court correctly concluded, "individuals aged 18 to 20 fall within the plain meaning of 'the people' for purposes of the Second Amendment. 1-ER-0010.

### B. The Right to Acquire Firearms Is Inherent In The Right to "Keep and Bear" Them.

The district court erred, however when it concluded that the right to "keep and bear" arms did not extend to the right to purchase them and held that the Semiautomatic Rifle Ban and Hunting License Requirement fell outside of the scope of the Second Amendment's plain text for that reason.

The text itself shows that purchasing firearms must be covered activity. The Supreme Court has explained that to "keep" in this context means that Americans have a right "to retain in one's power or possession," *i.e.*, to "have weapons." *Heller*, 554 U.S. at 582 (analyzing Founding-era dictionaries). Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). The right to "have weapons" " 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704

28

(7th Cir. 2011)); *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024) ("[O]ur court has consistently held that the Second Amendment also 'protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense' … [and] we acknowledged that unless the right to *acquire* firearms receives some Second Amendment protection, the right to keep and bear arms would be meaningless." (quoting *Teixeira*, 873 F.3d at 677)); *see also Reese*, 127 F.4th at 590 ("[T]he right to 'keep and bear arms' surely implies the right to purchase them."); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), *abrogated on other grounds by Bruen*, 597 U.S. at 19 ("[T]he right to possess firearms for protection implies a corresponding right to obtain bullets necessary to use them." (quoting *Ezell*, 651 F.3d at 704)); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), *abrogated on other grounds by Bruen*, 597 U.S. at 19 (The conclusion that "there would be no constitutional defect in prohibiting the commercial sale of firearms . . . would be untenable under *Heller*."); *Ill. Ass'n of Firearm Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ("This right must also include the right to *acquire* a firearm."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms,

29

necessarily involves the right to purchase them."); *see also Heller*, 554 U.S. at 583 n.7 (collecting laws).

Nevertheless, the district court held that neither the Hunting License Requirement nor the Semiautomatic Rifle Ban even implicated the text of the Second Amendment because it viewed both as "conditions and qualifications on the commercial sale of arms." 1-ER-0011 (quoting *Heller*, 554 U.S. at 626–27). This Court explained in *B&L*, that "commercial restrictions presumptively do not implicate the plain text of the Second Amendment," and determining whether a commercial regulation *does* implicate the plain text requires asking "whether a challenged regulation meaningfully impairs an individual's ability to access firearms." 104 F.4th at 119. Applying this decision here, the district court found that neither the Semiautomatic Rifle Ban nor the Hunting License Requirement implicated the Second Amendment at all because neither could be shown "meaningfully impair 18-to-20-year-olds access to firearms" and faulted Plaintiffs for failing to offer evidence to the contrary. 1-ER-0014.

That decision was, as discussed below, wrong on its own terms, but it was primarily faulty for having overread *B&L*. *B&L* did not hold that

30

*any* law that regulates the *acquisition* of firearms is a "condition or qualification" subject to its mode of analysis to determine whether the plain text is implicated. Indeed, *B&L* itself echoed *Teixeira*'s assurance "that unless the right to *acquire* firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless," *B&L*, 104 F.4th at 118 (citing *Teixeira*, 873 F.3d at 677), and it further stated that "a ban on all sales of a certain type of gun or ammunition in a region generally implicates the Second Amendment, as such a ban meaningfully constrains the right to keep and bear that firearm or ammunition," *B&L*, 104 F.4th at 119. The *B&L* panel contrasted such restrictions, *which did implicate the Second Amendment*, with much narrower laws placing "a minor constraint on the precise locations within a geographic area where one can acquire firearms" like the law at issue in that case, which merely prohibited sales of firearms on fairgrounds. *Id.* Indeed, since *B&L* this Court has reiterated: "[T]he purchase and acquisition of firearms is conduct that is protected by the plain text of the Second Amendment." *Yukutake*, 130 F.4th at 1090; *see also Nguyen v. Bonta*, No. 24-2036, slip op. at 11 (9th Cir. June 20, 2025) ("[I]f the Second Amendment's plain text protects the ability to possess

31

multiple arms, which we conclude it does, then it also protects the ability to acquire multiple arms."). In so doing, this Court made clear that the line drawn in *B&L* is "between laws that govern acquisition *simpliciter* and laws that merely restrict one particular *means* of acquiring a firearm" such that laws that constitute a "*general* regulation of firearms purchasing would restrict conduct covered by the plain text of the Second Amendment," even if a claim to purchase a firearm in a particular location would not. *Yukutake*, 130 F.4th at 1091. In other words, *B&L*'s "meaningful impairment" test governs only "discrete commercial restrictions" but has no application to "across-the-board regulation of the acquisition of handguns" or any other type of arm. *Id.*

Both the Semiautomatic Rifle Ban and the Hunting License Requirement are "across-the-board regulation[s]" that fall within the Second Amendment's plain text under *Yukutake*. Both are categorical restrictions on the types of firearms that 18-to-20-year-olds can acquire—centerfire, semiautomatic rifles not at all, and other long guns not at all without a hunting license.

