**No. 25-2509**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PWGG, LP, et al.,

*Plaintiff-Appellants*,

v.

ROB BONTA, in his official capacity as Attorney
General of the State of California, et al.,

*Defendants-Appellees*.

**On Appeal from United States District Court
for the Southern District of California**
Civil Case No. 3:19-cv-01226-L-AHG
The Honorable M. James Lorenz, Judge

**PLAINTIFF-APPELLANT'S EXCERPTS OF RECORD
VOLUME I**

| | |
|---|---|
| John William Dillion | David H. Thompson |
| DILLON LAW GROUP, APC | Peter A. Patterson |
| 2647 Gateway Road | William V. Bergstrom |
| Suite 105 | COOPER AND KIRK, PLLC |
| Carlsbad, CA 92009 | 1523 New Hampshire Ave. NW |
| Telephone:(760) 642-7150 | Washington, D.C. 20036 |
| jdillon@dillonlawgp.com | Tel: (202) 220-9600 |
| | Fax: (202) 220-9601 |
| | dthompson@cooperkirk.com |

*Counsel for Plaintiff-Appellants*

June 30, 2025



# United States District Court

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jose Chavez, Firearms Policy Coalition, Inc., Firearms Policy Foundation, Andrew Morris, North County Shooting Center, Inc., PWGG, L.P., Second Amendment Foundation, The California Gun Rights Foundation **Plaintiff,** V. Rob Bonta, Allison Mendoza **Defendant.** | Civil Action No.  19cv1226-L(AHG) **JUDGMENT IN A CIVIL CASE** |

**Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED:

Plaintiffs' motion for summary judgment is denied and Defendants' motion is granted at the first step of the Bruen test because Plaintiffs have not met their burden to raise a genuine issue of material fact that Section 27510 meaningfully impairs 18-to-20-year-olds' ability to commercially acquire firearms so as to fall within the plain text of the Second Amendment. Alternatively, Plaintiffs' motion for summary judgment is denied and Defendants' motion is granted at the second step of the Bruen test because Defendants met their burden to show that Section 27510 fits within the historical tradition of firearm regulation and therefore does not violate the Second Amendment.

**Date:**  _____3/26/25_____

**CLERK OF COURT**
**JOHN MORRILL, Clerk of Court**
By:  s/  R. Chapman
_____
R. Chapman, Deputy

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE CHAVEZ, et al.,<br><br>                     Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California, et al.,<br><br>                     Defendants. | Case No.: 19-cv-1226-L-AHG<br><br>**ORDER:**<br><br>**(1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 132]; and**<br><br>**(2) DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT [ECF NO. 136]** |

Plaintiffs and Defendants in this Second Amendment rights case have filed cross-motions for summary judgment (ECF Nos. 132, 136.) Both motions are opposed and fully briefed. The matters are submitted on the briefs without oral argument. *See* Civ. L. R. 7.1(d)(1). For the reasons stated below, Plaintiffs' motion is DENIED and Defendants' motion is GRANTED.

/ / / / /

## I. BACKGROUND[1]

Under California law, all commercial sales of firearms must occur through a federally licensed firearms dealer ("FFL" or "firearms dealer"). Cal. Penal Code §§ 27545, 28050. At issue in the present case is California Penal Code Section 27510 which prohibits FFLs from selling firearms to persons under 21 years of age with certain exceptions.

In 2018, the California Legislature amended Section 27510 by enacting Senate Bill 1100 ("SB 1100") in response to the mass shooting by 19-year-old Nikolas Cruz at Marjory Stoneman Douglas High School in Parkland, Florida. (ECF No. 135, Albrecht Dec. Ex 28 (Aug. 28, 2018, Cal. Senate Floor Analysis, SB 1100)). Among other provisions, SB 1100 restricts the sale, rental, delivery, or transfer of long guns[2] by FFLs to any person under the age of 21 unless the individual has a valid, unexpired hunting license issued by the Department of Fish and Wildlife, is an active-duty police officer or member of the Armed Forces or is an honorably discharged member of the Armed Forces.

In 2019, Section 27510 was further amended by Senate Bill 61 ("SB 61") which limited the sale of semiautomatic centerfire rifles[3] by FFLs to individuals under 21 with exceptions for certain active duty or reserve law enforcement officers and Armed Forces members. (Albrecht Dec. Ex. 37 (Sep. 13, 2019, Cal. Senate Floor Analysis, SB 61).)

/ / / / /

---

[1] Unless noted otherwise, the facts are taken from the operative Third Amended Complaint. (ECF No. 114.)

[2] A long gun is "a handheld firearm with a long barrel, as a rifle, designed to be fired when braced against the shoulder." https://www.dictionary.com/browse/long-gun (last visited 3/12/2025).

[3] A semiautomatic rifle "fires a single round each time the trigger is pulled while automatically loading the next cartridge." https://en.wikipedia.org/wiki/Semi-automatic_rifle (last visited 3/12/2025). A centerfire is a cartridge used in firearms. https://en.wikipedia.org/wiki/Centerfire_ammunition (last visited 3/12/2025). Its explosive primer is located at the center of the base of its casing. *Id*.

2

As amended, Section 27510 states in pertinent part:

Sale, supply, delivery, or giving possession of firearm by licensed person to individual under 21 years of age prohibited; exceptions

(a) A person licensed under Sections 26700 to 26915, inclusive, shall not sell, supply, deliver, or give possession or control of a firearm to any person who is under 21 years of age.

(b)(1) Subdivision (a) does not apply to or affect the sale, supplying, delivery, or giving possession or control of a firearm that is not a handgun, semiautomatic centerfire rifle, completed frame or receiver, or firearm precursor part to a person 18 years of age or older who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife.

