No. 25-2509

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

PWGG, LP, *et al.*,

*Plaintiffs-Appellants*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, *et al.*,

*Defendants-Appellees*.

_____

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:19-cv-1226-L-AHG
The Honorable M. James Lorenz

_____

**APPELLEES' ANSWERING BRIEF**

_____

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
ANYA M. BINSACCA
  *Supervising Deputy Attorney General*

IAN FEIN
  *Deputy Solicitor General*
JENNIFER E. ROSENBERG
  *Deputy Attorney General*

CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3466
Ian.Fein@doj.ca.gov

*Attorneys for Defendants-Appellees*

October 30, 2025

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................... 1

Statement of the issues .................................................................. 4

Jurisdictional statement ................................................................ 4

Addendum of statutory provisions ............................................... 5

Statement of the case .................................................................... 5

    A.    California's restrictions on the commercial sale or transfer of long guns to persons under age 21 ....................................... 5

    B.    Procedural history ............................................................... 8

        1.    Pre-*Bruen* proceedings ................................................ 8

        2.    Post-*Bruen* proceedings ............................................. 10

Summary of argument .................................................................. 14

Standard of review ....................................................................... 16

Argument ...................................................................................... 16

I.    California's hunting license exemption is consistent with the Second Amendment ................................................................... 18

    A.    The hunting license exemption does not meaningfully constrain 18-to-20-year-old's ability to keep and bear arms .. 18

    B.    The hunting license exemption is a lawful shall-issue licensing regime ................................................................ 24

II.    California's prohibition on the commercial sale or transfer of semiautomatic centerfire rifles to most persons under 21 is consistent with the Second Amendment ................................. 28

    A.    At the Second and Fourteenth Amendments' ratification, law restricted the ability of persons under 21 to purchase firearms ............................................................................. 28

        1.    Founding-era common law significantly limited the legal capacity of persons under 21, including their ability to purchase firearms ....................................... 28

## TABLE OF CONTENTS
### (continued)

Page

2. State militia laws confirm that 18-to-20-year-olds relied on their parents and guardians to provide them firearms ...................................................................... 32

3. Nineteenth-century statutes codified prohibitions on selling firearms to individuals under 21 ....................... 34

B. Section 27510 is relevantly similar to this historical tradition.................................................................. 43

Conclusion ........................................................................... 53

Statement of related cases ........................................................... 54

# TABLE OF AUTHORITIES

**Page**

CASES

Andrews v. State
    50 Tenn. 165 (1871)..................................................................37

Antonyuk v. James
    120 F.4th 941 (2d Cir. 2024) ...................................................25

B&L Prods., Inc. v. Newsom
    104 F.4th 108 (9th Cir. 2024) ............................10, 17, 18, 19, 21

Bauer v. Becerra
    858 F.3d 1216 (9th Cir. 2017) ................................................16

Brown v. Ent. Merchants Ass'n
    564 U.S. 786 (2011)...........................................................48, 52

District of Columbia v. Heller
    554 U.S. 570 (2008)........................................................passim

Giambalvo v. Suffolk Cnty., New York
    --- F.4th ---, 2025 WL 2627368 (2d Cir. Sept. 12, 2025)..........................25

Jones v. Bonta
    34 F.4th 704 (9th Cir.) ....................................................passim

Lara v. Comm'r Pa. State Police
    125 F.4th 428 (3d Cir. 2025) .....................................................3

Maryland Shall Issue, Inc. v. Moore
    116 F.4th 211 (4th Cir. 2024) ..................................................25

McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives
    140 F.4th 568 (4th Cir. 2025) .............................................passim

McDonald v. City of Chicago, Ill.
    561 U.S. 742 (2010)................................................................38

## TABLE OF AUTHORITIES
### (continued)

Page

*McRorey v. Garland*
99 F.4th 831 (5th Cir. 2024) .........................................................23, 24, 26

*Nat'l Rifle Ass'n v. Bondi*
133 F.4th 1108 (11th Cir. 2025) (en banc) .........................................*passim*

*New York State Rifle & Pistol Ass'n v. Bruen*
597 U.S. 1 (2022)...................................................................................*passim*

*Nguyen v. Bonta*
140 F.4th 1237 (9th Cir. 2025) ......................................................17, 22, 23

*Pinales v. Lopez*
765 F. Supp. 3d 1024 (D. Hawaii 2025).........................................36, 37, 38

*Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*
127 F.4th 583 (5th Cir. 2025) ........................................................................3

*Rhode v. Bonta*
145 F.4th 1090 (9th Cir. 2025) .............................................................22, 24

*Rocky Mountain Gun Owners v. Polis*
121 F.4th 96 (10th Cir. 2024) ........................................................3, 50, 51

*Saunders Glover & Co. v. Ott's Adm'r*
12 S.C.L. (1 McCord) 572 (Const. Ct. App. 1822) ...................................31

*State v. Callicutt*
69 Tenn. 714 (1878)....................................................................................37

*Teixeira v. County of Alameda*
873 F.3d 670 (9th Cir. 2017) (en banc) .....................................................21

*United States v. Duarte*
137 F.4th 743 (9th Cir. 2025) (en banc) ..................................17, 39, 43, 51

*United States v. Perez-Garcia*
96 F.4th 1166 (9th Cir. 2024) ..............................................................43, 45

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Rahimi*
  602 U.S. 680 (2024)...............................................................................*passim*

*United States v. Vlha*
  142 F.4th 1194 (9th Cir. 2025) ...........................................18, 19, 21, 22, 27

*Wolford v. Lopez*
  116 F.4th 959 (9th Cir. 2024) .....................................................................39

*Worth v. Jacobson*
  108 F.4th 677 (8th Cir. 2024) .......................................................................3

*Yukutake v. Lopez*
  130 F.4th 1077 (9th Cir.) .............................................................................22

STATUTES

**<u>Federal</u>**

18 U.S.C. § 922(b)(1).........................................................................................5

21 U.S.C. § 387f(d)(5) ......................................................................................50

23 U.S.C. § 158.................................................................................................50

28 U.S.C.
  § 1291............................................................................................................4
  § 1331............................................................................................................4

Bipartisan Safer Communities Act of 2022, Pub. L. No. 117-159,
  § 12001, 136 Stat. 1313 .............................................................................23

Militia Act, § 1, 1 Stat. 271 (1792).................................................................32

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L.
  No. 90-351, Title IV, § 902, 82 Stat. 197 ...................................................5

# TABLE OF AUTHORITIES
## (continued)

Page

**Alabama**

1856 Ala. Acts 17, No. 26, § 1.................................................................35

Ala. Code § 26-1-1........................................................................................50

**California**

California Bus. & Prof. Code
   § 19921.................................................................................................50
   § 19941.................................................................................................50

Calilfornia Fam. Code § 850............................................................................7

California Fish & Game Code
   § 1053.5...............................................................................................20
   § 3050...................................................................................................21
   § 3051.............................................................................................15, 26
   § 3052...................................................................................................20

California Penal Code
   § 16720.......................................................................................7, 44, 45
   § 16865...................................................................................................6
   § 16990(g)...............................................................................................7
   § 27505.............................................................................................5, 44
   § 27510............................................................................................*passim*
   § 27510(a)...............................................................................................6
   § 27510(b)..............................................................................6, 7, 11, 28
   § 27510(b)(1)....................................................................................*passim*
   § 27510(b)(2)...........................................................................................7
   § 27510(b)(3)......................................................................................6, 45
   § 27545...................................................................................................5
   § 27875(a).......................................................................................7, 44, 45
   § 27920(a)...............................................................................................7
   § 28050...................................................................................................5
   § 31700(c).............................................................................................27

## TABLE OF AUTHORITIES
### (continued)

Page

**Colorado**

Col. Rev. Stat. § 18-12-112.5(a.5) ....................................................................5

**Connecticut**

Conn. Gen. Stat. § 29-34(b) ...........................................................................5

**Delaware**

Del. Code Ann. Title 24, § 903 .......................................................................5

16 Del. Laws 716, Chapter 548, § 1 (1881).....................................................36

**District of Columbia**

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 116..............................................35

D.C. Code § 22-4507 .......................................................................................5

**Florida**

Fla. Stat. § 790.065(13)...................................................................................5

**Georgia**

1876 Ga. Laws 112, No. 128 (O. No. 63), § 1 ...............................................35

**Hawaii**

Haw. Rev. Stat. § 134-2(a), (d), (h) ................................................................5

**Illinois**

430 Ill. Comp. Stat. 65/3(a), 65/4(a)(2) .........................................................5

1881 Ill. Laws 73 ......................................................................................35, 47

## TABLE OF AUTHORITIES
### (continued)

Page

**Indiana**

1875 Ind. Laws 59, ch. 40, § 1 ...................................................................35

**Iowa**

1884 Iowa Acts 86, Chapter 78, § 1 ...........................................................35

**Kansas**

1883 Kan. Sess. Laws 159, Chapter 105, §§ 1-2 ....................................35, 47

**Kentucky**

1859 Ky. Acts 245, Chapter 33, § 23...........................................................35

**Louisiana**

1890 La. Acts 39, No. 46, § 1 .....................................................................35

**Maryland**

Md. Code Ann., Pub. Safety § 5-134(b) .........................................................5

1882 Md. Laws 656, Chapter 424, § 2.........................................................35

**Massachusetts**

Mass. Gen. Laws Chapter 140, § 131(d) .........................................................5

**Michigan**

Mich. Comp. Laws § 28.422(3)(b) ..................................................................5

**Mississippi**

Miss. Code Ann. § 93-1-5..........................................................................50

1878 Miss. Laws 175, Chapter 66, § 2 .......................................................36

## TABLE OF AUTHORITIES
### (continued)

Page

**Missouri**

Mo. Rev. Stat. § 1274 (1879)....................................................................35, 46

**North Carolina**

1893 N.C. Sess. Laws 468, Chapter 514 ........................................................35

**New Jersey**

N.J. Stat. Ann. § 2C:58-3(c)(4)........................................................................5

**New York**

N.Y. Penal Law § 400.00(1) ............................................................................5

**Nebraska**

Neb. Rev. Stat.
    § 42-105 ...................................................................................................50
    § 43-2101 .................................................................................................50
    § 69-2403 ...................................................................................................5
    § 69-2404 ...................................................................................................5

**Ohio**

Ohio Rev. Code Ann. § 2923.21(A)(2) .............................................................5

**Oklahoma**

1890 Okla. Sess. Laws 495, Article 47, §§ 1-3 ...............................................35

**Rhode Island**

R.I. Gen. Laws
    § 11-47-35(a)(1).......................................................................................5
    § 11-47-35.2 .............................................................................................5
    § 11-47-37 .................................................................................................5

## TABLE OF AUTHORITIES
### (continued)

Page

**Tennessee**

1856 Tenn. Pub. Acts 92, Chapter 81, § 2 ...................................... 35

**Texas**

1897 Tex. Gen. Laws 221-222, Chapter 155, § 1 ............................ 35

**Vermont**

Vt. Stat. Ann. Title 13, § 4020 ....................................................... 5