This result accords with the plain meaning of the Second Amendment much better than the district court's contorted reading. In

32

the district court's view, *anything* related to sales was presumptively unprotected and outside the scope of the Amendment's text. But that "is not a fair reading of its text. No reasonable person at the time of the Second Amendment's adoption would have thought that it[] … protects only the possession of those guns that thereafter either suddenly and miraculously appear in one's home or that the state *allows* you to acquire." *Id.*

The district court's analysis is also out of step with the Supreme Court's rejection of interest balancing for Second Amendment cases. While *B&L* rejected the argument that asking whether a regulation that, in fact, only regulated the *place* where firearms could be purchased "meaningfully constrains" firearm acquisition was equivalent to the old interest-balancing regime, *see B&L*, 104 F.4th at 119, asking whether a regulation that *actually* forbids certain people from purchasing certain firearms nevertheless provides *some* means of acquiring firearms is precisely the sort of analysis the Supreme Court has forbidden. As *Yukutake* explained, such an analysis "effectively resurrect[s] the very framework that *Bruen* rejected, in which the pre-*Bruen* lower courts held that the restrictions on the 'core' of the Second Amendment right are

33

subject to one type of analysis, while restrictions on 'ancillary,' non-core Second Amendment rights are subject to a very different analysis." 130 F.4th at 1092. And finally, the district court's approach *must* be wrong because it would relegate the Second Amendment to "second class status" by permitting "all manner of harassing limitations on the acquisition of firearms, *without any constitutional scrutiny whatsoever*, so long as those limitations fall short of ultimately preventing a citizen from possessing firearms for self-defense. … We would not decline to apply *any* First Amendment scrutiny to laws imposing special temporal or procedural restrictions on purchases of available copies of expressive works, merely on the ground that the plaintiff was *ultimately* able to obtain access to the work." *Id.*

Nevertheless, even if this Court concludes that Plaintiffs' claims should be subject to *B&L*'s "meaningful constraints" test, both the Semiautomatic Rifle Ban and the Hunting License Requirement meet that threshold. Take the Semiautomatic Rifle Ban first. By banning ordinary 18-to-20-year-olds from acquiring common semiautomatic rifles, it exacts a much more significant constraint on the ability of 18-to-20-year-old Californians to access firearms than was present in *B&L*. In

34

*B&L*, the law at issue merely forbade the sale of firearms on state grounds, like fairgrounds, so an individual who was eligible to acquire a firearm in California could not purchase one at a gun show held on state fairgrounds, but that same individual could easily visit a licensed dealer and purchase a firearm at his place of business. In other words, the law at issue was a restriction on *where* a commercial transaction could take place, not *whether* it could take place. Here, the opposite is true. An 18-to-20-year-old cannot go *anywhere* in the state and purchase a centerfire, semiautomatic rifle. Unlike the *B&L* law, which could plausibly be characterized as a "condition or qualification on the commercial sale of arms" in that it placed a condition on where such sales could occur, the law at issue here is a *ban* on the sale of arms, and so it falls outside the scope of *B&L* entirely (and within the scope of the Second Amendment's text). Indeed, *B&L* itself stated that "a ban on all sales of a certain type of gun or ammunition in a region generally implicates the Second Amendment, as such a ban meaningfully constrains the right to keep and bear that firearm or ammunition." 104 F.4th at 119 (citing *Jackson*, 746 F.3d at 968. That is precisely what the Semiautomatic Rifle Ban does here. *See Jones*, 34 F.4th at 723 ("[T]he semiautomatic rifle ban is more

35

aptly characterized as a 'prohibition' " than a "condition or qualification.").

Any doubt on this score is removed by this Court's recent decision in *Nguyen*. There, this Court held that California's "one-gun-a-month" law, which limited firearms purchasers to one firearm purchase per 30-day period, passed *B&L*'s threshold test because it intentionally delayed protected purchases of firearms, and effectively "temporally meter[ed] the exercise of constitutional rights." *Nguyen*, slip op. at 12. If a law that *allows* purchases of firearms, albeit on a delayed basis, meaningfully constrains the exercise of the right, then a law that blocks them altogether must as well.

Nevertheless, the district court held that the Semiautomatic Rifle Ban was not a meaningful constraint on the ability to acquire arms, because there were, on average, 437 semiautomatic rifles sold per year to 18-to-20-year-olds in 2020-2022 under the exception for sales to members of the police and military. 1-ER-0014. The district court criticized Plaintiffs for failing to rebut this evidence with their own evidence "to suggest that the relatively low number of semiautomatic centerfire rifles sold as compared to other types of long guns is due to Section 27510." *Id.*