(2) Subdivision (a) does not apply to or affect the sale, supplying, delivery, or giving possession or control of a firearm that is not a handgun or a semiautomatic centerfire rifle to a person who is 18 years of age or older and provides proper identification of being an honorably discharged member of the United States Armed Forces, the National Guard, the Air National Guard, or the active reserve components of the United States. …

(3) Subdivision (a) does not apply to or affect the sale, supplying, delivery, or giving possession or control of a firearm that is not a handgun to any of the following persons who are 18 years of age or older:

(A) An active peace officer, as described in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, who is authorized to carry a firearm in the course and scope of employment.

(B) An active federal officer or law enforcement agent who is authorized to carry a firearm in the course and scope of employment.

(C) A reserve peace officer, as defined in Section 832.6, who is authorized to carry a firearm in the course and scope of employment as a reserve peace officer.

(D) A person who provides proper identification of active membership in the United States Armed Forces, the National Guard, the Air National Guard, or active reserve components of the United States. …

/ / / / /

3

1  Plaintiffs filed a complaint pursuant to 42 U.S.C. §1983, alleging that Section 27510

2  as amended violates the rights of 18 to 20 years old individuals as provided by the Second

3  and Fourteenth Amendments of the United States Constitution. (ECF No. 114.) The Court

4  has subject matter jurisdiction pursuant to 42 U.S.C. §1331.

5  Plaintiffs allege they are law-abiding individuals aged from 18 to 20, licensed

6  firearms dealers and shooting ranges, and Second Amendment rights organizations with

7  members who want to acquire firearms for lawful purposes, some of whom are ineligible

8  due to Section 27510. Although Plaintiffs state that they are challenging the statute on its

9  face and as applied (ECF No. 114 at 35), their challenge is only to the law as applied to

10  law-abiding individuals aged 18 to 20. Defendants are the Attorney General of the State of

11  California and the Director of the Department of Justice of the State of California, Bureau

12  of Firearms.

13  The procedural history of this case is well known to the parties and is therefore not

14  repeated here. Most recently, on December 8, 2023, the Court denied Plaintiffs' motion for

15  preliminary injunction. (ECF No. 127.) Subsequently, the parties filed cross-motions for

16  summary judgment, which are now pending before the Court.

17  **II.    DISCUSSION**

18  **A.    <u>Summary Judgment</u>**

19  Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment

20  on factually unsupported claims or defenses, or parts thereof, to thereby "secure the just,

21  speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S.

22  317, 325, 327 (1986).[4] A party seeking summary judgment bears the initial burden of

23  establishing the absence of a genuine issue of material fact. *Id*. at 323. If the moving party

24  meets this initial burden, the nonmoving party cannot defeat summary judgment merely by

25  demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*

26  _____

27

28  [4] Unless otherwise noted, internal quotation marks, ellipses, brackets, citations, and footnotes are omitted from quotations.

**1-ER-006**
19-cv-1226-L-AHG

1    *Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, the nonmoving

2    party must "go beyond the pleadings" and by the depositions, answers to interrogatories,

3    and admissions on file, designate specific facts showing that there is a genuine issue for

4    trial. *Celotex*, 477 U.S. at 324.

5        The filing of cross-motions for summary judgment "does not necessarily mean there

6    are no disputed issues of material fact and does not necessarily permit the judge to render

7    judgment in favor of one side or the other." *Starsky v. Williams*, 512 F.2d 109, 112 (9th

8    Cir. 1975). "[E]ach motion must be considered on its own merits," and the court must

9    consider evidence submitted in support of and in opposition to both motions before ruling

10   on each one. *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132,

11   1136 (9th Cir. 2001).

12       "Credibility determinations, the weighing of the evidence, and the drawing of

13   legitimate inferences from the facts are jury functions, not those of a judge" on summary

14   judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). "The evidence of

15   the non-movant is to be believed, and all justifiable inferences are to be drawn in [its]

16   favor." *Id.*

17       Many facts relevant to the pending motions are undisputed. The motions turn

18   primarily on issues of law and the relevance of historical legal references.

19   ## B.    **The Second Amendment**

20       The Second Amendment guarantees the individual right to keep and bear arms for

21   self-defense within the home and in public. *District of Columbia v. Heller*, 554 U.S. 570,

22   629 (2008) ("*Heller*") (in the home); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597

23   U.S. 1, 8 (2022) ("*Bruen*") (public). "[T]he Due Process Clause of the Fourteenth

24   Amendment incorporates the Second Amendment right" and applies it against the states.

25   *McDonald v. City of Chicago,* 561 U.S. 742, 791 (2010).

26       The right secured by the Second Amendment is not unlimited. *Heller*, 554 U.S. at

27   626. "From Blackstone through the 19th-century cases, commentators and courts routinely

28   explained that the right was not a right to keep and carry any weapon whatsoever in any

**1-ER-007**

manner whatsoever and for whatever purpose." *Id.* at 626; *see also Bruen*, 597 U.S. at 70; *U.S. v. Rahimi,* 602 U.S. 680, 690-91 (2024). The "longstanding prohibitions" such as restrictions

> on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms[]

are examples of regulations which do not run afoul of the Second and Fourteenth Amendments. *Heller,* 554 U.S. at 626-27 & n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."); *Bruen,* 597 U.S. at 21.

In analyzing a Second Amendment claim, courts must apply the following framework:

> We first consider whether the Second Amendment's plain text covers an individual's proposed course of conduct. If so, the Second Amendment presumptively protects that conduct. The Government then bears the burden of justifying the challenged regulation by showing that it is consistent with our nation's "historical tradition of firearm regulation." Only then may we conclude that the regulation is constitutional.

*U.S. v. Perez-Garcia,* 96 F.4th 1166, 1178 (9th Cir. 2024) (citing *Bruen*, 597 U.S. at 24).

### 1.    Plain Text of the Second Amendment

"The threshold question in a Second Amendment claim is whether the Amendment presumptively protects the individual's conduct." *Perez-Garcia,* 96 F.4th at 1178 (citing *Bruen*, 597 U.S. at 24). The Second Amendment states: "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. Accordingly, the threshold question has two issues -- first, whether Plaintiffs are "among 'the people' within the plain meaning of the Second Amendment[,]" and second, "whether the plain text of the Amendment

**1-ER-008**

encompasses the individuals' proposed course of conduct." *Perez-Garcia,* 96 F.4th at 1178 (citing *Bruen,* 597 U.S. at 31-32).