**Washington**

Wash. Rev. Code § 9.41.240 ........................................................... 5

**West Virginia**

1882 W. Va. Acts 421-422, Chapter 135, § 1 ................................. 35

**Wisconsin**

1883 Wis. Sess. Laws 290, Chapter 329, §§ 1-2 ............................ 35

**Wyoming**

1890 Wyo. Sess. Laws 140, Chapter 73, § 97 ................................ 35

Wyo. Stat. § 6-8-404(d)(i)(A) ......................................................... 5

CONSTITUTIONAL PROVISIONS

U.S. Const. amendment II ................................................................ 18

OTHER AUTHORITIES

Blackstone, *Commentaries on the Laws of England* (1765) ........... 1, 29, 48, 49

Booraem, *Young Hickory: The Making of Andrew Jackson* (2001) ................ 31

x

# TABLE OF AUTHORITIES
## (continued)

Page

Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* (2005) .................................................. 30

Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (2019) ...................................... 36, 48

Comyn, *A Treatise of the Law Relative to Contracts and Agreements Not Under Seal* (1809) ................................................ 29, 48, 49

Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) ...................... 36

Gales, *The Debates and Proceedings in the Congress of the United States* (1834) ...................................................................... 33

Heniford, *The Young and the Armed: History for Litigating Firearms Age Restrictions in a Post-*Bruen *World* (May 16, 2025), 101 Ind. L.J. Supp. (forthcoming) .................................... 42

Kent, *Commentaries on American Law* (1827) ........................................ 30, 48

Macpherson, *Treatise on the Law Relating to Infants* (1843) ........................ 29

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ............................................................................................ 41

Spitzer, *Historical Weapons Restrictions on Minors*, 76 Rutgers U. L. Rev. 101 (2024) ........................................................ 30, 34

Swift, *A System of the Laws of the State of Connecticut* (1795) .............................................................. 28, 29, 30, 31, 50

Walsh & Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 Minn. L. Rev. 3049 (2024) .................... 32, 34

## INTRODUCTION

Twenty jurisdictions, including the federal government, have set a minimum age requirement of 21 to purchase at least some firearms. Some States have maintained those laws for almost 150 years. And before that, including at the founding, the common law significantly restricted individuals' ability to purchase firearms until they turned 21. Both founding-era common law and statutes at the time recognized that 18-to-20-year-olds would generally have to acquire firearms from their parents or guardians instead. These longstanding and widespread restrictions have been premised on the understanding that individuals under age 21 often lack the maturity and judgment necessary to responsibly purchase firearms on their own. *E.g.*, 1 William Blackstone, *Commentaries on the Laws of England* 441 (1765) (individuals do not "arriv[e] at years of discretion" or "reason," and therefore lack legal capacity, until the "age of twenty one").

California's legislature drew a similar conclusion when it passed the law challenged here. Responding to a mass shooting resulting in 17 deaths committed by a 19-year-old with a semiautomatic rifle, California set a baseline age of 21 for the commercial sale of long guns in the State. The challenged law, Penal Code Section 27510, still allows the sale of most long guns, such as common hunting rifles or shotguns, to 18-to-20-year-olds so long as they first complete a safety course and obtain a hunting license. But it limits the sale of the most lethal

1

category of long guns, specifically, semiautomatic centerfire rifles, to only those 18-to 20-year-olds who are part of law enforcement or the military. Section 27510 does not prohibit 18-to-20-year-olds from possessing any long guns, however, or, as at the founding, acquiring firearms from their parents or other family members.

The district court correctly concluded that California's age-based restriction on the sale or transfer of long guns to 18-to-20-year-olds comports with the Second Amendment. The provision of Section 27510 that allows 18-to-20-year-olds to purchase certain long guns if they complete firearms safety training and obtain a hunting license does not implicate the plain text of the Second Amendment. That licensing exemption does not meaningfully constrain the right to keep or bear arms, and it is the type of presumptively lawful, objective shall-issue licensing scheme that the Supreme Court has endorsed as constitutional.

In any event, both the hunting license exemption and the provision that further limits the sale of semiautomatic centerfire rifles to 18-to-20-year-olds are consistent with the Nation's historical tradition of restricting firearm sales to individuals under age 21. Four separate courts of appeals in the last year considered, and three rejected, Second Amendment challenges to restrictions on the sale of firearms to 18-to-20-year-olds. *See McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568 (4th Cir. 2025), *petition for cert. filed* (No. 25-24); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) (en

banc), *petition for cert. filed* (No. 24-1185); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024). The Tenth Circuit concluded that the law challenged there did not implicate the plain text of the Second Amendment. The Fourth and Eleventh Circuits held that the laws challenged in those cases are consistent with a historical tradition limiting sales of firearms to persons under 21. And the only court to disagree, the Fifth Circuit, did not consider the founding-era common law restrictions presented in this and other cases. *Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 127 F.4th 583 (5th Cir. 2025).[1]

Plaintiffs' contrary arguments lack merit. That some 18-to-20-year-olds may prefer not to take the safety training required to obtain a hunting a license does not mean they are meaningfully constrained from acquiring the relevant long guns. And with respect to the historical analysis, plaintiffs identify little evidence of their own, and instead try to discount the significant historical evidence demonstrating a lengthy tradition of restricting the sale of firearms to individuals under age 21. Plaintiffs reason that 18-to-20-year-olds were previously considered minors but are now considered adults, rendering that historical tradition no longer relevant. But

---

[1] Two other circuits have concluded that restrictions on 18-to-20-year-olds' ability to *carry* firearms violate the Second Amendment. *Lara v. Comm'r Pa. State Police*, 125 F.4th 428 (3d Cir. 2025), *petition for cert. filed* (No. 24-1329); *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024), *cert denied*, 145 S. Ct. 1924 (2025). But those cases involve legal questions distinct from restrictions on firearms *sales* to 18-to-20-year-olds, like the California law challenged here.

that oversimplified argument misapplies the historical analysis that the Supreme Court's Second Amendment precedents require. California, like many other jurisdictions, has determined that a baseline age of 21 is appropriate because 18-to-20-year-olds often lack the maturity and judgment necessary to responsibly purchase at least some firearms. And that same principle has justified similar restrictions since the founding: a recognition that individuals under 21 years old are still developing their judgment and reason. The district court's grant of summary judgment should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether California's hunting license exemption, which allows the commercial sale or transfer of certain long guns to 18-to-20-year-olds if they complete firearms safety training, is consistent with the Second Amendment.

2. Whether California's restriction on the commercial sale or transfer of semiautomatic centerfire rifles to most 18-to-20-year-olds is consistent with the Second Amendment.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. Plaintiffs timely appealed the district court's March 26, 2025 final judgment on April 15, 2025. 1-ER-2; 2-ER-27–33.

4

## ADDENDUM OF STATUTORY PROVISIONS

Pertinent statutory provisions appear in an addendum to plaintiffs' Opening Brief.

## STATEMENT OF THE CASE

### A. California's Restrictions on the Commercial Sale or Transfer of Long Guns to Persons Under Age 21

All commercial sales and most types of transfers of firearms in California must occur through a federally licensed firearms dealer. Cal. Penal Code §§ 27545, 28050. California has long prohibited the commercial sale or transfer of all firearms to persons under 18 years old, and the sale of handguns to persons under 21. *See id.* § 27505(a). Those age requirements parallel federal law. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 902, 82 Stat. 197, 230 (codified as amended at 18 U.S.C. § 922(b)(1)). Seventeen other states and the District of Columbia also impose a minimum age of 21 for purchasing at least some firearms.[2]

---

[2] Col. Rev. Stat. § 18-12-112.5(a.5); Conn. Gen. Stat. § 29-34(b); Del. Code Ann. tit. 24, § 903; D.C. Code § 22-4507; Fla. Stat. § 790.065(13); Haw. Rev. Stat. § 134-2(a), (d), (h); 430 Ill. Comp. Stat. 65/3(a), 65/4(a)(2); Md. Code Ann., Pub. Safety § 5-134(b); Mass. Gen. Laws ch. 140, § 131(d); Mich. Comp. Laws § 28.422(3)(b); Neb. Rev. Stat. §§ 69-2403, 69-2404; N.J. Stat. Ann. § 2C:58-3(c)(4); N.Y. Penal Law § 400.00(1); Ohio Rev. Code Ann. § 2923.21(A)(2); R.I. Gen. Laws §§ 11-47-35(a)(1), 11-47-35.2, 11-47-37; Vt. Stat. Ann. tit. 13, § 4020; Wash. Rev. Code § 9.41.240; Wyo. Stat. § 6-8-404(d)(i)(A).

5

In February 2018, a 19-year-old used a semiautomatic centerfire rifle at Marjory Stoneman Douglas High School in Parkland, Florida, to kill 17 people and wound another 17. *See Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1111-1113 (11th Cir. 2025) (en banc) (describing the mass shooting). In response, California raised the baseline age for the sale of long guns in the State from 18 to 21. *See* Cal. Penal Code § 27510; 1-SER-29. California defines "long gun" as "any firearm that is not a handgun or machinegun," Cal. Penal Code § 16865; it includes rifles and shotguns, *id.* Supporters of the new law observed that long guns may now present a greater threat to public safety than handguns, and pointed to data showing that long guns have been used in a growing share of crimes. 1-SER-26–27. They also explained that "maturity, impulsive or reckless behavior, and responsibility vary greatly among 18-20 year olds," who are "disproportionally linked" to "gun homicides." 1-SER-27.

Section 27510(a) begins by prohibiting licensed dealers from selling or transferring any firearm to a person under age 21.[3] Section 27510(b) then includes several exemptions relevant to this appeal that allow 18-to-20-year-olds to purchase certain long guns if they have completed more extensive firearms safety training. Under Section 27510(b)(3), for example, 18-to-20-year-olds who are

---

[3] Because of the parallel federal law that prohibits the sale of handguns to persons under age 21, plaintiffs do not challenge Section 27510's application to handguns. Opening Br. 8.

active members of law enforcement or the military (and thus have completed intense firearms training) may purchase any long gun. Under Section 27510(b)(1) and (2), meanwhile, 18-to-20-year-olds who have been honorably discharged from the military or who possess a valid, unexpired hunting license may purchase all long guns except for semiautomatic centerfire rifles, *see* 1-SER-32—a particularly lethal category of firearm that includes the weapon used in the Parkland mass shooting. The process for obtaining a hunting license in California involves completing a 10-hour education course that covers firearms safety topics and paying a roughly $60 fee. *See* 1-SER-12; 1-SER-16; *see also infra* pp. 20-21 (describing the process in detail). Section 27510 operates at only the sales or transfer level; it does not otherwise restrict the possession of any firearms— including semiautomatic centerfire rifles—by 18-to-20-year-olds.