36

But the "evidence" of that fact is the language of the statute itself *forbidding* ordinary 18-to-20-year-olds, unless they join the military or become police officers, from acquiring firearms. No evidentiary work needs to be done to see that the plain language of the statute places a direct barrier between Plaintiffs and acquiring the common semiautomatic rifles that they wish to buy. *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992) (noting that standing is straightforward to prove where there is actual harm caused by a statute's plain text). Indeed, the simple fact that the sales that the district court pointed to were sales that are *explicitly exempted* from the Ban's coverage demonstrates that the Ban itself limits access to the banned firearms. *See* 1-ER-0014. It surely cannot be an answer to a ban of this type that individuals could, if they wanted to, acquire such a firearm by joining the military. (Notably, this exception is even narrower than it appears, as many police departments in California require officers to be at least 21 years old. *See, e.g., FAQ, Minimum Qualifications*, JOIN SFPD, https://perma.cc/WC8V-L7F6 ("Applicants must be at least 20 years old when they take the examination. 21 years of age by the time of appointment.")). Finally, the district court overlooked straightforward

37

evidence that the Semiautomatic Rifle Ban does impede the purchase of centerfire, semiautomatic rifles—the testimony and discovery responses of Plaintiffs and their members stating that they would, if not for the Ban, purchase such rifles. *See, e.g.*, 4-ER-0592–93 (Declaration of Destiny Garcia).

The district court's decision regarding the Hunting License Requirement was incorrect for the same reasons. Again, if the Hunting License Requirement is analyzed under *B&L*'s framework at all, it is at least as significant a restriction on the right as the one present in *Nguyen*, since it delays the acquisition of firearms until the purchaser obtains an utterly irrelevant hunter license. Getting a hunting license "requires [individuals] to first take and pass a hunter education class" which can be either in-person or hybrid and "takes approximately ten hours." *Jones*, 34 F.4th at 727; *see also Hunting Licenses: Hunter Education Requirements*, CAL. DEP'T OF FISH & WILDLIFE, https://perma.cc/A2FD-EWV4. Once an individual has completed the required educational course, they must then pay a $62.90 licensing fee. *Hunting License Items and Fees*, CAL. DEP'T OF FISH & WILDLIFE, https://perma.cc/K4RQ-V76C. Nevertheless, the district court again

38

noted that, despite this impediment, 18-to-20-year-olds manage to acquire firearms in California anyway. But as noted above, the fact that some people *surmount* an obstacle does not mean the obstacle is not meaningful—after all, the *Nguyen* law did not stop *anyone* from acquiring a firearm but that was nevertheless held to be a meaningful constraint.

## II. There Is No Historical Justification for the Semiautomatic Rifle Ban or the Hunting License Requirement.

Because Plaintiffs' proposed conduct is covered by the plain text of the Second Amendment, the question of the Semiautomatic Rifle Ban's and the Hunting License Requirement's constitutionality is one to be answered through *Bruen*'s historical analysis. *Bruen* and *Rahimi* provide significant guidance to this Court in conducting this analysis. First, evidence from the Founding era, when the Second Amendment was ratified, has controlling weight. *Bruen*, 597 U.S. at 34–35; *accord Lara*, 125 F.4th at 438–43 (holding that 1791 is the most probative period); *Worth*, 108 F.4th at 692 ("*Bruen* strongly suggests that we should prioritize Founding-era history."). *Bruen* was explicit that "not all history is created equal." 597 U.S. at 34; *see also id.* at 36 (Sources originating " '75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.' "

39

(quoting *Heller*, 554 U.S. at 614)). This is because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35. The people adopted the Second Amendment in 1791, so the public understanding of the right at that time is crucial to understanding any limits on the scope of that right. *Bruen*, 597 U.S. at 37; *see also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://perma.cc/75MP-MHFS. Consequently, evidence that long pre- or post-dates 1791 is less probative, *Bruen*, 597 U.S. at 35–37; and laws from the 20th-century are categorically too late to matter, *id.* at 66 n.28.

To be sure, this Court has previously concluded that it may "look to historical regulations extant when the Second and Fourteenth Amendments were adopted in 1791 and 1868, respectively," in conducting the *Bruen* analysis. *United States v. Duarte*, 137 F.4th 743, 755 (9th Cir. 2025); *see also Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024) ("[A]t least when considering the 'sensitive places' doctrine, we look to the understanding of the right to bear arms <u>both</u> at the time of the ratification of the Second Amendment in 1791 <u>and</u> at the time of the

40

ratification of the Fourteenth Amendment in 1868."). But in so doing, the Court has expressly reserved the question of what value, if any, evidence from 1868 has when it runs contrary to evidence from the Founding. *See Duarte*, 137 F.4th at 755 n.8 ("The Supreme Court has not resolved this issue, and we need not decide it here, as the historical evidence from both periods is consistent."); *see also Duncan v. Bonta*, 133 F.4th 852, 870 n.4 (9th Cir. 2025) (en banc) ("We need not address that issue here, because the relevant historical traditions, discussed below, all began at the time of the Founding or earlier.").