### a.    The People

The parties disagree whether individuals aged 18 to 20 are included in "the people" as the term is used in the Second Amendment.[5] Relying on *Heller,* 554 U.S. at 580, Plaintiffs contend that the Second Amendment does not contain any age restriction, and that, because 18-to-20-year-olds are "members of the political community," they are included in "the people." Relying on *Bruen*, 597 U.S. at 31-32 ("adult citizens"), Defendants counter that in the 1790's and for most of this nation's history, the right to vote was limited to individuals over the age of 21, and that 18-to-20-year-olds therefore are not members of the political community.

There is a "lingering ambiguity" in the caselaw over the meaning of "the people" in the Second Amendment. *Perez-Garcia,* 96 F.4th at 1178. *Heller* initially interpreted "the people" as "'a class of persons who are part of the national community or who have otherwise developed sufficient connection with this country to be considered part of that community[,]" thus "presum[ing] that 'the people' refers to 'all Americans.'" *Id.* at 1178-79 (quoting *Heller,* 554 U.S. at 580-81). However, when "specifically analyz[ing]

---

[5] Plaintiffs argue that Defendants made judicial admissions, and that the Court previously held, that 18-to-20-year-olds were part of "the people" and that the restrictions imposed by Section 27510 fall within the plain text of the Second Amendment. To the contrary, in their opposition to Plaintiffs' motion for preliminary injunction, Defendants

> *assum[ed] only for the purpose of this motion* that 18-to-20-year-olds are part of the "people" protected by the Second Amendment and that the acquisition restrictions imposed through FFLs implicate the right to "keep and bear Arms[.]"

(ECF No. 111 at 8-9 (emphasis added); *see also id.* n.4.) Given Defendants' explicit limitation, these statements are not judicial admissions. *See Am. Title Ins. Co. v. Lacelaw,* 861 F.2d 224, 226 (9th Cir. 1988). Furthermore, as these elements were stipulated for purposes of the preliminary injunction motion, the Court made no findings as to them. (*See* ECF No. 127 at 9.)

7

'limitations' on the scope of the Second Amendment's protections, *Heller* described the Second Amendment right as belonging to 'law-abiding, responsible citizens.'" *Id*. at 1179 (quoting *Heller*, 554 U.S. at 626-27, 635). *Bruen* also "used the term 'law-abiding, responsible citizens' and its variants … when describing the Second Amendment's scope." *Id*. & n.9 (quoting *Bruen passim*). Some Circuit Courts of Appeals interpret this "to mean that there are certain groups of people – for example, violent felons or the mentally ill – who fall entirely outside the Second Amendment's scope, meaning that they do not fall within even the plain text of the Amendment." *Id.* at 1179 (citing cases). Other Circuits "instead maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right." *Id.* (citing cases).

The parties have cited no binding precedent, and the Court is aware of none, which has decided whether individuals aged 18 to 20 are included in "the people" within the plain meaning of the Second Amendment. In the context of pretrial release with a condition prohibiting firearm possession, the Ninth Circuit was persuaded by the Circuits that broadly interpret the term and held that the pretrial releasees were included in "the people," thus preserving their ability to invoke the Second Amendment right. *Perez-Garcia,* 96 F.4th at 1180. Circuits that have examined the question whether 18-to-20-year-olds are included have held that they are. *See, e.g., Rocky Mountain Gun Owners v. Polis,* 121 F.4th 96, 116 (10th Cir. 2024) ("an ordinary law-abiding citizen under the age of 21 is part of 'the people' as defined by the Second Amendment"); *Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 437 (3rd Cir. 2025); *Worth v. Jacobson*, 108 F.4th 677, 690 (8th Cir. 2024).

The reasoning of *Rocky Mountain Gun Owners* is persuasive as consistent with the interpretation of "the people" throughout the Constitution. *See* 121 F.4th at 114-16; *see also id.* at 115 ("the First, Second, and Fourth Amendments protect 'the people'"). Accordingly, individuals aged 18 to 20 fall within the plain meaning of "the people" for purposes of the Second Amendment.

/ / / / /

b. <u>Keep and Bear Arms</u>

"The plain text of the Second Amendment directly protects one thing—the right to 'keep and bear' firearms." *B & L Prod., Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024). "[L]aws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." *Heller,* 554 U.S. at 626-27 & n.26; *see also McDonald,* 561 U.S. at 786 (repeating the "assurance" stated in *Heller* that "such longstanding regulatory measures as … laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful").

Section 27510 prohibits licensed dealers from selling firearms to individuals aged 18 to 20 under certain circumstances. Defendants argue that this does not infringe the right to keep and bear arms[6] but instead constitutes a presumptively lawful regulation of commerce. Plaintiffs counter that the Court should not interpret the commercial sale exception in *Heller* as broadly as Defendants suggest because the exception would eviscerate the Second Amendment.

"[C]ommercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test." *B & L Prod.,* 104 F.4th at 119. The presumption may be overcome, however, if a regulation meaningfully constrains the right to acquire firearms. *Id.*; *see also Texeira v. Cnty. of Alameda,* 873 F.3d 670, 680 (9th Cir. 2017) (en banc).[7] For example, a ban on all sales of a certain type of gun in a region is a

---

[6] Defendants do not dispute Plaintiffs' contention that long guns and semiautomatic centerfire rifles are "Arms," as the term is used in the Second Amendment.