Every year thousands of long guns are sold and transferred to 18-to-20-year-olds pursuant to Section 27510(b)'s exemptions. 1-ER013; 1-SER-41–43. Beyond sales and transfers through federally licensed firearms dealers under Section 27510(b), 18-to-20-year-olds also may—and do—acquire firearms in California through other lawful means. 1-ER-13. For example, they may receive firearms from parents or grandparents through intrafamilial transfers, Cal. Penal Code § 27875(a); *id.* § 16720, or otherwise obtain firearms "by operation of law," such as from a spouse, *id.* § 27920(a)(2); *id.* § 16990(g); Cal. Fam. Code § 850.

### B. Procedural History

Plaintiffs challenged Section 27510's restrictions on the sale and transfer of long guns to 18-to-20-year-olds under the Second and Fourteenth Amendments. 4-ER-677–712. The plaintiffs include two shooting ranges that are licensed firearms dealers, and three gun-rights organizations. Opening Br. 8-10. At least one organization has an individual member who is an 18-to-20-year-old covered by Section 27510's restrictions. *Id.* at 10. Other individual plaintiffs had participated in the district court, but did not join this appeal because they are now at least 21 years old. *Id.*

#### 1. Pre-*Bruen* proceedings

In November 2020, the district court denied plaintiffs a preliminary injunction, concluding that they were not likely to succeed in their challenge to Section 27510. 4-ER-726–744. On appeal, applying the framework for Second Amendment claims that predated *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), this Court affirmed in part and reversed in part, *Jones v. Bonta*, 34 F.4th 704 (9th Cir.), *opinion vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022).

The Court unanimously affirmed the district court's conclusion that Section 27510(b)(1)'s hunting license exemption—which allows 18-to-20-year-olds to purchase most long guns if they first obtain a hunting license—was likely constitutional. *Jones*, 34 F.4th at 728. The panel observed that the exemption

8

"does not prevent young adults from having any firearms" and "does not impose a significant burden on the Second Amendment right to keep and bear arms." *Id.* at 724. Applying intermediate scrutiny, the panel held that requiring 18-to-20-year-olds to take a hunter education course covering "more extensive" firearm safety information was likely a reasonable fit for the State's objective to increase public safety through "proper training" and "sensible firearm control." *Id.* at 727, 728.

The panel divided on whether Section 27510's further restriction on the commercial sale of semiautomatic centerfire rifles—which are not subject to the hunting license exemption—should have been enjoined. Judges Ryan Nelson and Lee held that strict scrutiny should have applied to this prohibition, which they suggested the law presumably could not satisfy, and that it likely would have failed intermediate scrutiny as well. *Jones*, 34 F.4th at 724-727, 730-732. Judge Stein dissented, concluding that strict scrutiny was "inappropriate," and that the prohibition on the sale of semiautomatic centerfire rifles to most 18-to-20-year-olds was a reasonable fit for the State's objectives of "enhancing public safety and reducing gun violence." *Id.* at 759 (Stein, J., dissenting in part). He based the latter conclusion on 18-to-20-year-olds' "disproportionate commission of violent gun crime," an increasing scientific understanding of their "relative immaturity and incomplete cognitive development," and the "heightened dangerousness of

9

semiautomatic rifles as compared with other types of long gun." *Id.* at 759, 760-761.

### 2. Post-*Bruen* proceedings

Soon after, the Supreme Court decided *Bruen*, which announced a new framework for evaluating Second Amendment claims based on text and history, rather than means-end scrutiny. 597 U.S. at 17-24. In light of *Bruen*, this Court granted a petition for rehearing, vacated the *Jones* opinion, and remanded the case to the district court for further proceedings. *Jones*, 47 F.4th at 1125.

In March 2025, the district court granted summary judgment to defendants and denied it to plaintiffs. 1-ER-2–25. The court held first that 18-to-20-year-olds are among "the people" referenced in the Second Amendment. 1-ER-19–20. But the court concluded that plaintiffs' challenge still failed *Bruen*'s threshold inquiry because Section 27510 is a commercial restriction on the sale of firearms that is "not covered by the Second Amendment's plain text." 1-ER-14.

The court explained that the "'plain text of the Second Amendment directly protects one thing—the right to "keep and bear" firearms'"—and that commercial restrictions on firearms sales "'do not implicate the plain text'" unless they "meaningfully constrain[]" individuals' ability to acquire firearms. 1-ER-11 (quoting *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 117, 119 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1958 (2025)). The court observed that "Section 27510

10

does not prohibit 18-to-20-year-olds from owning, possessing, or carrying firearms, and does not create a ban on acquisition." 1-ER-12. In fact, Section 27510(b) "permits commercial sale to individuals aged 18 to 20 in certain situations," and "every year thousands of firearms are sold to individuals aged 18 to 20 through … [those] exceptions," including the hunting license exemption in Section 27510(b)(1). 1-ER-12–13. Plaintiffs, meanwhile, "presented no evidence" demonstrating that the exemptions "meaningfully impair 18-to-20-year-olds' access to" firearms. 1-ER-13–14. Instead, as to the hunting license exemption in particular, plaintiffs admitted that they merely "do not wish" to take the required education course as a "personal choice," "even if it is free and conveniently located." 1-ER-13.

The court held further that, even if the Second Amendment's plain text were implicated, Section 27510 "fits within the historical tradition" of firearm regulation and is therefore "lawful under the Second Amendment." 1-ER-24. In reaching that conclusion, the court canvassed historical laws and considered several expert historian declarations submitted by defendants. 1-ER-16–24; *see e.g.*, 1-SER-96–182 (Declaration of Saul Cornell); 1-SER-238–276 (Declaration of Brennan Rivas); 2-SER-278–331 (Declaration of Robert Spitzer); 2-SER-332–363 (Declaration of Holly Brewer). The court also observed that plaintiffs failed to submit any expert declarations in support of their position. 1-ER-16.

11

Based on the court's review of the historical evidence, it concluded that Section 27510 is consistent with the regulatory tradition and the principles underpinning it:  namely, a recognition that individuals under 21 may be restricted in their "ability to commercially acquire firearms" because of their relative "immaturity and undeveloped judgment."  1-ER-24.  The court also found "persuasive" Chief Judge Pryor's recent decision in *Bondi*, 133 F.4th at 1114-1130, which rejected a Second Amendment challenge to a similar Florida law, because the en banc Eleventh Circuit "considered a statute similar to Section 27510 as well as a similar record of historical analogues as were produced in this case."  1-ER-17.

As part of its historical analysis, the district court first observed that founding-era common law and practices restricted the ability of individuals under 21 to purchase firearms.  1-ER-17–19, 1-ER-24.  The common law considered such individuals "infants," 1-ER-17 (quoting 1-SER-107 (Cornell Decl. ¶ 21)), who were "mentally immature and not yet capable of responsible self-governance," *id.* (quoting 2-SER-339–340 (Brewer Decl. ¶ 13)).  As a result, individuals under 21 were "legally unable to enter contracts to purchase on credit," which significantly impeded their ability to "acquir[e] firearms through commercial transactions."  1-ER-18–19 (citing 2-SER-354, 2-SER-356–357 (Brewer Decl. ¶¶ 37-38, 41, 43)).  Instead, such individuals relied on their parents or guardians to provide them with

firearms, as reflected in numerous founding-era state militia laws that "required parents or guardians to provide firearms to militia members under the age of 21." 1-ER-20–21 (quoting 1-SER-127 (Cornell Decl. ¶ 60)).

The court also looked to nineteenth-century state laws that codified prohibitions on the commercial sale of firearms to persons under 21. 1-ER-22–23. During that period, twenty jurisdictions enacted such laws, demonstrating that "laws restricting 18-to-20-year-olds from acquiring firearms were not uncommon." 1-ER-23 (citing 1-SER-160–163 (Cornell Decl. ¶¶ 125-132); 1-SER-262–265 (Rivas Decl. ¶¶ 40-45)). The court acknowledged a debate about whether courts applying *Bruen*'s historical analysis should primarily rely on evidence from the time of the Second Amendment's ratification in 1791 or the Fourteenth Amendment's ratification in 1868, when the right to keep and bear arms was incorporated against the States. 1-ER-15–16. But the court deemed that debate irrelevant here, where the nineteenth-century statutes were "consistent with the Founding Era common law that curtailed commercial firearm purchases by individuals aged 18 to 20," and *Bruen* had emphasized that "courts may look to the nineteenth century to confirm the Founding Era understanding of the Second Amendment." 1-ER-22–23.

Finally, the court explained that Section 27510 "fits within the historical tradition" because it "imposed a comparable burden" on 18-to-20-year-olds and

was "comparably justified." 1-ER-14–15, 1-ER-24. Like the historical analogues, "Section 27510 impedes these individuals in their ability to commercially acquire firearms," but does not "preclude this group from acquiring firearms" through their parents. 1-ER-24. Further, the regulatory tradition "curtailed the rights of individuals under 21, including their ability to commercially acquire firearms, due to their immaturity and undeveloped judgment." *Id.* And California enacted the analogous restrictions in Section 27510 "for the same reasons." *Id.* Accordingly, the court concluded, the historical tradition confirms that 18-to-20-year-olds "may be restricted in their ability to purchase firearms." *Id.*

## SUMMARY OF ARGUMENT

The district court properly rejected plaintiffs' challenge to both Section 27510's hunting license exemption and its restriction on the sale of semiautomatic centerfire rifles to most 18-to-20-year-olds. With respect to the hunting license exemption, plaintiffs falter at the threshold inquiry of *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022), because the exemption does not meaningfully constrain would-be purchasers' ability to keep and bear long guns (except for semiautomatic centerfire rifles, discussed below). To purchase most types of long guns under the exemption, an 18-to-20-year-old need only complete a ten-hour education course and pay a license fee of about $60. The hunting license exemption is also akin to the objective, "'shall-issue' licensing regimes" endorsed

14

as constitutional in *Bruen*, 597 U.S. at 38 n.9. Like those regimes, the exemption requires applicants to pass a course covering firearms safety training, and the licensing official "shall issue" a certificate to applicants who complete the course. Cal. Fish & Game Code § 3051(c). Plaintiffs' contrary arguments misapply the "meaningful constraint" standard and cannot be squared with precedents upholding similar licensing regimes.

In any event, both the purchase limitations of the hunting license exemption and the sales restriction for semiautomatic centerfire rifles are consistent with the Nation's historical tradition, which—"[f]rom English common law to America's founding and beyond"—"has permitted restrictions on the sale of firearms to individuals under the age of 21." *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568, 572 (4th Cir. 2025). In the founding era, common law restricted the ability of 18-to-20-year-olds to purchase firearms, and state militia laws reflect that such individuals generally had to acquire firearms from their parents or guardians instead. Then, in the nineteenth century, States enacted statutory prohibitions on the sale of firearms to persons under age 21, with twenty jurisdictions passing laws restricting the sale of firearms to such individuals.