*Bruen*'s reasoning in fact provides an answer to this question and compels the conclusion that evidence from 1868 cannot overcome a lack of evidence from 1791 supporting a given restriction on the right. After initially rejecting "medieval English regulations," *Bruen*, 597 U.S. at 40; *accord United States v. Rahimi*, 602 U.S. 680, 694 (2024) (rejecting English traditions that failed to make it to "this side of the Atlantic"), *Bruen* turned to sources leading up to the ratification of the Second Amendment, including the 1689 English Bill of Rights, *see* 597 U.S. at 44–45. But the Court placed notably less weight on these English sources than it did on "the history of the Colonies and early Republic," and

41

especially "the first decade after [the Second Amendment's] adoption." *Id.* at 46, 50. And it found that the challenged law had "no historical basis" because no analogue in that relevant historical period supported it. *Id.* at 50. Later evidence was much less important. After canvassing the historical evidence from English, Colonial, Early Republic, and Reconstruction periods the Court separately discussed the late-19th century. *Id.* at 60–70. But the Court found that much of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect 'the origins and continuing significance of the [Second] Amendment.'" *Id.* at 67 (quoting *Heller*, 554 U.S. at 614). Thus, the Court declined to rely on such laws and regulations. *See Bruen*, 597 U.S. at 66–68; *accord Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (holding that "more than 30" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions were not grounded in Founding era practice). *Bruen* thus cautioned lower courts to "guard against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35.

42

*Bruen* therefore strongly supports the conclusion that the Founding era is the primary benchmark against which historical evidence from later time periods must be measured, even if the Court formally left open the question whether 1791 or 1868 is the controlling date for constitutional analysis. *See id.* at 37 (noting that "19th-century evidence [has been] treated as mere confirmation of what the Court thought had already been established" (internal quotation marks omitted)); *accord Jones*, 34 F.4th at 722 ("19th-century sources may be relevant to the extent they illuminate the Second Amendment's original meaning, but they cannot be used to construe the Second Amendment in a way that is inconsistent with that meaning." (quoting *NRA v. ATF*, 714 F.3d 334, 339 n.5 (5th Cir. 2013) (Jones, J., dissental)); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012); *Lara*, 125 F.4th at 438–43; *Worth*, 108 F.4th at 692. Restrictions on the right to keep and bear arms adopted after the Founding era may be looked to for confirmation of what earlier history shows but cannot alone establish the historical tradition of regulation required by *Bruen*. *See Bruen*, 597 U.S. at 37 ("*Heller*'s interest in mid- to late-19th-century commentary was secondary" to the more important Founding-era evidence about the scope of the right.). Only "enduring" and

43

"well-established" restrictions with roots in the Founding are relevant in assessing whether the challenged restrictions comport with the text's "unqualified command." *Id.* at 17, 30–31 (last quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)); *see also Rahimi*, 602 U.S. at 692.

Second, *Bruen* held that forming a historical tradition requires proof of representative, relevantly similar analogues. As *Rahimi* explained, such historical laws must evidence the "principles that underpin our regulatory tradition" and conform to those that "underly[] the Second Amendment." 602 U.S. at 692. Analogues are representative, therefore, if they are broadly applicable and widely accepted. A small number of state laws that are disconnected, in principle, to earlier or later enactments is not a "historical tradition" of regulation sufficient to inform the original public meaning of the right at the Founding. *Bruen*, 597 U.S. at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" and rejecting regulations applying to only 1% of the population (emphasis omitted)). Put differently, laws existing in only a few jurisdictions—

44

historical "outliers"—should be disregarded. *Id.* at 30 (internal quotation marks omitted).

Third, any analogues must be "relevantly similar" based on "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id.* The "principles" to be applied in assessing a modern statute's constitutionality come from the analysis of this relevant similarity. *Rahimi*, 602 U.S. at 692. Thus, historical laws arising in different contexts, and for different reasons, are inapt comparators to a modern law, since they are not motivated by the same underlying principles. *See, e.g.*, *id.* ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.").

## A. History Demonstrates That The Second Amendment Protects 18-to-20-Year-Olds.

Well before the Founding era, the tradition of 18-to-20-year-olds "keeping and bearing arms [was] deeply-rooted in English law and custom" and "was brought across the Atlantic by the American colonists."

45

*Jones*, 34 F.4th at 717. There were, quite simply, *zero* laws during this time period that directly restricted the right of 18-to-20-year-olds to acquire firearms. Indeed, quite the opposite, there were laws *requiring* them to provide themselves with firearms. In 1792, just months after the ratification of the Second Amendment, the Second Congress enacted the Militia Act of 1792 which required, in part, that "every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as herein excepted) shall severally and respectively be enrolled in the militia." Act of May 8, 1792, ch. 33 § 1, 1 Stat. 271. The law further required that "every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock." *Id.* Following the example of the federal law, in the period immediately after ratification of the Second Amendment, every state in the Union set the age for militia enrollment at 18, effectively requiring 18-year-olds across the country to acquire firearms. *See Jones*, 34 F.4th at 718–19, 739 (App'x 2) (collecting post-ratification state militia laws). These militia laws, while not *extending* Second Amendment rights to 18-to-20-year-olds, are "clear and germane evidence that eighteen-to-twenty-year-olds enjoyed

46

the same Second Amendment rights as their twenty-one-year-old peers at the founding." *Reese*, 127 F.4th at 596; *see also Lara*, 125 F.4th at 444 ("[T]he Second Militia Act is good circumstantial evidence of the public understanding at the Second Amendment's ratification as to whether 18-to-20-year-olds could be armed, especially considering that the Commissioner cannot point to a single founding-era statute imposing restrictions on the freedom of 18-to-20-year-olds to carry guns."). "[T]here is not just a vacuum at the founding era: instead, the founding-era evidence of militia membership undermines Defendants' interpretation." *Jones*, 34 F.4th at 722.