[7] This standard is similar to the standard for "'shall-issue' licensing regimes" suggested in *Bruen.* 587 U.S. at 38 n.9. Such regimes are constitutional if they "contain only narrow, objective, and definite standards guiding licensing officials[.]" *Id.* These regimes "often require applicants to undergo a background check or pass a firearms safety course [and] are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* However, "because any permitting scheme can be put toward abusive ends, … constitutional challenges [are possible] where, for example,

**1-ER-0011**

meaningful constraint implicating the Second Amendment, but a "minor constraint on the precise locations within a geographic area where one can acquire firearms [is] not." *B & L Prod.,* 104 F.4th at 119. Establishing a "violation would require evidence that a statute 'impedes … residents from acquiring firearms.'" *Id.* at 118 (quoting *Texeira*, 873 F.3d at 678).

Plaintiffs seek to overcome the presumptive lawfulness of commercial sale regulations by arguing that Section 27510 acts as a complete ban on the sale of semiautomatic centerfire rifles and a partial ban on the sale of long guns to individuals aged 18 to 20. Their arguments are unavailing.

Section 27510 does not prohibit 18-to-20-year-olds from owning, possessing, or carrying firearms, and does not create a ban on acquisition. These individuals can acquire firearms from immediate family members "by gift, bequest, intestate succession, or other means from one individual to another," Cal. Pen. Code §27875(a), or "take title or possession of a firearm by operation of law," as, for example, between spouses, *id.* §27920(a)(2), *see also id.* §16960(g) (defining "operation of law"), Cal. Fam. Code §850 (defining transmutation of property between spouses).[8]

Section 27510 permits commercial sale to individuals aged 18 to 20 in certain situations. Cal. Pen. Code §27510(b). It permits sale of (1) long guns if the individual "possesses a valid, unexpired hunting license," *id.* §27510(b)(1) ("hunting license exception"); (2) long guns if the individual is "an honorably discharged member of the United States Armed Forces, the National Guard, the Air National Guard, or the active

---

lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.*

[8] These individuals can also borrow firearms from a family member, Cal. Pen. Code §27880, or any person over 18 years of age, so long as that person is present, *id*. §27885. Finally, they can rent a firearm "for the purposes of shooting at targets" at a licensed target facility, *id*. §27910, or rent a firearm other than a handgun for purposes of hunting if they have a hunting license, *id*. §27950.

10

1  reserve components of the United States[,]" *id.* §27510(b)(2); and (3) long guns and

2  semiautomatic centerfire rifles if (i) the individual is "[a]n active peace officer[,]" "active

3  federal officer or law enforcement agent[,]" or "[a] reserve peace officer … authorized to

4  carry a firearm in the scope of employment[,]" or (ii) the individual is an active member of

5  the "United States Armed Forces, the National Guard, the Air National Guard, or the active

6  reserve components of the United States[,]" *id.* §27510(b)(3) ("police and military

7  exception").

8        Defendants have shown that every year thousands of firearms are sold to individuals

9  aged 18 to 20 through licensed dealers in California via Section 27510's exceptions. (ECF

10  No. 135, Albrecht Dec. Ex. 54 (Chavez Dec.).) These sales amounted to 4,682 firearms in

11  2020, 5,534 firearms in 2021, 5,172 firearms in 2022, and 2,172 firearms in the first six

12  months of 2023. (*Id.*; ECF No. 135, Albrecht Dec. Ex. 55 (Resp. to Interrog.) at DX0604.)

13  These sales are in addition to acquisitions through intrafamilial transfers and transfers by

14  operation of law. In 2023, 342 such firearm transfers were made to individuals aged 18 to

15  20. (ECF No. 140-3 (Griffin Dec.).) Individual Plaintiffs admit that they have not been able

16  to purchase a firearm because, as a "personal choice," they do not wish to take the hunting

17  license course, even if it is free and conveniently located. (ECF No. 135, Albrecht Dec. Ex.

18  56, Morris Dep. at 109-10; *id.* Ex. 57, Chavez Dep. at 137-38; *see also id.* at 132-35.)

19  Similarly, declarations from members of advocacy-group Plaintiffs reflect a choice not to

20  take a hunting license course. (ECF 136-2, Pl. Exs. C & D.)

21        To the extent Plaintiffs contend that the hunting license exception is too burdensome,

22  this is belied by Defendants' evidence. In 2020, 4,247 firearms were sold to individuals

23  aged 18 to 20 in California based on the hunting license exception. (Albrecht Dec. Ex. 55

24  at DX0626.) In 2021, the number was 5,205; in 2022 it was 5,063; and in the first six

25  months of 2023, it was 2,277. (*Id.*) Plaintiffs have presented no evidence to meet their

26  burden at summary judgment. *See B & L Prod.*, 104 F.4th at 118 ("violation would require

27  evidence").

28  / / / / /

1    Finally, Plaintiffs argue that the police and military exception is so restrictive as to

2    meaningfully impair the 18-to-20-year-olds' access to semiautomatic centerfire rifles.

3    Defendants' evidence shows that in 2020, 491 firearms were sold to individuals aged 18 to

4    20 in California based on the police and military exception. (Def. Ex. 55 at DX0628.) In

5    2021, the number was 452; in 2022 it was 368; and in the first six months of 2023, it was

6    178. (*Id.*) Plaintiffs produced no evidence to suggest that the relatively lower number of

7    semiautomatic centerfire rifles sold as compared to other types of long guns is due to

8    Section 27510. An individual Plaintiff's testimony suggests that the higher cost of such

9    firearms may contribute to lower sales. (*See* Morris Dep. at 85-86.) Regardless, in light of

10   Defendants' evidence, Plaintiffs cannot raise a genuine issue of material fact without

11   evidence of their own.

12   Defendants' evidence supports a reasonable inference that Section 27510 is a

13   commercial restriction that does not meaningfully impair 18-to-20-year-olds' access to

14   firearms and is therefore not covered by the Second Amendment's plain text at the first

15   step of the *Bruen* test. As Plaintiffs offer no evidence in support of their arguments to the

16   contrary, they are unable to raise a genuine issue of material fact as to this issue. *See*

17   *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus.,* 475 U.S. at 586. This presents sufficient

18   grounds to deny Plaintiffs' motion for summary judgment and grant Defendants' motion

19   without proceeding to the historical tradition step of the *Bruen* test.