Section 27510 is "relevantly similar" to—and "consistent with the principles" of—this historical tradition. *United States v. Rahimi*, 602 U.S. 680, 692 (2024). The statute imposes a comparable burden on 18-to-20-year-olds' ability to keep

and bear arms because it restricts their ability to purchase firearms but does not prevent them from possessing firearms or acquiring them from a parent. And it is also comparably justified. The California Legislature enacted Section 27510 because it believed that 18-to-20-year-olds are still developing the maturity and responsibility necessary to buy lethal firearms. This is the same justification as the founding-era common law and nineteenth-century statutes, which also restricted the ability of persons under 21 to buy firearms because they lacked reason and judgment. *E.g.*, *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1122-1123 (11th Cir. 2025) (en banc). Plaintiffs' contrary arguments are unpersuasive. They fail to grapple with the founding-era common law; disregard statutes that are squarely part of the historical analysis; and rely on a facile distinction between minors and adults that is untethered from any Second Amendment precedent. The district court's judgment should be affirmed.

## STANDARD OF REVIEW

The Court reviews a grant of summary judgment de novo. *Bauer v. Becerra*, 858 F.3d 1216, 1220 (9th Cir. 2017).

## ARGUMENT

The district court held that plaintiffs' challenge to Section 27510 failed under both the threshold inquiry and the historical analysis of *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). 1-ER-11–25. For long guns subject to

16

the hunting license exemption in Section 27510(b)(1), defendants agree with the district court's analysis that plaintiffs' challenge fails *Bruen*'s threshold inquiry because the process for obtaining a license does not "meaningfully constrain" would-be purchasers' ability to keep and bear those firearms. *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1958 (2025). In light of intervening circuit precedent, however, defendants do not advance the district court's broader argument (at 1-ER-14) that Section 27510 does not meaningfully constrain an 18-to-20-year-olds' ability to acquire semiautomatic centerfire rifles, which are excluded from the hunting license exemption.[4] Plaintiffs' challenge to both aspects of Section 27510's restriction on the sale of long guns nonetheless still fails *Bruen*'s historical analysis because the statute is consistent with the Nation's tradition of restricting the sale of firearms to individuals under age 21.

---

[4] *See Nguyen v. Bonta*, 140 F.4th 1237, 1242-1243 (9th Cir. 2025). Likewise, in light of *United States v. Duarte*, 137 F.4th 743, 752-753 (9th Cir. 2025) (en banc), defendants do not advance the argument that 18-to-20-year-olds are not among "the people" in the Second Amendment. The brief should not be understood to concede any of plaintiffs' specific arguments on that point, however.

## I. CALIFORNIA'S HUNTING LICENSE EXEMPTION IS CONSISTENT WITH THE SECOND AMENDMENT

### A. The hunting license exemption does not meaningfully constrain 18-to-20-year-old's ability to keep and bear arms

1. Commercial restrictions on the sale of firearms "presumptively do not implicate the plain text of the Second Amendment." *B&L*, 104 F.4th at 109. That text "directly protects one thing—the right to 'keep and bear' firearms"—and "says nothing about commerce" or "firearm sales." *Id.* at 117-118 (quoting U.S. Const. amend. II). The ability to acquire firearms "receives some Second Amendment protection," of course, "to the extent necessary" to preserve "the core right to possess a firearm for self-defense." *Id.* at 118. But the "Supreme Court itself has suggested" that the right to acquire firearms "only implicates the Second Amendment in limited circumstances," *id.*, describing "'laws imposing conditions and qualifications on the commercial sale of firearms,'" for example, as "'presumptively lawful regulatory measures,'" *id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-627 & n.26 (2008)); *accord Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring).

Laws regulating the sale or transfer of firearms implicate the Second Amendment's text only if they "meaningfully constrain" the right to keep and bear arms. *B&L*, 104 F.4th at 119; *see also United States v. Vlha*, 142 F.4th 1194, 1198 (9th Cir. 2025) (describing "meaningful-constraints test"). In other words, such

18

regulations are subject to historical scrutiny under *Bruen* if—and only if—plaintiffs first demonstrate that the challenged regulation "meaningfully impairs an individual's ability to access firearms." *B&L*, 104 F.4th at 119. "[O]therwise, the Second Amendment is not implicated" and a plaintiff's challenge "necessarily fails." *Id.* at 117-118.

Under that standard, Section 27510(b)(1)'s provision that allows 18-to-20-year-olds to purchase most long guns if they first obtain a hunting license does not meaningfully constrain the right to keep and bear arms. "Section 27510 does not prohibit 18-to-20-year-olds from owning, possessing, or carrying firearms, and does not create a ban on acquisition." 1-ER-12. Instead, the "regulated conduct at issue" involves the sale of long guns to such individuals. *Vlha*, 142 F.4th at 1197; *see B&L*, 104 F.4th at 117 & n.17. And 18-to-20-year-olds indisputably may purchase most types of long guns so long as they take a course covering firearms safety training and obtain a hunting license. Cal. Penal Code § 27510(b)(1). To proceed past *Bruen*'s threshold inquiry, then, plaintiffs "must be able to demonstrate that the would-be purchasers' core right of possession is being meaningfully constrained." *Vlha*, 142 F.4th at 1198. At least as to long guns subject to Section 27510(b)(1)'s hunting license exemption, plaintiffs cannot make that showing—and, indeed, have not even really tried.

California law allows 18-to-20-year-olds to purchase long guns (other than semiautomatic centerfire rifles) so long as they possess a valid, unexpired hunting license. Cal. Penal Code § 27510(b)(1). As the *Jones* panel observed (in the context of applying the pre-*Bruen* Second Amendment framework), the hunting license exemption "does not prevent young adults from having any firearms" and "does not impose a significant burden on the Second Amendment right to keep and bear arms." *Jones v. Bonta*, 34 F.4th 704, 724 (9th Cir.), *opinion vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022).

The process for obtaining a hunting license is straightforward and simple. An applicant first must complete a hunter education course that covers "firearms safety information" that is "more extensive" than that covered by the otherwise applicable firearms safety certificate (which persons over 21 must obtain to purchase a long gun). *Jones*, 34 F.4th at 727; *see* 1-SER-22; Cal. Fish & Game Code § 1053.5. Applicants have the choice of taking a traditional course of roughly ten hours of in-person instruction, or an online course followed by four hours in person. 1-SER-16–17. The online course costs about $30, 1-SER-18, while the traditional course is provided either at a similarly modest cost or—as is often the case—for free. *E.g.*, 1-SER-10 (course fee of $20); 1-SER-11 (course "free to all"); *see also* Cal. Fish & Game Code § 3052 (course attendees "shall not be charged a fee" for instructor's services, but "may be charged a fee to cover" teaching materials).

20

At the conclusion of the hunter education course, applicants must pass a practical firearms test covering objective safe use and handling demonstrations. 1-SER-8–9. After passing the course and obtaining a hunter education certificate, applicants may purchase an annual hunting license for about $60. 1-SER-12. Applicants may renew their license in subsequent years without needing to take the education course again. *See* Cal. Fish & Game Code § 3050(a)(1), (3).

This licensing process—which ensures adequate safety instruction and training, at nominal cost—"does not meaningfully constrain would-be purchasers from obtaining firearms." *Vlha*, 142 F.4th at 1200. As the district court observed, 1-ER-13, thousands of long guns are sold every year to 18-to-20-year-olds pursuant to this exemption. *See* 1-SER-45. Individual plaintiffs acknowledged below that free hunter education courses were readily available in locations close to where they lived. 1-SER-57–64; 1-SER-73. Their stance was simply that they preferred not to take the course as a matter of "personal choice." 1-ER-13 (quoting 1-SER-59); *see also* 4-ER-593. The Second Amendment, however, "'does not elevate convenience and preference over all other considerations.'" *B&L*, 104 F.4th at 119 (quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) (en banc), *abrogated in part by Bruen*, 597 U.S. at 17).

2. On appeal, plaintiffs primarily contend that the "meaningful constraints" test does not apply to an "across-the-board regulation" of the acquisition of

21

firearms. Opening Br. 30-34.[5] Even assuming that Section 27510(b)(1)'s hunting license exemption constituted such an "across-the-board" regulation, plaintiffs' argument is mistaken. They base the argument (at 32) on the since-vacated panel opinion in *Yukutake v. Lopez*, 130 F.4th 1077 (9th Cir.), *reh'g en banc granted, opinion vacated*, 144 F.4th 1119 (9th Cir. 2025). This Court has voted to rehear that case en banc, however, and has otherwise consistently applied the meaningful-constraints standard to evaluate whether a regulation of firearms acquisition implicates the text of the Second Amendment, even if the law applies broadly. *See, e.g.*, *Vlha*, 142 F.4th at 1198-1200; *Nguyen*, 140 F.4th at 1242-1243; *Rhode v. Bonta*, 145 F.4th 1090, 1107-1109 (9th Cir. 2025), *petition for reh'g filed*. While the Court has reached different conclusions about whether a particular law imposes a meaningful constraint, it has not adopted plaintiffs' view that the standard is not applied when a law is characterized as applying "across-the-board." Rather, the Court has applied the standard in a recent case where, as here, the challenged regulations involved a broadly applicable licensing requirement (in that case, for the manufacture of firearms). *Vlha*, 142 F.4th at 1199-1200.

---

[5] Plaintiffs' argument would not only call into question licensing laws like the exemption challenged in this case, but also extend to *any* law requiring a permit or license to purchase or carry a firearm. That view of the Second Amendment cannot be reconciled with *Bruen*, 597 U.S. at 38 n.9. *See also infra* pp. 24-25.

Plaintiffs' only remaining argument as to Section 27510(b)(1)'s hunting license exemption is that it is "at least as significant a restriction" as the one-gun-a-month law that the Court deemed to pose a meaningful constraint in *Nguyen*. Opening Br. 38. But the Court concluded that the law in *Nguyen* meaningfully constrained individuals' right to possess multiple firearms because it "categorically prohibit[ed] citizens from purchasing more than one firearm of any kind in a 30-day period." 140 F.4th at 1243. Here, the hunting license exemption does not categorically prohibit any conduct; it requires only that 18-to-20-year-olds obtain a license to ensure that they receive additional firearms safety training. *Supra* pp. 20-21. And once an individual has completed the education course, the hunting license may be renewed annually without taking the course again. *Supra* p. 21.

*Nguyen* itself, 140 F.4th at 1243, also distinguished the law at issue in that case from the federal law upheld by the Fifth Circuit in *McRorey v. Garland*, which requires expanded background checks for 18-to-20-year-olds. 99 F.4th 831, 838-840 (5th Cir. 2024) (evaluating law enacted as part of the Bipartisan Safer Communities Act of 2022, Pub. L. No. 117-159, § 12001, 136 Stat. 1313, 1322-1324). This Court explained its view that "delay *itself* is the purpose" of the one-gun-a-month law in *Nguyen*, whereas the expanded background checks in *McRorey* "served a presumptively valid purpose." *Nguyen*, 140 F.4th at 1243. The hunting

license exemption here serves a materially similar purpose as the background check examined in *McRorey*.