Furthermore, in addition to militia service, 18-to-20-year-olds were obliged, at the Founding, to assist law enforcement and bear arms as part of the *posse comitatus*, which "allowed sheriffs and others to compel citizens to serve in the name of the state to execute arrests, level public nuisances, and keep the peace, upon pain of fine and imprisonment." *Id.* at 718 (cleaned up). In doing so, they were required to bring "such arms or weapons as they have or can provide." Kopel & Greenlee, *supra*, at 534 n. 253; *see also Reese*, 127 F.4th at 598. Similarly, at common law, by age

47

18 all able-bodied men "were obliged to join the 'hue and cry' (*hutesium et clamor*) to pursue fleeing criminals." Kopel & Greenlee, *supra*, at 534.

**B. The District Court's Contrary Approach to History Is Deeply Flawed.**

The district court nevertheless held that Founding era history supported California's restrictions on 18-to-20-year-olds because individuals in that age group were considered minors for most purposes at the Founding. 1-ER-0017–18. This legal reality, the district court held, amounted to a practical restriction on the rights of individuals in this age group to acquire firearms for two reasons: first, minors were subject to the control of their parents, and second, minors had restrictions on their ability to contract for the purchase of goods unless those goods were "necessaries" which, the district court determined, firearms were not. 1-ER-0018. These restrictions also provided the district court with its justification for rejecting the militia laws as relevant evidence for similar reasons; it noted that although 18-to-20-year-olds were required to *have* firearms, the militia laws were "consistent with the Founding Era restrictions placed on the 18-to-20-year-olds' ability to purchase firearms" because in some states the militia laws made the parents

48

responsible for acquiring firearms for their children or held them liable for their children's failure to do so. 1-ER-0021.

As to each of these points, the district court's reasoning was flawed, but before addressing the errors specific to each conclusion, there is a global problem with the district court's analysis. Even assuming (contrary to the evidence, as discussed below) that 18-to-20-year-olds' firearm rights at the Founding were limited by the restrictions the district court identified, 18-to-20-year-olds are *adults* today, and all of these restrictions that the district court relied upon from the Founding were *incidental* to minority status. That distinction matters for two reasons. First, it is definitional that an adult has the "full enjoyment of his civil and political rights." JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1854). Indeed, every other constitutional right, including those not enumerated explicitly in the constitution, indisputably applies to 18-year-olds. *Hirschfeld*, 5 F.4th at 422–23. The Second Amendment "is not a 'second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' " *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780). If that is true, the right to keep and bear

49

arms cannot be the *only* constitutionally protected right that is denied to a subset of adult Americans.

Second, the distinction between adult and minor was a meaningful one, and that defeats any possible analogy under *Bruen* between restrictions on adults today to limits on children at the Founding. The Supreme Court requires that historical restrictions and modern restrictions be animated by the same "principles," *Rahimi*, 602 U.S. at 692 or, put another way, the historical and modern restrictions must be "relevantly similar" in both "how and why" they limit the right to bear arms, *Bruen*, 597 U.S. at 29. An incidental restriction on a *minor* is simply not the same as a direct restriction on an *adult*, because an adult is responsible for himself and his own care and protection in a way that a minor is not. The same historical sources on which the district court relied make this point clear and defeat any analogy to limits on modern adults. For instance, the district court at several points cited Blackstone for the proposition that 18-to-20-year-olds as "minors" were subject to various legal disabilities and subject to the control of their parents. *See*, e.g., 1-ER-0018 ("*Blackstone*['s] *Commentaries* was 'a primary legal authority for 18th- and 19th-century American lawyers." (quoting

50

*Washington v. Glucksberg*, 521 U.S. 702, 712 (1997)). But in the same chapter in which Blackstone discussed the disabilities of "infants," he made clear that "their very disabilities are privileges; in order to secure them from hurting themselves by their own improvident acts. An infant cannot be sued but under the protection, and joining the name, of his guardian; *for he is to defend him against all attacks as well by law as otherwise*." WILLIAM BLACKSTONE, 1 COMMENTARIES ON THE LAWS OF ENGLAND 452 (1765) (emphasis added). In other words, it was inherent in the restrictions placed upon minors that they went hand in hand with, and were compensated for, by the guardian's own duty to *protect* the minor in his care. The State today wishes to place the same disabilities on legal adults, who lack that compensation. That sort of mechanical application of putative historical rules without care for the fact that the principles underpinning those historical rules do not apply today is precisely the sort of "law trapped in amber" legal reasoning that *Rahimi* definitively rejected. 602 U.S. at 691.