20   ### 2.    Historical Tradition of Firearm Regulation

21   In the alternative, the Court considers the second step of the *Bruen* test: determining

22   whether the government can justify its regulation by showing that the law is "consistent

23   with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. If the

24   regulation "fits within that tradition, it is lawful under the Second Amendment." *Rahimi*,

25   602 U.S. at 691.

26   This historical inquiry "will often involve reasoning by analogy[.]" *Bruen*, 597 U.S.

27   at 28. The "*central* considerations" in this inquiry are "whether modern and historical

28   regulations impose a comparable burden on the right of armed self-defense and whether

**1-ER-0014**
19-cv-1226-L-AHG

1    that burden is comparably justified[.]" *Id*. at 29 (emphasis in original). Accordingly, "[w]hy

2    and how the regulation burdens the right are central to this inquiry." *Rahimi*, 602 U.S. at

3    692.

4                            a.    Relevant Historical Analogues

5          The analysis of the historical tradition of firearm regulation requires courts to

6    determine whether the regulations are "relevantly similar." *Bruen*, 597 U.S. at 29. The

7    parties disagree about what constitutes a relevant historical analogue to Section 27510.

8          Plaintiffs posit that only straightforward historical prohibitions on purchasing and

9    possession of firearms by 18-to-20-year-olds are relevant. (ECF No. 139, Pl. Opp'n at 14.)

10   They seek further to limit relevant historical analogues by claiming that the year when the

11   Second Amendment was enacted -- "1791 must be the controlling time." (ECF No. 136-1,

12   Pl. Mem. of P&A at 14.)

13         Plaintiffs' position is unsupported.

14         To be clear, analogical reasoning under the Second Amendment is neither a
           regulatory straitjacket nor a regulatory blank check. On the one hand, courts
15         should not uphold every modern law that remotely resembles a historical
           analogue, because doing so risks endorsing outliers that our ancestors would
16         never have accepted. On the other hand, analogical reasoning requires only
           that the government identify a well-established and representative historical
17         analogue, not a historical twin. So even if a modern-day regulation is not a
           dead ringer for historical precursors, it still may be analogous enough to pass
18         constitutional muster.

19

20

21   *Bruen,* 597 U.S. at 30. "By that same logic, the Second Amendment permits more than just

22   those regulations identical to ones that could be found in 1791. Holding otherwise would

23   be as mistaken as applying the protections of the right only to muskets and sabers."[9]

24   _____

25

26   [9] *Bruen* noted "an ongoing scholarly debate on whether courts should primarily rely on the
     prevailing understanding of an individual right when the Fourteenth Amendment was
27   ratified in 1868 when defining its scope (as well as the scope of the right against the Federal
     Government)." 597 U.S. at 37. The distinction is based on the theory that "[w]hen the
28   people adopted the Fourteenth Amendment into existence, they readopted the original Bill

1  *Rahimi,* 602 U.S. at 691-92. The Second Amendment right is not "trapped in amber." *Id.*

2  at 691.

3                          b.    <u>Analysis of Relevant Historical Analogues</u>

4          Defendants, as the parties with the burden, filed several expert declarations and

5  historical records in support of their motion and in opposition to Plaintiffs' motion. (*See*

6  ECF Nos. 133-134, 140-1.) Defendants' experts include historians Saul Cornell, Ph.D.,

7  Holly Brewer, Ph.D., Robert J. Spitzer, Ph.D., and Brennan Rivas, Ph.D. (*See* ECF Nos.

8  134-2 (Rosenberg Dec. Ex. 2), 134-6 (*id.* Ex. 6), ECF No. 134-5 (*id.* Ex. 5), and 134-4 (*id.*

9  Ex. 4) for their respective declarations.)

10         Plaintiffs argue that the historical sources produced by Defendants, and relied upon

11  by Defendants' experts, are not relevantly similar. Although Plaintiffs have not filed any

12  expert declarations in support of their position, they filed some of their own articles, charts,

13  historical records. (*See* ECF Nos. 136-2 through 136-6, 139-1.)[10]

14         The parties have cited no binding authority on the issue whether restricting the right

15  of 18-to-20-year-olds to commercially acquire firearms violates the Second Amendment,

16  and this Court is aware of none. The Circuits that considered the issue are not unanimous.

17  *See Lara,* 125 F.4th 428 (3rd Cir. 2025) (unconstitutional); *Reese v. Bureau of Alcohol,*

18  *Tobacco, Firearms, and Explosives*, __ F.4th __, 2025 WL 340799 (5th Cir. Jan. 30, 2025)

19  (unconstitutional); *Nat'l Rifle Ass'n v. Bondi,* __ F.4th __, 2025 WL 815734 (11th Cir.

20  Mar. 14, 2025) (en banc) (constitutional). *Lara* is distinguishable because the statute it

21  considered was broader than Section 27510 in that it regulated 18-to-20-year-olds' right to

22

23  _____

24  of Rights, and did so in a manner that invested those original 1791 texts with new 1868
   meanings." *Id*. at 38. *Bruen* did not resolve this debate because it found that "the public
25  understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant
   purposes, the same with respect to public carry." *Id.; see also Rahimi*, 602 U.S. at 692 n.1.
26  As discussed below, the same is true regarding commercial acquisition of firearms by 18-
27  to-20-year-olds.

28  [10] Defendants' objections to Plaintiffs' evidence (ECF No. 140-4) are overruled.

                                          14

carry. *See Lara,* 125 F.4th at 432. *Reese,* while it considered a statute similar to Section 27510, did not consider the Founding Era historical analogues discussed below, and is therefore unpersuasive. *See Reese,* 2025 WL 340799 at *9-12. *Bondi*, on the other hand, is persuasive because it considered a statute similar to Section 27510 as well as a similar record of historical analogues as were produced in this case. *See Bondi,* 2025 WL 815734 at *7-8.

          i.     *Founding Era Common Law Governing Individuals Under 21*[11]

> At the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers. Some jurisdictions banned the carrying of "dangerous and unusual weapons." Others forbade carrying concealed firearms.