Finally, the hunting license exemption's one-time education course, followed by a renewable annual license, also distinguishes Section 27510(b)(1) from the recurring ammunition background check deemed to pose a meaningful constraint on the right to bear operable arms in *Rhode*, 145 F.4th at 1106-1109. The panel opinion in *Rhode*, which is subject to a pending petition for rehearing en banc, distinguished that recurring background check—which applies "every time a person seeks to purchase ammunition"—from other "one-time" background checks or licenses that courts have held do not implicate the Second Amendment. *Id.* at 1109 n.23, 1117. Thus, even if the *Rhode* panel opinion is not reheard en banc, it does not affect the outcome here.

### B. The hunting license exemption is a lawful shall-issue licensing regime

Section 27510(b)(1)'s exemption allowing the purchase of most types of long guns by 18-to-20-year-olds who possess a valid hunting license is also the type of shall-issue licensing regime endorsed as constitutional in *Bruen*.

The Supreme Court explained in *Bruen* that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of … States' 'shall-issue' licensing regimes." 597 U.S. at 38 n.9. The Court observed that those regimes incorporate "narrow, objective, and definite standards," "often require applicants to … pass a

24

firearms safety course," and are "designed to ensure only that" applicants are "'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). Without performing any historical analysis, the Court explained that plaintiffs challenging such a licensing regime under the Second Amendment would have to show that it is "put toward abusive ends," such as through "lengthy wait times in processing license applications or exorbitant fees." *Id.* Justice Kavanaugh authored a concurring opinion, joined by Chief Justice Roberts, elaborating on the point. He explained that such licensing regimes, which may "require a license applicant to undergo … training in firearms handling," are "constitutionally permissible," though subject to an "as-applied challenge" if they do not operate as designed. *Id.* at 80 (Kavanaugh, J., concurring).

Since *Bruen*, courts have consistently rejected Second Amendment challenges to licensing regimes that require applicants to complete firearms safety training or courses. *See, e.g.*, *Giambalvo v. Suffolk Cnty., New York*, --- F.4th ---, No. 23-208, 2025 WL 2627368, at *9-10 (2d Cir. Sept. 12, 2025); *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 225-229 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1049 (2025). And courts have further held that licensing regimes are consistent with the Nation's tradition of firearm regulation. *See Antonyuk v. James*, 120 F.4th 941, 981-999 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025).

The reasoning in these cases settles the question of whether Section 27510(b)(1)'s hunting license exemption comports with the Second Amendment, both as a matter of plain text and after a historical inquiry. By law, instructors of the education course "shall issue" a certificate of completion to persons who complete it. Cal. Fish & Game Code § 3051(c). The course includes "firearms safety and handling" training. 1-SER-14–15; *see also* 1-SER-3–8; 1-SER-78–88. There are also "narrow" and "objective" standards guiding licensing officials, *Bruen*, 597 U.S. at 38 n.9—such as whether students in the education course are "unable to apply safety principles after correction," 1-SER-8–9. And the "more extensive" firearms safety instruction required as part of the licensing exemption, *Jones*, 34 F.4th at 727, 728, is "designed to ensure" that 18-to-20-year-old purchasers of long guns are "responsible citizens" who can use and handle a firearm safely, *Bruen*, 597 U.S. at 38 n.9.

Plaintiffs have never argued that the hunting license exemption involves "lengthy wait times" or "exorbitant fees," or is abusive in a similar manner. *Bruen*, 597 U.S. at 38 n.9. The ten-hour safety course is shorter than the ten-day period for expanded background checks that the Fifth Circuit found not to be "abusive" in *McRorey*, 99 F.4th at 839-840. And as described above (at 20-21), the course is either free or costs about $30, with the license fee an additional $60. That modest cost is in lieu of a firearms safety certificate, which itself costs $25 and is

otherwise required for individuals 21-and-over to purchase a long gun. 1-SER-37–38. Plaintiffs erroneously assert that the hunting license is "in addition to" that safety certificate (Opening Br. 7-8), but the State exempts hunting license holders from the firearms safety certificate requirement because the hunting license training covers "more extensive" safety information, *Jones*, 34 F.4th at 727; Cal. Penal Code § 31700(c); 1-SER-22.

Plaintiffs' true argument is that the hunting license is "irrelevant" or a "pointless endeavor for someone with no interest in hunting." Opening Br. 6, 7. But their disagreement with the California legislature's judgment that 18-to-20-year-olds would benefit from additional safety instruction is not a basis for relief under the Second Amendment. The relevant question is whether the licensing regime is "put toward abusive ends." *Bruen*, 597 U.S. at 38 n.9. And plaintiffs "have not shown any such abuse here." *Vlha*, 142 F.4th at 1200.

Nor can plaintiffs seriously dispute the rationality of the license exemption. The education course may include some topics (like conservation) that are "less relevant" to non-hunters, *Jones*, 34 F.4th at 728, but firearms safety and handling is a primary focus, *see* 1-SER-3–8; 1-SER-78–88. And in the proceedings below, the individual plaintiffs acknowledged that many of the topics covered in the course are relevant to safe and responsible firearms use. 1-SER-47–57; 1-SER-66–72.

27

## II. CALIFORNIA'S PROHIBITION ON THE COMMERCIAL SALE OR TRANSFER OF SEMIAUTOMATIC CENTERFIRE RIFLES TO MOST PERSONS UNDER 21 IS CONSISTENT WITH THE SECOND AMENDMENT

The sale of semiautomatic centerfire rifles is not covered by the hunting license exception in Section 27510(b)(1), so licensed firearms dealers may not sell or transfer those arms to 18-to-20-year-olds unless they are active members of law enforcement or military. *See* Cal. Penal Code § 27510(b)(1)-(3). That restriction is lawful under the Second Amendment, however, because it is consistent with the Nation's historical tradition of restricting the sale of firearms to individuals under age 21. If the Court concludes (or assumes) that the hunting license exemption implicates the plain text of the Second Amendment, the same historical analysis supports that limitation on the sale or transfer of those other long guns as well.

### A. At the Second and Fourteenth Amendments' ratification, law restricted the ability of persons under 21 to purchase firearms

#### 1. Founding-era common law significantly limited the legal capacity of persons under 21, including their ability to purchase firearms

At the founding, individuals were considered "infants" in the eyes of the law until they turned 21. 2-SER-337–338 (Brewer Decl. ¶ 9); 1-SER-107, 1-SER-117–118, 1-SER-122 (Cornell Decl. ¶¶ 21, 41, 50) (citing, e.g., 1 Zephaniah Swift, *A System of the Laws of the State of Connecticut* 213 (1795)). This "infancy doctrine" was "premised on the understanding" that persons under 21 were "mentally immature and not yet capable of responsible self-governance." 2-SER-

339 (Brewer Decl. ¶ 13); 1-SER-122–123 (Cornell Decl. ¶ 51). The principle derived from English common law, which recognized that persons "had no independent political and legal capacity" until they "reached the age of 21 and [then] had full use of [their] reason and therefore full capacity to make judgments." 2-SER-339 (Brewer Decl. ¶ 13) (citing 1 William Blackstone, *Commentaries on the Laws of England* 441, 450 (1765)). Individuals under 21 thus lacked legal rights and were subject to the power of their parents or guardians. 2-SER-339–340, 2-SER-354–356, 2-SER-359–361 (Brewer Decl. ¶¶ 13, 37-40, 47-50); 1 Blackstone, *supra*, at 441; 1 Swift, *supra*, at 213. This Nation's founding generation "shared the view" that 18-to-20-year-olds "lacked the reason and judgment necessary to be trusted with legal rights." *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025) (en banc) (citing, e.g., letters of John Adams and Thomas Jefferson); 1-ER-17–18 n.12 (same).

One of the implications of the infancy doctrine was that persons under 21 lacked the capacity to contract or purchase goods on credit. 2-SER-340–343 (Brewer Decl. ¶¶ 14-19); 1-SER-122 (Cornell Decl. ¶ 50); *see also* 1 Samuel Comyn, *A Treatise of the Law Relative to Contracts and Agreements Not Under Seal* 148 (1809); William Macpherson, *Treatise on the Law Relating to Infants* 303 (1843). Such individuals' inability to bind themselves by contract was a "well understood and engrained principle of American law." *McCoy v. Bureau of*

*Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568, 575 (4th Cir. 2025) (citing 1 Swift, *supra*, at 215; 2 James Kent, *Commentaries on American Law* 191 (1827)); *see also* Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* 269-271 (2005).

These legal impediments significantly restricted the ability of individuals under 21 to purchase firearms at the founding.  2-SER-341, 2-SER-354 (Brewer Decl. ¶¶ 16, 37–38); 1-ER-18–19; *see McCoy*, 140 F.4th at 576.  Firearms were expensive, 2-SER-354, 2-SER-356–358 (Brewer Decl. ¶¶ 38, 41, 43-45), and individuals under 21 lacked disposable income because any wages they might have received belonged to their parents or guardians, 2-SER-354 (Brewer Decl. ¶ 37); *see* Robert J. Spitzer, *Historical Weapons Restrictions on Minors*, 76 Rutgers U. L. Rev. 101, 108 (2024).  As a result, individuals under the age of 21 generally "did not have the ability to purchase weapons" at the founding.  2-SER-361 (Brewer Decl. ¶ 51); 1-SER-147 (Cornell Decl. ¶ 95); *Bondi*, 133 F.4th at 1118.

Plaintiffs do not meaningfully contest that these common law principles rendered 18-to-20-year-olds unable to purchase most goods at the founding. Instead, plaintiffs surmise that they could have purchased firearms pursuant to a common law exception that allowed individuals under 21 to contract for "necessaries."  Opening Br. 54-57.  "Necessaries," however, were limited to items like food, clothing, education, lodging, and medicine.  2-SER-340–343 (Brewer

Decl. ¶¶ 15, 19); 1-SER-122 (Cornell Decl. ¶ 50) (citing 1 Swift, *supra*, at 216).

Courts viewed the exception narrowly, and plaintiffs have not presented "any

evidence" that the exception applied to firearms at the founding. 2-SER-342–343,

2-SER-354 (Brewer Decl. ¶¶ 19, 38); *accord McCoy*, 140 F.4th at 576 (citing, e.g.,

Brewer, *supra*, at 266).[6]  At least one court held at the time that while "[l]odging,

clothing, food, medicine and education[] are necessaries," other items including

"liquor, pistols, powder, [and] saddles" were "not." *Saunders Glover & Co. v.*

*Ott's Adm'r*, 12 S.C.L. (1 McCord) 572, 572 (Const. Ct. App. 1822).