The flaws of this approach are apparent given that the district court's analogy between adults today and minors at the Founding on the basis that both groups include 18-to-20-year-olds would equally permit

51

the State to ban the sale of firearms to married women. At the Founding, husbands had significant power to regulate the activities of their wives under the doctrine of coverture. At the time, a husband's control over his wife was so complete that "the very being or legal existence of a woman is suspended during the marriage" and "under [her husband's] wing, protection, and cover, she performs every thing; and is therefore called in our law-french a *feme-covert*." Blackstone, *supra*, at 430. As with a minor and his father, this manifested most notably in restrictions on the wife's ability to contract. "Married women [were], by the law of England, subject, in matters of contract, to a greater disability even than infants; for the contracts of an infant [were], as hath been shewn, for the most part only voidable, while those of married women [were], with few exceptions, absolutely void." PEREGRINE BINGHAM, THE LAW OF INFANCY AND COVERTURE 161 (1816). The notable exception was, again, the ability to acquire "necessaries." "The husband is bound to provide his wife with necessaries by law, as much as himself; and if she contracts debts for them, he is obliged to pay them: but for anything besides necessaries, he is not chargeable." Blackstone, *supra*, at 430. Thus, just as an 18-to-20-year-old minor was under the care and protection of his father at the

Founding and limited in his ability to contract for and acquire goods, a married woman was in precisely the same situation—and if those historical restrictions can support a modern ban on adult 18-to-20-year-olds today, then they can equally support restrictions on married women today.

Of course, that is absurd. California could not justify a modern-day ban on married women buying firearms on the grounds that married women at the Founding would have been subject to certain legal disabilities that could have functionally amounted to an effective ban on their ability to acquire firearms. Marriage today is different and married women are subject to very different expectations and rules. But that is precisely the point. Eighteen-to-twenty-year-olds today are not minors, they are adults who are legally responsible for managing their own affairs and providing for their own care and protection. Treating them as though they are still subject to the historical burdens that came along with their now inapplicable status is as nonsensical as it would be to treat married women as though they were "femes covert" in 2025.

That overarching error is reason enough to reject the district court's reliance on the fact that 18-to-20-year-olds were minors at the Founding

53

to justify the Semiautomatic Rifle Ban and Hunting License Requirement. But there are other problems with its analysis. For instance, although the district court posited that both parental control and contracting rules operated as *de facto* limitations on the rights of 18-to-20-year-olds, that was simply not true. As the district court acknowledged, individuals in this age range were *required* by law to acquire a musket or similar long gun and be acquainted with its use in order to serve in the militia. *See, e.g., Jones*, 34 F.4th at 738, App'x 2; *see also Reese*, 127 F.4th at 596. To the extent that these laws required, in some instances, parents to acquire arms for their sons, or made them liable if their sons failed to do so, they directly refute the district court's assumption that parents were using their authority to preclude their 18-year-old children from acquiring arms. 1-ER-0020.

The district court's reliance on the limitations on minor contracting rights is similarly misguided because those limitations legally could not have impeded the acquisition of firearms, because they would have been considered "necessaries" for which an 18-year-old could form a binding contract. As Lord Coke explained, "generally whatsoever an infant is bound to do by law, the same shall bind him, albeit he does it without

54

suit at law." Co. Litt. 172a (emphasis omitted). And given that 18-to-20-year-olds were *required* to be armed by law, it follows that they could bind themselves to a contract to acquire those required arms.

The district court's contrary authority was a single case from South Carolina, which it read to establish that firearms were *per se* not "necessaries" because the court concluded in that case that "liquor, pistols, powder, saddles, bridles, whips, fiddles, fiddle-strings, &c." were not necessaries for that minor. *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. 572, 572 (S.C. Const. Ct. App. 1822). Notably, this single decision formed the basis for both the Fourth and the Eleventh Circuit's misguided decisions along the same lines as the district court's in this case. *See NRA v. Bondi*, 133 F.4th 1108, 1118 (11th Cir. 2025); *McCoy v. ATF*, No. 23-2085, 2025 WL 1702193, at *5 (4th Cir. June 18, 2025). But this overreads *Saunders Glover* and fundamentally misunderstands how the system of "necessaries" worked. First, *Saunders Glover* does not establish that a firearm was not a "necessary" even in that particular minor's case. The Court's decision, which provided no explanation for its conclusions, pertained only to "pistols" which were not the primary arms used either in militia or for most other purposes at the Founding.

55

Second, *Saunders* did not establish that even "pistols" were *per se* not necessary, only that they were not necessary in that case. The district court was wrong to treat the world as divided neatly into items that were "necessaries" and other items for which minors could not contract. While there were, in fact, a few things that were *per se* necessaries—food, lodging, and educational expenses appear to have been always accepted as necessaries for which a minor could contract, *see, e.g.*, Blackstone, *supra* at 454—outside of those items whether an item was a necessary was a "question of circumstance—not only of age but also of station in life." *Peters v. Fleming*, 6 M. & W. 42 (Ex. 1839); *see also Van Valkinburgh v. Watson & Watson*, 13 Johns. 480 (N.Y. Sup. Ct. 1816); JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW 239 (1848) ("The question of necessaries is governed by the real circumstances of the infant."). And even "pistols" were undoubtedly necessary to individuals in some circumstances. For instance, future President Andrew Jackson, who was a practicing attorney at 20 despite being a "minor," purchased a pair of pistols and a rifle for his self-defense when he moved to (what would become) Tennessee. *See* HENDRIK BOORAEM, YOUNG HICKORY: THE MAKING OF ANDREW JACKSON 195, 199 (2001). The purchase was,