*Rahimi,* 602 U.S. at 691.

    "Those between the ages of eighteen and twenty (and indeed all under the age of 21) were considered 'minors' or 'infants' from the time of the nation's founding[.]" (Cornell Dec. ¶ 21; *see also id.* ¶ 41 (citing Zephaniah Swift, 1 *A System of the Laws of the State of Connecticut* 213 (1795)); *see also id.* ¶¶ 44, 50; Brewer Dec. ¶ 9.) "Regulations establishing 21 years as the age of majority during this period were premised on the understanding that those below that age were mentally immature and not yet capable of responsible self-governance."[12] (Brewer Dec. ¶ 13 (citing 1 *Blackstone Commentaries on the Laws of England* 434, 441–45 (1765)).)

---

[11] The Founding Era ended in 1799. (Cornell Dec. ¶ 10.)

[12] "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years." (Cornell Dec. ¶ 51 (quoting 2 James Kent, *Commentaries on American Law* 259 (3d ed. 1836)).) John Adams noted that "[c]hildren" under 21 lack "[j]udgment or [w]ill of their own" and are not "fit to be trusted by the [p]ublic." *See* Letter from John Adams to James Sullivan (26 May 1776) (on file with the

**1-ER-0017**
19-cv-1226-L-AHG

Although Plaintiffs refer to 18-to-20-year-olds as adults, these individuals were considered minors until the second half of the twentieth century. (Cornell Dec. ¶ 41; Brewer Dec. ¶ 53.) The 26th Amendment, which lowered the voting age to 18, was not ratified until 1971. In California, the age of majority was lowered in 1972. *See* Cal. Fam. Code § 6502.

In the Founding Era, parents had the power to regulate the activities of their children until they reached the age of 21. 1 Blackstone, *supra*, at 440–41; *cf. Washington v. Glucksberg*, 521 U.S. 702, 712 (1997) (*Blackstone Commentaries* was "a primary legal authority for 18th- and 19th-century American lawyers."). (*See also* Cornell Dec. ¶ 42.) For example, at common law, the father was entitled to the earnings of his minor children, unless they were emancipated. 1 Blackstone, *supra*, at 453. (Brewer Dec. ¶ 37.) This impeded the ability of 18-to-20-year-olds to make purchases, including firearms. Robert J. Spitzer, *Historical Weapons Restrictions on Minors*, 76 Rutgers U.L. Rev.: Commentaries 101, 108 (2024).

The ability of individuals under 21 to make purchases was further impeded because they were unable to enter into contracts, which were required to purchase goods on account, including firearms, which were expensive. William Macpherson, *Treatise on the Law Relating to Infants* 303 (1843). (Brewer Dec. ¶¶ 13, 15, 43.) All "contracts with infants, except for necessaries, [were] either void or voidable" because "infants ... are supposed to want judgment and discretion in their contracts and transactions with others." 1 Samuel Comyn, *A Treatise of the Law Relative to Contracts and Agreements Not Under Seal* 148 (1809); *see also* 1 Swift, *supra*, at 215. A minor was entrusted to "bind himself by his contract for necessaries, for diet[,] apparel, education, and lodging," 1 Swift, *supra*, at 216 (quoted in Cornell Dec. ¶ 50); *accord* Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* 271 (2005); 2 James Kent, *Commentaries*

---

National Archives); *see also* Letter from Thomas Jefferson to Samuel Smith (May 3, 1823), https://perma.cc/YD6X-H6PN.

**1-ER-0018**
19-cv-1226-L-AHG

*on American Law* 256 (William Kent ed., 8th ed. 1854). However, "liquor, pistols, powder, saddles, bridles, [and] whips" were not considered necessaries. *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. 572 (1822). (Brewer Dec. ¶ 38 ("[G]uns were … legally categorized as 'not necessary.'").)  Voidability placed sellers at risk that they could not recover goods sold if they were not paid. Brewer, *supra*, at 271. Accordingly, "infants [were] effectively unable to form contracts." *Id.* This impeded 18-to-20-year-olds from acquiring firearms through commercial transactions. (Brewer Dec. ¶¶ 37, 38, 41, 43.) The foregoing is particularly relevant here, because Section 27510 regulates the commercial acquisition of firearms by individuals under 21.

Accordingly, parents had the power to regulate the activities of their children until they reached the age of 21.[13] These individuals were curtailed in their ability to purchase firearms because they lacked income, as their wages belonged to their parents, and because they were legally unable to enter contracts to purchase on credit.

The common law limitations on the rights of individuals under 21 were pervasive and obviated more specific regulation. *See Commonwealth v. Chapman,* 54 Mass. 68, 69 (1847) ("It is true that there is no statute of the Commonwealth declaring the writing or publishing of … libel … a punishable offence. But this goes little way towards settling the question. A great part of the municipal law of Massachusetts, both civil and criminal, is an

---

[13] This state of the law is also evident in the Founding Era university rules, which placed university authorities in *loco parentis.* (Cornell Dec. ¶ 66 (citing Brian Jackson, *The Lingering Legacy of "In Loco Parentis": An Historical Survey and Proposal for Reform*, 44 Vand L. Rev.. 1135 (1991)); Spitzer Dec. ¶ 26.) *Loco parentis* means acting "[i]n the place of a parent; instead of a parent; charged . . . with a parent's rights, duties, and responsibilities." *Black's Law Dictionary* (12th ed. 2024). Many universities, including state universities, prohibited guns on campus. (Cornell Dec. ¶¶ 67-71 (citing and quoting sources); Spitzer Dec. ¶¶ 26-25 (citing sources); Brewer Dec. ¶ 39 (citing sources).) Although these restrictions were placed on all students, regardless of age, and the privilege of higher education was limited to a small number, the university rules reflect the common law of the Founding Era which did not entrust individuals under 21 with unfettered access to firearms. (*See* Brewer Dec. ¶ 39.)