Plaintiffs nonetheless suggest that because 18-to-20-year-olds were

sometimes "*required* to be armed" for militia service, it "follows" that firearms

would have been considered "necessaries."  Opening Br. 54-55.  But as explained

below, many States enacted laws *requiring parents or guardians* to provide 18-to-

20-year-olds with firearms in those circumstances, precisely because they

recognized that individuals under 21 "would not be able to purchase" firearms on

their own.  1-SER-147 (Cornell Decl. ¶ 95).  Those laws thus provide no historical

support for plaintiffs' argument that 18-to-20-year-olds at the founding could

---

[6] Plaintiffs cite a biography of Andrew Jackson to suggest that he purchased firearms at age 20 pursuant to the "necessaries" exception.  Opening Br. 56-57. But even assuming assertions in that book could provide relevant evidence of the historical tradition, the book simply does not say how the firearms were acquired. Hendrik Booraem, *Young Hickory: The Making of Andrew Jackson* 195 (2001).

purchase firearms under the common law "necessaries" exception.  To the contrary, they demonstrate a widely shared understanding that individuals "under the age of 21 *were unable to purchase weapons*" at the time.  2-SER-361 (Brewer Decl. ¶ 51).

> **2.    State militia laws confirm that 18-to-20-year-olds relied on their parents and guardians to provide them firearms**

State militia laws from the founding era reflect the common-law tradition that 18-to-20-year-olds generally could not purchase firearms, and that they relied on their parents or guardians to provide them with firearms instead.  The Second Congress enacted the Militia Act to enroll "able-bodied" men between the ages of 18 and 45 in the militia, and required that each enrollee shall "provide himself with a good musket or firelock."  Militia Act, § 1, 1 Stat. 271 (1792).  But because the common law infancy doctrine restricted 18-to-20-year-olds' ability to purchase firearms, it was widely understood at the time that parents or guardians (or local governments) would have to provide firearms for those underage militia members instead.  *See* 2-SER-343–344, 2-SER-356, 2-SER-361 (Brewer Decl. ¶¶ 21, 41, 51); 1-SER-147 (Cornell Decl. ¶ 95); Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 Minn. L. Rev. 3049, 3077-3081 (2024).  Indeed, members of Congress specifically discussed this point as part of the Militia Act's legislative debates.  *See Bondi*, 133 F.4th at 1119

(citing 2 Joseph Gales, *The Debates and Proceedings in the Congress of the United States* 1854-1856 (1834)).

Consistent with that understanding, many States enacted militia statutes in the founding era to address 18-to-20-year-olds' inability to purchase their own firearms. 1-ER-20–21; 1-SER-140–147 (Cornell Decl. ¶¶ 85, 90-94); 2-SER-343–353 (Brewer Decl. ¶¶ 21-36); *see also* 3-SER-521–532 (table cataloging these laws). Seven States (Louisiana, Maine, Massachusetts, Missouri, New Hampshire, North Carolina, and Vermont) passed laws requiring parents or guardians to provide firearms to militia members under the age of 21. 1-ER-21 n.14 (collecting statutes). Two States (Delaware and Pennsylvania) exempted members under 21 from the firearm requirement. 1-ER-21 n.15. And twelve States (Connecticut, Georgia, Illinois, Indiana, Kentucky, Maryland, Mississippi, New Jersey, New York, Ohio, Rhode Island, and Virginia) held parents or guardians liable for an 18-to-20-year-old's failure to obtain or show up to muster with an appropriate firearm, thereby requiring parents or guardians as a practical matter to provide their children a firearm or face fines. 1-ER-21 n.16.

All told, by 1826, "at least 21 of the 24 states admitted to the Union—representing roughly 89 percent of the population—had enacted laws that placed the onus on parents to provide minors [defined at the time to be persons under 21] with firearms for militia service." *Bondi*, 133 F.4th at 1120 (citation omitted).

Plaintiffs do not even try to explain why so many States would have enacted these laws if plaintiffs were correct that 18-to-20-year-olds at the founding could purchase firearms on their own. Opening Br. 54. Instead, they point to laws requiring 18-to-20-year-olds to serve in the militia as purported evidence that they could bear arms, *id.* at 46-47, when the laws in fact reveal that their service (or their similar participation in posse comitatus) was possible only to the extent others provided them with arms. *See* 1-SER-127, 1-SER-147 (Cornell Decl. ¶¶ 60, 96); 2-SER-343–353, 2-SER-356, 2-SER-358–359 (Brewer Decl. ¶¶ 21-36, 41, 46). The statutes codifying parental obligations to furnish firearms thus confirm the background founding-era practice that persons under age 21 "did not have the ability to purchase weapons" on their own. 2-SER-361 (Brewer Decl. ¶ 51); 1-SER-147 (Cornell Decl. ¶ 95).[7]

### 3. Nineteenth-century statutes codified prohibitions on selling firearms to individuals under 21

a. The founding-era restrictions on the ability to purchase firearms by individuals under age 21 continued in the nineteenth century as States enacted

---

[7] University regulations from the founding era also demonstrate that 18-to-20-year-olds needed parental consent to access firearms. University authorities acted in *loco parenti*s, meaning "in the place of a parent," and commonly restricted firearms access both on and off campus. 1-ER-19 n.13; *see* 2-SER-294–300 (Spitzer Decl. ¶¶ 26-35); 1-SER-129–132 (Cornell Decl. ¶¶ 66-71). These widespread regulations further "illustrate the view that the Founders opposed unfettered access to guns" by 18-to-20-year-olds. Walsh & Cornell, *supra*, at 3069-3075; *see also* Spitzer, *supra*, at 112-119; *Bondi*, 133 F.4th at 1120-1121.

statutory prohibitions. Between 1856 and the end of the century, at least 19 States and the District of Columbia enacted laws prohibiting the sale of firearms to individuals under age 21. 1-ER-23 (citing, e.g., 1-SER-160–163 (Cornell Decl. ¶¶ 125-132); 1-SER-262–265 (Rivas Decl. ¶¶ 40-45)).

In 1856, for example, Alabama prohibited selling, giving, or lending an "air gun, or pistol," to males under 21. 1856 Ala. Acts 17, No. 26, § 1; *see* 1-SER-155 (Cornell Decl. ¶ 113). And similarly, in 1875, Indiana made it unlawful to "sell, barter, or give to any other person, under the age of twenty-one years, any pistol … or other deadly weapon." 1875 Ind. Laws 59, ch. 40, § 1; *see* 1-SER-160–161 (Cornell Decl. ¶ 125). In addition, more than a dozen other jurisdictions (including the District of Columbia, Georgia, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Oklahoma, Tennessee, Texas, West Virginia, Wisconsin, and Wyoming) generally prohibited all methods of providing certain firearms to individuals under the age of 21, subject to occasional exceptions.[8] Two

---

[8] Act of July 13, 1892, ch. 159, § 5, 27 Stat. 116, 116-117 (District of Columbia); 1876 Ga. Laws 112, No. 128 (O. No. 63), § 1; 1881 Ill. Laws 73, § 2; 1884 Iowa Acts 86, ch. 78, § 1; 1883 Kan. Sess. Laws 159, ch. 105, §§ 1-2; 1859 Ky. Acts 245, ch. 33, § 23; 1890 La. Acts 39, No. 46, § 1; 1882 Md. Laws 656, ch. 424, § 2; Mo. Rev. Stat. § 1274 (1879); 1893 N.C. Sess. Laws 468, ch. 514; 1890 Okla. Sess. Laws 495, art. 47, §§ 1-3; 1856 Tenn. Pub. Acts 92, ch. 81, § 2; 1897 Tex. Gen. Laws 221-222, ch. 155, § 1; 1882 W. Va. Acts 421-422, ch. 135, § 1; 1883 Wis. Sess. Laws 290, ch. 329, §§ 1-2; 1890 Wyo. Sess. Laws 140, ch. 73, § 97. For the Court's reference, a table cataloguing these (and other relevant)

(continued…)

other States (Delaware and Mississippi) prohibited the sale of firearms to individuals under 21, but not other means of providing them those arms. *See* 16 Del. Laws 716, ch. 548, § 1 (1881); 1878 Miss. Laws 175, ch. 66, § 2.

The statutory prohibitions on the sale or transfer of firearms—which spanned every region of States admitted to the Union—were "celebrated by the public and went largely unchallenged." *McCoy*, 140 F.4th at 579 (citing Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 156 (2019)); 1-SER-260–261, 1-SER-266 (Rivas Decl. ¶¶ 38, 47). Thomas Cooley, who wrote a "massively popular" treatise that the Supreme Court has cited with approval, *Heller*, 554 U.S. at 616, explained at the time that "the State may prohibit the sale of arms to minors," Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883). Because Cooley recognized an individual right to keep and bear arms in other writings around the same time, *see Heller*, 554 U.S. at 616-611, the treatise's comment is at least "persuasive evidence" that laws prohibiting the sale of firearms to those under 21 were uncontroversial. *Pinales v. Lopez*, 765 F. Supp. 3d 1024, 1052 (D. Hawaii 2025).

Plaintiffs presented no historical evidence suggesting that "the lawfulness or constitutionality of any of the nineteenth century statutes discussed above was

---

nineteenth-century laws appears at 3-SER-482–520, and the laws catalogues in that table are reproduced at 3-SER-533–683.

subject [to meaningful] disputes." 1-ER-23 (citing 1-SER-266 (Rivas Decl. ¶ 46)). In what appears to be the only nineteenth-century judicial decision addressing a constitutional challenge to a statute prohibiting the sale of firearms to individuals under age 21, the Tennessee Supreme Court held that its state law was "not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *State v. Callicutt*, 69 Tenn. 714, 716-717 (1878). Notably, that same court had just a few years earlier held that another state statute, which forbade openly carrying a pistol, contravened the state constitution's Second Amendment analogue. *Heller*, 554 U.S. at 629 (citing *Andrews v. State*, 50 Tenn. 165, 187 (1871)).

Because "dozens of geographically diverse states" passed laws prohibiting the sale of firearms to individuals under age 21 during this period, "one would expect more caselaw if the public considered the laws even borderline unconstitutional." *Pinales*, 765 F. Supp. 3d at 1051-1052. Instead, States routinely prosecuted and convicted people, without constitutional challenge, for violating the statutes that prohibited sales of arms to persons under 21. *See Bondi*, 133 F.4th at 1140-1142 (Rosenbaum., J., concurring) (collecting cases). This Court can thus "assume it settled" that the laws are "consistent with the Second Amendment." *Bruen*, 597 U.S. at 30; *see* 1-ER-23; 1-SER-266 (Rivas Decl. ¶ 47).

b. The timing of these nineteenth-century statutes is particularly relevant in this case, given that plaintiffs challenge a state law. States enacted these statutes around the time of the 1868 ratification of the Fourteenth Amendment, which incorporated the Second Amendment against the States. Plaintiffs cannot explain why over a dozen States would have prohibited the sale of firearms to individuals under age 21 during this period, and why those laws would not have sparked more controversy, if the statutes violated the right to keep and bear arms as understood by Americans at that time. *See* 1-SER-159–160 (Cornell Decl. ¶ 124). The Supreme Court has explained that a "clear majority of the States" and the "ratifiers of the Fourteenth Amendment" recognized that right as "among the foundational rights necessary to our system of Government." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 777-778 (2010). It thus "would be odd," to say the least, for so many States to enact such laws knowing that they "run afoul … of the Second Amendment that was just applied to them." *Pinales*, 765 F. Supp. 3d at 1043.