evidently, judged to be necessary by the merchant who agreed to sell to a minor. And more pertinent to this case, other firearms like muskets were unquestionably necessary in many "stages of life" including, not least, that period when an individual was required by law to arm himself or was otherwise responsible for his own protection. Indeed, firearms at the Founding were critical in effectively *all* stages of life for personal and familial protection. As one indicator of the necessary position that firearms occupied in the American households of the time, several states specifically exempted firearms from any form of otherwise legal seizure. *See, e.g.*, AN ACT FOR SETTLING THE MILITIA, 3 WILLIAM W. HENING, THE STATUTE AT LARGE OF VIRGINIA 339 (1823) (enacted 1705); 1 THE LAWS OF THE STATE OF VERMONT, DIGESTED AND COMPILED, ch. 31 § 1, 321 (Wright 1808) (enacted 1797). A review of probate records found that firearms were more commonly owned (by almost two times, in fact) than Bibles, and while less commonly possessed than beds or cooking utensils, were more common than *chairs*. *See* James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 WM. & MARY L. REV. 1777, 1801 (2002); *see also* Brief of Amicus Curiae The Second Amendment Foundation in Support of Petitioner at 6–16, *NRA v. Glass*, No. 24-1185

57

(U.S. June 20, 2025) (discussing this and other Founding-era evidence that firearms would have been considered "necessaries").

Next, even assuming, contrary to all this evidence, that parental restrictions and contracting rules were a meaningful limitation on acquisition of firearms, and leaving aside the critical fact that 18-to-20-year-olds are not minors today, a father or mother's decision not to allow their son or daughter to acquire a firearm is not "relevantly similar" to a State barring that person from participating in the commercial firearms market. As the Supreme Court has made clear in the First Amendment context (which it has frequently drawn on to explain its method of analysis in the Second Amendment context, *see Bruen*, 597 U.S. at 24) the state cannot arrogate to itself the authority of a parent in controlling the exercise of even a minor's rights. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). So too here—even if parents still had authority to bar their 18-to-20-year-old sons and daughters from acquiring firearms today (and they do not), it would be inappropriate for the State to supplant that authority with its own.

Finally, later history strongly suggests that the district court misunderstood the ability of 18-to-20-year-olds to purchase firearms at

58

the Founding. The court asserted that these de jure and de facto limits on minors "obviated more specific regulation" on the rights of 18-to-20-year-olds to acquire firearms. 1-ER-0019. But as will be discussed shortly, the latter half of the 19th century brought exactly that sort of "specific regulation" on minors purchasing firearms that the district court claimed was unnecessary, even though they were still minors and still subject to contracting disabilities and the authority of their parents. The district court's historical story fails to account for this fact.

### C. The State's 19th-Century Restrictions Are Too Little And Too Late.

As noted above, where Founding-era history indicates an answer to a question about the breadth of the Second Amendment's protections, later evidence is powerless to contradict that and carve out what would amount to a "new" exception to the Amendment's protections. Because Founding-era history uniformly indicates that 18-to-20-year-olds at the time, and at the very least, all adults, had the right to acquire common firearms, nothing in later history could undercut that conclusion and this Court's analysis can end here. *See Lara*, 125 F.4th at 445. However, if later history *is* analyzed, it further demonstrates that throughout our

Country's history through the end of the 19th Century, the rights of all legal adults to purchase firearms have always been respected.

The district court's evidence was not to the contrary. In fact, it cited *no law* from any time period that purported to limit the rights of legal adults. What it did cite to support its conclusion was weak. First, the court credited an 1803 New York City ordinance directed at curbing "the firing of guns and the practice of fowling in the public streets" by making it illegal to fire a gun within four miles of City Hall. EDWARD LIVINGSTON, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803); *see* 1-ER-0022. But the ordinance is a poor analogue for the laws at issue here because it did not preclude anyone, of any age, from acquiring firearms and it applied equally to everyone, only singling out "minor[s], apprentice[s], servant[s] or slave[s]" who it assumed to be unable to pay the five dollar fine and made their "father, mother, master or mistress" liable for penalties they accrued. Livingston, *supra*, at 83–84. That is in

60

no way "relevantly similar" to the burden placed on 18-to-20-year-olds by the Semiautomatic Rifle Ban or the Hunting License Requirement.

Next, the district court looked to an 1857 law that "prohibited gunpowder sales to minors except with parental permission." 1-ER-0022. Even if that law actually did what the district court claimed, that would not be enough to make it "relevantly similar" to California's modern restrictions, given that 18-to-20-year-olds today are not minors subject to their parents' control. But the district court also misrepresented the statute's scope: by its plain terms, it would not have applied to 18-to-20-year-olds even at the time, as it merely proscribed "retail[ing] gunpowder to minors *under fifteen years of age* … without authority from his parent or guardian." Oliver H. Strattan, A Collection of the State and Municipal Laws, in Force, and Applicable to The City of Louisville, Ky. 175 (1857) (emphasis added).