17

unwritten and traditionary [*sic*] law. It has been common to denominate this the common law[.]") Because of the common-law tradition, statutes were a "comparatively infrequent" source of law through the mid-19th century. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 3 (2012).

ii.    *Founding Era Militia Laws*

Plaintiffs do not dispute that the rights of 18-to-20-year-olds during the Founding Era were curtailed particularly when it came to commerce.  Instead, they argue that state militia laws and the Federal Militia Act demonstrate that these individuals had a right to acquire firearms.

The Militia Act passed by the Second Congress required "able-bodied" men between the ages of 18 and 45 to enroll in the militia and provided that "every citizen so enrolled … shall… provide himself with a good musket or firelock." Act of May 8, 1792, 1 Stat. 271. On its face, this statute confers no right on individuals under 21 to purchase firearms. Moreover, because the common law curtailed minors' ability to purchase firearms, it was understood that their parents or guardians would furnish them. (Cornell Dec. ¶ 85.) *See Bondi,* 2025 WL 815734 * 7.

The states, which were required to implement the Militia Act, passed their own militia laws. (*See* Brewer ¶ 21.) "[O]ver a third of state militia statutes in the Founding Era required parents or guardians to provide firearms to militia members under the age of 21[.]" (Cornell Dec. ¶ 60; *see also id.* ¶ 26, 85, 90-94; Brewer Dec. ¶¶ 21-36 (comprehensive survey of state militia laws); *see also id.* ¶¶ 46, 51.) Some states passed laws making this a

/ / / / /

**1-ER-0020**

19-cv-1226-L-AHG

requirement.[14] Others either exempted minors from providing their own firearm,[15] or held parents liable for the failure of a minor to obtain a firearm, thereby forcing parents to provide a firearm or face fines.[16] Accordingly, the militia laws are consistent with the Founding Era restrictions placed on the 18-to-20-year-olds' ability to purchase firearms.

---

[14] *See The Laws of the State of New Hampshire* 422 (Portsmouth, John Melcher 1797) (Act of 1792); 2 *The Perpetual Laws of the Commonwealth of Massachusetts* 181 (Boston, I. Thomas & E. T. Andrews 1801) (Statutes of 1793); 2 *The Laws of the State of Vermont* 131–32 (Randolph, Sereno Wright 1808) (Act of 1797); 2 Francois-Xavier Martin, *The Public Acts of the General Assembly of North Carolina* 159 (Newbern, Martin & Ogden 1804) (Act of 1800); *Acts Passed At the First Session of the Legislative Council of the Territory of Orleans* 284–86 (New Orleans, James M. Bradford 1805) (Act of 1805); *An Act To Organize, Govern, and Discipline the Militia, of the State of Maine* 21, 37 (Portland, Todd & Smith 1824) (Act of 1821); 2 *Laws of the State of Missouri* 533, 554, 571, 574 (St. Louis, E. Charless 1825) (Act of 1825).

[15] 14 James T. Mitchell & Henry Flanders, *The Statutes At Large of Pennsylvania from 1682 to 1801* 456 (1909) ("[Y]oung men under the age of twenty-one ... shall be exempted from furnishing the necessary arms, ammunition and accoutrements.") (Statutes of 1793); 2 *Laws of the State of Delaware 1135–36* (New Castle, Samuel Adams & John Adams 1797) (same) (Statutes of 1793).

[16] 9 William Walter Hening, *The Statutes At Large; Being a Collection of All the Laws of Virginia From the First Session of the Legislature in the Year 1619* 270–71 (Richmond, J. & G. Cochran Printers 1821) (Act of 1777); *Acts and Laws of the State of Connecticut, in America* 307–08, 312 (Hartford, Hudson & Goodwin 1796) (Act of 1792); 3 *Laws of the State of New York* 58, 63–64 (New York, Thomas Greenleaf 1797) (Act of 1793); *The Public Laws of the State of Rhode Island and Providence Plantations* 436–38 (Providence, Carter & Wilkinson 1798) (Act of 1798); 2 William Kilty, *The Laws of Maryland* ch. LIII, §§ I, XV, XIX (Annapolis, Frederick Green 1800) (Supplement of 1798); William Paterson, *Laws of the State of New Jersey* 438–40 (New Brunswick, Abraham Blauvelt 1800) (Act of 1799); 2 *Acts of the State of Ohio: Second Session of the General Assembly* 31–32, 35 (Chillicothe, N. Willis, reprinted by The Laning Co. 1901) (Statutes of 1803); Harry Toulmin, *The Statutes of the Mississippi Territory* 80 (Natchez, Samuel Terrell 1807) (Statutes of 1807); 2 Laws of Kentucky 401, 405 (Lexington, John Bradford 1807) (Statutes of 1807); Oliver H. Prince, *A Digest of the Laws of the State of Ge*orgia 330–31 (Milledgeville, Grantland & Orme 1822) (Act of 1807); *An Act Regulating the Militia, of the State of Indiana* 19–20 (Corydon, Carpenter & Douglass 1824) (Act of 1824); *Laws*

1-ER-0021

iii.    *Nineteenth Century Legislation*

In examining the historical analogues, courts may look to the nineteenth century to confirm the Founding Era understanding of the Second Amendment. *See Bruen,* 597 U.S. at 35-36. The Founding Era restrictions on the minors' ability to purchase firearms continued in the nineteenth century, when they began to be codified. *See* Scalia & Garner, *supra,* at 3.

Some laws reflected the 18-to-20-year-olds' status as "infants" under their parents' control who could not themselves contract to purchase firearms. For example, in 1803 in New York City, a law punished guardians for firearms infractions committed by their charges, and in 1857 in Louisville, Kentucky, another law prohibited gunpowder sales to minors except with parental permission. (Cornell Dec. ¶ 117.)[17] Other laws incorporated explicit age restrictions. For example, in 1856, Tennessee enacted a law prohibiting the selling, loaning, giving, or delivering "to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling."[18] Tenn. Code § 4864 (1858) (reprinted in 2 Seymour Dwight Thompson, *A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-'71* 125 (1873).) Laws of other states, for

_____

*Passed By the Fourth General Assembly of the State of Illinois, At Their Second Session* 23 (Vandalia, Robert Blackwell 1826) (Act of 1826).