Plaintiffs nonetheless argue that these statutes are "too-late-in-time" to matter for purposes of *Bruen*'s historical analysis. Opening Br. 62; *id.* at 39-44. But the Supreme Court has described historical evidence "through the end of the 19th century" as a "critical tool of constitutional interpretation," *Heller*, 554 U.S. at 605, and has stated that it will "consider whether 'historical precedent' from before, during, *and even after* the founding evinces a comparable tradition of regulation,"

38

*Bruen*, 597 U.S. at 27 (quoting *Heller*, 554 U.S. at 631) (emphasis added); *see also Heller*, 554 U.S. at 605-619 (considering nineteenth-century evidence when construing scope of Second Amendment); *Bruen*, 597 U.S. at 50-56 (similar).  This Court, too, has repeatedly "look[ed] to the understanding of the right to bear arms *both* at the time of the ratification of the Second Amendment in 1791 *and* at the time of the ratification of the Fourteenth Amendment in 1868."  *Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024), *cert. granted on other grounds*, --- S.Ct. ---, 2025 WL 2808808 (2025); *United States v. Duarte*, 137 F.4th 743, 755 (9th Cir. 2025) (en banc).[9]

In fact, this Court has relied on some of these very same nineteenth-century statutes when undertaking a historical analysis under *Bruen*, observing that States, "through the late 1800s," restricted the "sale of firearms to … individuals below specified ages."  *Duarte*, 137 F.4th at 759 & n.14.  To be sure, evidence from the late nineteenth century may not "provide much insight into the meaning of the Second Amendment when it *contradicts* earlier evidence."  *Bruen*, 597 U.S. at 66

---

[9] The Supreme Court recently granted certiorari in *Wolford*, but expressly limited the grant to the first question presented in the petition, *see* 2025 WL 2808808, which addresses the places in which a state may presumptively prohibit the carrying of handguns, *see* Pet. for Writ of Cert. i-ii, *Wolford v. Lopez*, No. 24-1046, https://tinyurl.com/3248jy5a. The Supreme Court declined to grant certiorari on the second question presented, which addressed the relevant time period for *Bruen*'s historical analysis.  *Id.* at ii.

(emphasis added).  But here, the nineteenth-century statutes "confirm the Founding-era understanding of the Second Amendment," as "the law of both eras" restricted the ability of individuals under age 21 to purchase firearms.  *Bondi*, 133 F.4th at 1116-1117; *see also McCoy*, 140 F.4th at 578-579; 1-ER-15–16.

Plaintiffs disagree, arguing that the ratification-era statutes are inconsistent with founding-era law based on their view that, at the founding, "there were zero restrictions of any kind on 18-to-20-year-olds, period."  Opening Br. 16; *id.* at 46. But that assertion is based on plaintiffs' review of founding-era statutes; it entirely ignores how the common law significantly restricted 18-to-20-year-olds' ability to purchase firearms.  *Supra* pp. 28-34.  And to the extent plaintiffs rely on a lack of *legislative* restrictions at the founding, they wrongly "assume[] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority."  *United States v. Rahimi*, 602 U.S. 680, 739-740 (2024) (Barrett, J., concurring).

Any such assumption is "especially unwarranted" in this case, where the common-law limitations on the legal rights of 18-to-20-year-olds "were so pervasive that states had no need to enact restrictions that prohibited their purchase of firearms."  *Bondi*, 133 F.4th at 1123; 1-ER-19.  Even Judge Newsom from the Eleventh Circuit—a self-described "critic" of reliance on post-ratification history—agrees that the nineteenth-century statutes are relevant and informative in

this context because they help "avoid mistaking the *absence* of a precisely analogous Founding-era regulation for the *existence* of a substantive constitutional right." *Bondi*, 133 F.4th at 1156-1159 (Newsom, J., concurring). In other words, "[t]he laws from the mid-to-late nineteenth century make explicit what was implicit at the Founding": States may "prohibit[] the sale of certain arms to individuals under the age of 21." *Id.* at 1124 (majority opinion).

Plaintiffs also contend that this "historical story fails to account" for why States enacted laws expressly prohibiting the sale of firearms to individuals under 21 in the nineteenth century if the common law "'obviated'" the need for "'more specific regulation'" at the time of the founding. Opening Br. 59 (quoting 1-ER-19). But as the district court explained, statutes were "comparatively infrequent" through the middle of the nineteenth century because of the Nation's common-law tradition. 1-ER-20 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 3 (2012)).

In addition, as several of defendants' historian experts explained, technological developments affecting the commercial availability and lethality of firearms, together with significant societal changes in the latter half of the nineteenth century, prompted States to codify prohibitions on the sale of firearms to underage individuals. *See* 1-SER-153–155, 1-SER-166–169 (Cornell Decl. ¶¶ 109-116, 138-142); 1-SER-203–216 (Declaration of Randolph Roth ¶¶ 27-39);

41

1-SER-242–244, 1-SER-251–256, 1-SER-266–267 (Rivas Decl. ¶¶ 9-14, 23-32, 48-49); 2-SER-292–294 (Spitzer Decl. ¶¶ 24-25); *see also Bondi*, 133 F.4th at 1135-1139, 1145-1146 (Rosenbaum, J., concurring). Plaintiffs provided no contrary evidence to rebut this well-documented historical context that explains why statutory age-based restrictions proliferated in the latter half of the nineteenth century. And their failure even to acknowledge the historical explanation illustrates how profoundly they misapply the historical analysis required by the Supreme Court's precedents. *See Rahimi*, 602 U.S. at 691-692 (explaining that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791").

At the founding, an 18-to-20-year-old "could not walk into a gun store and purchase a firearm." Kellen Heniford, *The Young and the Armed: History for Litigating Firearms Age Restrictions in a Post-*Bruen *World* 33 (May 16, 2025), 101 Ind. L.J. Supp. (forthcoming), https://ssrn.com/abstract=5256286. But later in the nineteenth century—"because of changes in the monetary system, because of changes in contract norms, and … because of changes in the firearm industry"—an 18-to-20-year-old "could do just that." *Id.* Accordingly, when the common law "became less effective at restricting" these individuals' ability to purchase firearms, "statutes increasingly did the work." *Bondi*, 133 F.4th at 1122.

In sum, these laws—from the founding-era common law, to the militia statutes that reveal a practice of parents or guardians providing firearms, to the many statutory prohibitions increasingly enacted in the nineteenth century—reflect the principle that "our regulatory tradition has permitted restrictions on the sale of firearms to individuals under the age of 21." *McCoy*, 140 F.4th at 572.

### B.    Section 27510 is relevantly similar to this historical tradition

To be consistent with the Second Amendment, Section 27510 need not be "identical to" or "precisely match its historical precursors." *Rahimi*, 602 U.S. at 692. The "appropriate analysis" is "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* (emphasis added). "Why and how the regulation burdens the right are central to this inquiry." *Id.* Courts consider "(1) 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense' (the 'how'); and (2) 'whether that burden is comparably justified' (the 'why')." *Duarte*, 137 F.4th at 755 (quoting *Bruen*, 597 U.S. at 29). Here, Section 27510 is "relevantly similar" to the regulatory tradition in both respects. *United States v. Perez-Garcia*, 96 F.4th 1166, 1184 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2707 (2025).

1. The challenged California law is relevantly similar to the regulatory tradition in "how" it burdens the right to keep and bear arms. "Section 27510 does not prohibit 18-to-20-year-olds from owning, possessing, or carrying firearms." 1-

ER-12.  Instead, the law, in the case of semiautomatic centerfire rifles, prohibits only the commercial sale or transfer of such firearms to most 18-to-20-year-olds (unless they are active members of law enforcement or the military); and, in the case of the hunting license exemption, limits the commercial sale or transfer of other long guns to those individuals who obtain a license.  Cal. Penal Code § 27510.  The law also allows 18-to-20-year-olds to acquire any firearm— including semiautomatic centerfire rifles—from their parents and grandparents through intrafamilial transfers.  *Supra* p. 7; 52 U.S.C. § 27875(a); *id.* § 16720.[10]

Section 27510 imposes a comparable burden as the law of the founding era. As described above (at 28-32), the common law infancy doctrine significantly restricted the ability of individuals under 21 to purchase firearms at the founding. 2-SER-339–342, 2-SER-354 (Brewer Decl. ¶¶ 13-19, 37-38); *see also Bondi*, 133 F.4th at 1122; *McCoy*, 140 F.4th at 577.  Further, as the state militia laws show, it was widely understood that 18-to-20-year-olds were unable to purchase firearms and relied on their parents or guardians to provide them with firearms for militia service instead.  2-SER-343–344, 2-SER-361 (Brewer Decl. ¶¶ 21, 51); 1-SER-147

---

[10] Plaintiffs err in suggesting that parents in California may not transfer a long gun to 18-to-20-year-olds.  Opening Br. 6.  They cite a provision that governs the loaning of firearms to a minor, Cal. Penal Code § 27505(b)(3), but ignore another provision that expressly allows parents to give a firearm to their children (and grandparents to their grandchildren) where the "person receiving the firearm is 18 years or older."  *Id.* § 27875(a)(2), (a)(5); *id.* § 16720.

(Cornell Decl. ¶ 95); *supra* pp. 32-34. California law, meanwhile, not only permits 18-to-20-year-olds to acquire firearms from their parents, Cal. Penal Code § 27875(a); *id.* § 16720, but also allows them to purchase any long gun (including semiautomatic centerfire rifles) if they are active members of law enforcement or the military, *id.* § 27510(b)(3), and to purchase most types of long guns with a hunting license, *id.* § 27510(b)(1). Section 27510 is therefore "*more generous* than the Founding-era" law in relevant respects, because it allows 18-to-20-year-olds to purchase many firearms with the acquisition of a hunting license and to purchase even the more lethal semiautomatic centerfire rifles if they are active members of law enforcement or the military. *Bondi*, 133 F.4th at 1123.

Section 27510 also imposes on 18-to-20-year-olds a comparable burden to the nineteenth-century statutes that prohibited the sale of firearms to individuals under age 21. Plaintiffs try to dismiss these statutes as different than Section 27510 in one respect or another. Opening Br. 62-65. But a modern law need not "precisely match its historical precursors," *Rahimi*, 602 U.S. at 692, and plaintiffs' "divide-and-conquer approach" to these statutes "misses the forest for the trees," *Perez-Garcia*, 96 F.4th at 1191. Courts must "examine the historical evidence as a whole, determining whether it establishes a tradition of permissible regulation (such as 'dangerous and unusual weapons' or 'sensitive places'), and whether the historical precedent and the modern regulation are 'relevantly similar.'" *Id.*

45

(quoting *Bruen*, 597 U.S. at 27). The "appropriate analysis" is not whether Section 27510 is "identical" to these earlier statutes, but whether it is "consistent with the principles that underpin [the] regulatory tradition." *Rahimi*, 602 U.S. at 692.