The district court next turned to laws from Kentucky, Alabama, and Columbia, South Carolina which it claimed "show that laws restricting 18-to-20-year-olds from acquiring firearms were not uncommon," as well as Tennessee law from the same period. 1-ER-0023. To begin with, both the Tennessee law and Alabama law date to 1856 and as such, are the

61

State's earliest putatively similar restrictions. But even if this Court considers these too-late-in-time restrictions, both are distinguishable. The Tennessee law prohibited "selling, loaning, giving, or delivering 'to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except for a gun for hunting or weapon for .defense in traveling.' " 1-ER-0022 (quoting Tenn. Code § 4864 (1858) But that is unlike the Semiautomatic Rifle Ban and Hunting License Requirement, because neither permits an 18-to-20-year-old to be exempt if they wish to use it for self-defense. Furthermore, as the law itself declares, it was targeted only at specific "dangerous weapon[s]" and notably does not include in its list, alongside things like an "Arkansas tooth-pick" the standard rifles and long guns that were the preferred self-defense firearms of the time, and so it is not like the State's ban on ordinary semiautomatic firearms that "traditionally have been widely accepted as lawful possession." *Staples v. United States*, 511 U.S. 600, 612 (1994). And of course, the law explicitly targeted a "minor" not a legal adult like 18-to-20-year-old Californians today. The Alabama law is much the same—it too applied only to "male minors," not adults, and only to a subset of weapons ("bowie knife, or knife or instrument of the like kind

62

or description … or air gun or pistol") that excluded common self-defense firearms of the time. *See* 1856 Ala. Acts. 17. The story with the Kentucky law, 1860 Ky. Acts 245, § 23 (mis-cited by the district court as 1859 Ky. Acts 245, § 23) is much the same. It too applied only to "minors," explicitly carved out an option for their parents to supply them with arms, and also only barred the sale of certain enumerated "deadly weapon[s], which [are] carried concealed." *Id.*; *see also Jones*, 34 F.4th at 720 (discounting laws that only banned the sale of pistols or which had exceptions for parental consent). In addition, as this Court previously noted, the Kentucky law also "restricted firearm access by African Americans" and should be rejected on that basis as well. *Jones*, 34 F.4th at 720.

As for the local restriction from Columbia, South Carolina, it is even less relevant. The law, like the 1803 New York law the district court cited, did not prevent anyone from possessing firearms but rather barred *all people*, regardless of age, from firing a firearm in certain parts of the city. *See* ORDINANCES OF THE TOWN OF COLUMBIA, (S. C.) PASSED SINCE THE INCORPORATION OF SAID TOWN: TO WHICH ARE PREFIXED, THE ACTS OF THE GENERAL ASSEMBLY, FOR INCORPORATING THE SAID TOWN, AND OTHERS IN RELATION THERETO 61–62 (1823). The ordinance only treated

63

minors differently than adults in that it assumed they would "have no ostensible property whereof [the five dollar] penalty can be levied" and so authorized the authorities to seize the unlawfully fired weapon from a minor and sell it if the minor did not pay the fine. *Id.* Unless an 18-to-20-year-old used his firearm unlawfully *and* failed to pay the fee, the law posed no impediment at all to his acquiring or possessing a firearm.

Finally, the district court concluded by declaring that "[b]y the end of the 19th century, nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use firearms." 1-ER-0023 (collecting citations). But this Court in *Jones* already rejected reliance on all those laws, noting that they all applied only to minors. *See Jones*, 34 F.4th at 720. And several of the laws are distinguishable for other reasons including that they, too, targeted only a subset of purportedly "dangerous" or concealable weapons like pistols or revolvers. *See, e.g.*, 1885 Nev. Stat. 51; 1893 N.C. Sess. Laws 468–69; 1883 Wis. Sess. Laws 290. Others, as this Court noted, contained a carve out for parental consent, *Jones*, 34 F.4th at 720; *see also, e.g.* Mo. Rev. Stat § 1274 (1879), while Nevada's law did not limit acquisition at all and only regulated the mode of carriage. *See, e.g.*, 1885

64

Nev. Stat. 51 (banning concealed carry). As such, even if this Court gives serious consideration to these laws, which again, it should not, nothing in the historical record could support the State's restrictions on firearm acquisition by legal adults.

## CONCLUSION

The decision of the district court should be reversed and the Court should remand with instruction to grant summary judgment in Plaintiffs' favor and enjoin the Semiautomatic Rifle Ban and Hunting License Requirement.

Dated: June 30, 2025        Respectfully submitted,

John William Dillion
DILLON LAW GROUP, APC
2647 Gateway Road
Suite 105
Carlsbad, CA 92009
Telephone: (760) 642-7150
jdillon@dillonlawgp.com

/s/ David H. Thompson
David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER AND KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

65

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system, which will transmit the foregoing document via email to all counsel of record.

Dated: June 30, 2025 <span style="float:right;">/s/David H. Thompson</span>

David H. Thompson

<em>Counsel for Plaintiffs-Appellants</em>

66

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-2509

I am the attorney or self-represented party.

**This brief contains** | 13,267 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ David H. Thompson | **Date** | 06/30/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*