[17] Dr. Cornell cites and quotes Edward Livingston, Laws and Ordinances, Ordained and Established By The Mayor, *Aldermen and Commonalty of the City of New-York, in Common-Council Convened, or the Good Rule and Government of the Inhabitants and Residents of The Said City* 83–84 (1803); Oliver H. Strattan, *A Collection of the State and Municipal Laws, in Force, and Applicable to The City of Louisville, Ky.* 175 (1857).

[18] Plaintiffs argue that the exception for hunting rifles and weapons for defense while traveling undermines Defendants' case. To the contrary, this provision emphasizes the relevance of this analogue because exceptions are carved *to the prohibition* of selling firearms to individuals under 21.

**1-ER-0022**
19-cv-1226-L-AHG

example, Kentucky and Alabama, and local regulations, for example, Columbia, South Carolina, show that laws restricting 18-to-20-year-olds from acquiring firearms were not uncommon. (Cornell Dec. ¶¶ 113-15, 117.)[19] By the end of the 19th century, nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use firearms.[20] (*See also* Cornell Dec. ¶¶ 125-32; Rivas Decl. ¶¶ 40-45.) These statutes are "relevantly similar" to Section 27510. *See Reese*, 2025 WL 340799 *12.

The foregoing legislation is consistent with the Founding Era common law that curtailed commercial firearm purchases by individuals aged 18 to 20. Plaintiffs presented no legal authority, and the Court is aware of none, that the lawfulness or constitutionality of any of the nineteenth century statutes discussed above was subject of disputes. (*See also* Rivas Dec. ¶ 46.) In the absence of such disputes, courts can assume that the statutes represent the settled law of their time. *See Bruen,* 597 U.S. at 30.

/ / / / /

---

[19] In addition to the sources cited in footnote 17, above, Dr. Cornell cites and quotes *Act of February 2, 1856*, no. 26, § 1, 1856 Ala. Acts 17, 17; 1859 Ky. Acts 245, *An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg*, § 23; *Ordinances of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto* 61-61 (1823).

[20] 1856 Ala. Acts 17; 16 Del. Laws 716 (1881); 27 Stat. 116–17 (1892) (District of Columbia); 1876 Ga. Laws 112; 1881 Ill. Laws 73; 1875 Ind. Acts 86; 1884 Iowa Acts 86; 1883 Kan. Sess. Laws 159; 1873 Ky. Acts 359; 1890 La. Acts 39; 1882 Md. Laws 656; 1878 Miss. Laws 175–76; Mo.Rev.Stat. § 1274 (1879); 1885 Nev. Stat. 51; 1893 N.C. Sess. Laws 468–69; 1856 Tenn. Pub. Acts 92; 1897 Tex. Gen. Laws 221–22; 1882 W. Va. Acts 421–22; 1883 Wis. Sess. Laws 290; 1890 Wyo. Sess. Laws 1253. *See also Lara,* 125 F.4th at 442 n.20. Alabama, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Tennessee, Texas, and Wyoming had Second Amendment analogues in their respective constitutions at the time they enacted these regulations.

### c.    Conclusion

In examining the historical tradition of firearm regulation to determine the contours of the Second Amendment, the "[w]hy and how the regulation burdens the right are central to the inquiry." *Rahimi*, 602 U.S. at 692. Section 27510 fits within both parameters.

Taken together, the common law legal impediments of minors and militia laws show that the ability of individuals under 21 to purchase firearms was restricted in the Founding Era. The restriction continued in the nineteenth century. This historical tradition demonstrates that curtailing the ability of 18-to-20-year-olds to purchase firearms was common. Section 27510 impedes these individuals in their ability to commercially acquire firearms from dealers. It does not prohibit them from owning, possessing, or carrying firearms. Neither the Founding Era laws, nor California law today, preclude this group from acquiring firearms by intrafamilial transfer or operation of law.

"[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Rahimi*, 602 U.S. at 692. As noted in Section II.B.2.b.i. above, the Founding Era common law curtailed the rights of individuals under 21, including their ability to commercially acquire firearms, due to their immaturity and undeveloped judgment. The same purpose animated the amendments to Section 27510: "Maturity, impulsive or reckless behavior, and responsibility vary greatly among 18-20 year olds." (*See, e.g.,* Albrecht Dec. Ex. 24 at DX0186.)

For the foregoing reasons, the historical tradition of firearm regulation "confirm[s] what common sense suggests:" Individuals aged 18 to 20 may be restricted in their ability to purchase firearms. *Rahimi*, 602 U.S. at 692. Section 27510 is not more restrictive in its scope than the limitations traditionally placed on individuals under 21, and the limitations it established were put in place for the same reasons. Because Section 27510 fits within the historical tradition, it is lawful under the Second Amendment.

/ / / / /

**III.    CONCLUSION**

As discussed above in section II.B.1., Plaintiffs' motion for summary judgment is denied and Defendants' motion is granted at the first step of the *Bruen* test because Plaintiffs have not met their burden to raise a genuine issue of material fact that Section 27510 meaningfully impairs 18-to-20-year-olds' ability to commercially acquire firearms so as to fall within the plain text of the Second Amendment. Alternatively, for the reasons stated in section II.B.2., Plaintiffs' motion for summary judgment is denied and Defendants' motion is granted at the second step of the *Bruen* test because Defendants met their burden to show that Section 27510 fits within the historical tradition of firearm regulation and therefore does not violate the Second Amendment.

**IT IS SO ORDERED.**

Dated:  March 26, 2025

Hon. M. James Lorenz
United States District Judge

**1-ER-0025**
19-cv-1226-L-AHG