Here, these nineteenth-century statutes, taken as a whole, reveal a comparable regulatory tradition of restricting the sale of firearms to individuals under age 21. Several of the nineteenth-century statutes focused on concealable weapons, but others prohibited the sale of "all firearms or deadly or dangerous weapons." *Jones*, 34 F.4th at 720; *see, e.g.*, Mo. Rev. Stat. § 1274 (1879). And even the concealable weapons laws are relevantly similar to Section 27510 in that they focus on the firearms considered most dangerous for 18-to-20-year-olds at the time, while leaving open other methods to acquire less dangerous arms. *See* 1-SER-168–169 (Cornell Decl. ¶¶ 140-142); 1-SER-242–244, 1-SER-253–256 (Rivas Decl. ¶¶ 9-12, 26-32); *see also Bondi*, 133 F.4th at 1135-1140 (Rosenbaum, J., concurring). Section 27510 likewise more heavily restricts the semiautomatic centerfire rifles increasingly used by 18-to-20-year-olds in recent mass shootings, 2-SER-447, 2-SER-455 (Declaration of Louis Klarevas ¶¶ 17, 20); 1-SER-229–232 (Roth Decl. ¶¶ 57-62), but allows such individuals to purchase other long guns so long as they complete firearms safety training. *Supra* pp. 20-21.

Finally, it is worth noting that many of these nineteenth-century statutes prohibited not just commercial sales, but "all methods of providing arms to

individuals under the age of 21." *Bondi*, 133 F.4th at 1121. Only a few of those laws allowed parents to provide arms to their children, *id.* (citing, e.g., 1881 Ill. Laws 73), and at least one even prohibited "*possession* by individuals under the age of 21," *id.* at 1123; *see, e.g.*, 1883 Kan. Sess. Laws 159, ch. 105, § 2. The fact that Section 27510, which allows 18-to-20-year-olds to acquire firearms from their parents and does not prohibit possession, imposes a lesser burden on 18-to-20-year-olds than at least some of those statutes "further confirms that it fits within our regulatory tradition." *Bondi*, 133 F.4th at 1123. And even if Section 27510 could be considered more restrictive than some of the nineteenth-century statutes in certain respects—for instance, because it applies to more kinds of firearms—it is "nevertheless consistent with the law of the Founding," which restricted the ability of individuals under 21 to purchase "any kind of firearm." *Id.* at 1124.

2. Section 27510 is also relevantly similar and comparably justified to these historical precursors in "why" it burdens 18-to-20-year-olds' right to keep and bear arms. California enacted the challenged law in response to a mass shooting by a 19-year-old, based on concerns that 18-to-20-year-olds often lack "maturity" and "responsibility" and thus should be restricted in their purchase of long guns. 1-SER-29–30. This is the "same 'why' as the Founding-era limitations," which were also premised on the understanding that "individuals under the age of 21 have not reached the age of reason and lack the judgment and discretion to purchase

47

firearms responsibly." *Bondi*, 133 F.4th at 1122-1123; *id.* at 1117-1118 (citing, e.g., 1 Blackstone, *supra*, at 441); *supra* 28-30*; see also Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 834 (2011) (Thomas, J., dissenting) (noting that founding-era law "imposed age limits on all manner of activities that required judgment and reason"). In other words, the common-law "infancy doctrine" and Section 27510 "share a common rationale": both were "motivated by a recognition that individuals under the age of 21 lack good judgment and reason." *McCoy*, 140 F.4th at 577 (citing 1 Comyn, *supra*, at 148; 2 Kent, *supra*, at 191).

The nineteenth-century statutes, too, were enacted "for a familiar reason": a concern that individuals under 21 "lacked the maturity and judgment to responsibly buy their own pistols." *McCoy*, 140 F.4th at 579 (citing Charles, *supra*, at 156, 404-405); *see* 1-SER-155, 1-SER-160–163 (Cornell Decl. ¶¶ 113-116, 125-132); 1-SER-260–262 (Rivas Decl. ¶¶ 38-40); 2-SER-285, 2-SER-287, 2-SER-289–291 (Spitzer Decl. ¶¶ 13, 16, 19-20). In fact, like Section 27510, States enacted those laws prohibiting the sale of firearms to persons under 21 based on public-safety concerns because underage individuals were responsible for an "unprecedented kind of lethal, gun-related violence." *Bondi*, 133 F.4th at 1135-1140 (Rosenbaum, J., concurring); *see* 1-SER-166–169 (Cornell Decl. ¶¶ 138-142); 1-SER-242–244 (Rivas Decl. ¶¶ 9-12); Charles, *supra*, at 156. Plaintiffs, again, provided no contrary evidence to suggest that these statutes had some other justification.

48

Instead, plaintiffs argue that Section 27510 is not comparably justified to the historical precursors primarily because 18-to-20-year-old were previously considered "minors" but are generally considered "adults" today. Opening Br. 49-53. They contend that founding-era legal restrictions on individuals under 21 were premised on their parents' duty to protect them, whereas 18-to-20-year-olds are now responsible for themselves. *Id.* at 50-51. This argument is in considerable tension with plaintiffs' argument elsewhere that 18-to-20-year-olds were always understood to be covered by the Second Amendment's right to bear arms for self-defense. *Id.* at 19-27.

In any event, plaintiffs' argument misunderstands the "why" of the founding-era common law. The regulatory tradition restricted 18-to-20-year-olds' legal capacity and ability to purchase firearms because they lacked "full capacity to make judgments" and were thus considered "mentally immature and not yet capable of responsible self-governance." 2-SER-339–340 (Brewer Decl. ¶ 13) (citing, e.g., 1 Blackstone, *supra*, at 441); *see also* 1 Comyn, *supra*, at 148 (under the common law, individuals under 21 were understood to lack "judgment and discretion in their contracts and transactions with others"); 1-ER-17 n.12 (citing letters of Jefferson and Adams). In fact, it was "[b]ecause of their lack of reason" that such individuals were "subject to the 'power' of their parents until they reached age 21." *Bondi*, 133 F.4th at 1117 (citing 1 Blackstone, *supra*, at 451;

49

1 Swift, *supra*, at 213); 2-SER-339–340 (Brewer Decl. ¶ 13). And the nineteenth-century statutes were justified on similar grounds. *Supra* 48.

This same justification supports Section 27510 today, notwithstanding the fact that 18-to-20-year-olds are now generally—but not universally, *see, e.g.*, Ala. Code § 26-1-1 (designating 19 as age of majority)—considered "adults." The Second Amendment does not turn on an "evolving standard of adulthood that is divorced from the text of the Amendment and from our regulatory tradition." *Bondi*, 133 F.4th at 1125. And the "minimum age for firearm purchases need not rise or fall entirely with the age at which most states currently set as the age of majority." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 126 (10th Cir. 2024). At least two States prohibit 18-year-olds from marrying without parental consent. *See, e.g.*, Miss. Code Ann. § 93-1-5 (minimum age of 21 for marriage without parental consent); Neb. Rev. Stat. §§ 42-105, 43-2101 (minimum age of 19 without parental consent). And as Section 27510's supporters observed, 18-to-20-year-olds' relative lack of maturity and responsibility for impulsive decisions is also still "recognized in other areas" of the law that set minimum age requirements of 21, 1-SER-30—such as alcohol consumption, tobacco sales, and gambling, to name a few, *see* 23 U.S.C. § 158 (declaring national minimum drinking age of 21); 21 U.S.C. § 387f(d)(5) (prohibiting sale of tobacco products to persons under 21); Cal. Bus. & Prof. Code §§ 19921, 19941 (restricting gambling activities for

persons under 21). Plaintiffs themselves acknowledge that many police departments set a minimum age of 21 to serve, Opening Br. 37, even if they decline to address *why* those departments may choose to do so.

The California Legislature enacted Section 27510 based on its judgment that many 18-to-20-year-olds are still developing the maturity and discretion required to purchase firearms responsibly and safely. California is not alone. A noted above (at 5 & n.2), the federal government, seventeen other States, and the District of Columbia also maintain a minimum age requirement of 21 for purchasing at least some firearms. "Thus, a considerable portion of our country has made the normative judgment that setting a minimum purchase age at 21 is appropriate to ensure that firearms are held by responsible, law-abiding persons." *Rocky Mountain Gun Owners*, 121 F.4th at 124. Restrictions of this kind are well supported by both public-safety data and the latest science regarding 18-to-20-year-olds' brain development. *See, e.g.*, 1-SER-232–236 (Roth Decl. ¶¶ 63-70); 2-SER-372–387, 2-SER-412–414 (Declaration of John Donohue ¶¶ 20-45, 81-85); 2-SER-464–466 (Declaration of Elizabeth Cauffman Decl. ¶¶ 13-17); *see also Bondi*, 133 F.4th at 1148-1153 (Rosenbaum, J., concurring). And they are "comparably justified" and "consistent with" the principles that underlie the regulatory tradition. *Duarte*, 137 F.4th at 755 (quoting *Rahimi*, 602 U.S. at 692). In fact, the current "widespread restrictions" on the sale of firearms to individuals under 21—which

span well over a dozen States and the federal government—are "testament to the continuity of the historical tradition." *McCoy*, 140 F.4th at 579.

Finally, although plaintiffs focus on 18-to-20-year-olds' present status as adults, plaintiffs fail to explain how the Second or Fourteenth Amendments would, in their view, allow the government to prohibit the sale of firearms to children under 18, either. They argue that it would "make no sense to interpret 'the people' in the Second Amendment" to exclude "even those under 18," for example, Opening Br. 21-22, and they contend that firearms would have been considered "necessaries" in "*all* stages of life" at the founding, *id.* at 57. They further argue that "even if parents still had authority to bar their 18-to-20-year-old sons and daughters from acquiring firearms today," a State could not "supplant that authority with its own." *Id.* at 58 (citing *Brown*, 564 U.S. 786). That logic would presumably mean States could not prohibit children under 18 from purchasing firearms either. If plaintiffs "accept that some age restrictions are constitutional," they fail to explain what parts of their legal arguments "would support that position." *Bondi*, 133 F.4th at 1127-1128; *McCoy*, 140 F.4th at 579-580.

## CONCLUSION

The district court's judgment should be affirmed.

Dated: October 30, 2025

Respectfully submitted,

_s/ Ian Fein_

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
ANYA M. BINSACCA
  *Senior Assistant Attorney General*
IAN FEIN
  *Deputy Solicitor General*
JENNIFER E. ROSENBERG
  *Deputy Attorney General*

## STATEMENT OF RELATED CASES

The State is not aware of any related cases.

# CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number:** 25-2509

I am the attorney or self-represented party.

**This brief contains 12,196 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** *s/ Ian Fein*_____ **Date:** 10/30/2025_____