No. 25-2509

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PWGG, LP, et al.,

*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of California
No. 3:19-cv-1226-L-AHG
The Honorable M. James Lorenz

## BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AND BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS-APPELLEES

Robert A. Sacks
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067

[Additional counsel listed on signature page]

November 6, 2025

Leonid Traps
   *Counsel of Record*
Madeline B. Jenks
Lisa Wang
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
trapsl@sullcrom.com

*Counsel for* Amici Curiae

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A) and Circuit Rule 26.1-1, the undersigned counsel states that *amici curiae* Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence are non-profit organizations that do not have parent corporations or stock, and therefore no publicly held corporation owns 10% or more of their stock.

/s/ *Leonid Traps*

Leonid Traps
*Counsel for* Amici Curiae

November 6, 2025

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................i

IDENTITY AND INTEREST OF *AMICI CURIAE* .................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................5

ARGUMENT ......................................................................11

I.    SECTION 27510 IS CONSISTENT WITH THE
HISTORICAL PRINCIPLE OF REGULATING GROUPS
THAT POSE A HEIGHTENED RISK OF FIREARM
VIOLENCE ...................................................................11

II.   MODERN SOCIAL SCIENCE AND NEUROSCIENCE
CONFIRM WHAT LEGISLATORS HAVE LONG
RECOGNIZED: THAT 18-TO-20-YEAR-OLDS POSE A
HEIGHTENED RISK OF FIREARM VIOLENCE.......................13

     A.    18-to-20-Year-Olds Attempt Suicide at
Disproportionately High Rates, and Access to Firearms
Increases the Likelihood and Lethality of Those Suicide
Attempts ..............................................................14

     B.    18-to-20-Year-Olds Are Increasingly the Perpetrators
of Mass Shootings..................................................19

     C.    18-to-20-Year-Olds Are Generally More Impulsive
Than Older Cohorts ...............................................24

     D.    Minimum-Age Laws Have Proven Effective at
Reducing Gun Violence Among Minors ...............................28

CONCLUSION ..................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) ................................................................. 2

*B & L Prods., Inc.* v. *Newsom*,
  104 F.4th 108 (9th Cir. 2024) ............................................................. 8

*District of Columbia* v. *Heller*,
  554 U.S. 570 (2008) ..................................................................... 2, 8

*Duncan* v. *Bonta*,
  133 F.4th 852 (9th Cir. 2025) ............................................................ 8

*Graham* v. *Florida*,
  560 U.S. 48 (2010) ........................................................................ 25

*Hanson* v. *District of Columbia*,
  671 F. Supp. 3d 1 (D.D.C. 2023) ........................................................ 4

*Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms &
  Explosives*,
  417 F. Supp. 3d 747 (W.D. Va. 2019) ................................................. 2

*Horsley* v. *Trame*,
  808 F.3d 1126 (7th Cir. 2015) ........................................................... 25

*Lara* v. *Evanchick*,
  534 F. Supp. 3d 478 (W.D. Pa. 2021) .................................................. 2

*McCoy* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  140 F.4th 568 (4th Cir. 2025) ............................................................ 12

*McDonald* v. *City of Chicago*,
  561 U.S. 742 (2010) ........................................................................ 2

*Md. Shall Issue* v. *Hogan*,
  353 F. Supp. 3d 400 (D. Md. 2018) ..................................................... 2

*Miller* v. *Alabama*,
567 U.S. 460 (2012)...............................................................26

*Mitchell* v. *Atkins*,
483 F. Supp. 3d 985 (W.D. Wash. 2020)...............................2

*Nat'l Ass'n for Gun Rts.* v. *City of San Jose*,
2023 WL 4552284 (N.D. Cal. July 13, 2023).......................3

*Nat'l Ass'n for Gun Rts.* v. *Lamont*,
685 F. Supp. 3d 63 (D. Conn. 2023).....................................3

*Nat'l Rifle Ass'n* v. *Bondi*,
133 F.4th 1108 (11th Cir. 2025) .............................. *passim*

*Nat'l Rifle Ass'n of Am.* v. *Bureau of Alcohol, Tobacco,
Firearms & Explosives*,
700 F.3d 185 (5th Cir. 2012)................................................26

*N.Y. State Rifle & Pistol Ass'n* v. *Bruen*,
597 U.S. 1 (2022)...................................................... *passim*

*Peruta* v. *County of San Diego*,
824 F.3d 919 (9th Cir. 2016)..................................................2

*Stimmel* v. *Sessions*,
879 F.3d 198 (6th Cir. 2018)..................................................2

*United States* v. *Duarte*,
137 F.4th 743 (9th Cir. 2025) ...............................................9

*United States* v. *Hayes*,
555 U.S. 415 (2009).................................................................3

*United States* v. *Rahimi*,
602 U.S. 680 (2024)................................................... *passim*

## Constitution, Statutes, and Rules

U.S. CONST. amend. II................................................ *passim*

U.S. CONST. amend. XXVI....................................................5

21 U.S.C. § 387f ................................................................. 5

23 U.S.C. § 158 .................................................................. 5

Cal. Bus. & Prof. Code § 22958 ..................................... 5

Cal. Bus. & Prof. Code § 25658 ..................................... 5

Cal. Gov't Code § 8880.52 .............................................. 5

Cal. Penal Code § 27510 ........................................... *passim*

Cal. Penal Code § 27875 .................................................. 7

Fed. R. App. P. 29 ........................................................... 1

**Other Authorities**

*A Partial List of Mass Shootings in the United States in 2022*, N.Y. TIMES (Jan. 24, 2023) ....................................... 21

Adam Winkler & Cara Natterson, *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST (Jan. 6, 2016) .................................................................. 24

*AMA Calls Gun Violence "a Public Health Crisis,"* AMA (June 14, 2016) ................................................................ 23

*Assemb. Floor Hearing on SB 1100*, 2017-2018 Sess. (Cal. Aug. 28, 2018) ................................................................. 6

Cal. Sen. Democrats, *Senator Portantino Presents SB 1100 to Senate Public Safety Committee* (Apr. 17, 2018) ................ 6

Cal. State Assemb., *Assembly Floor Session* (Aug. 28, 2018) .................. 7

*Columbine High School Shootings Fast Facts*, CNN (Apr. 1, 2025) .................................................................. 22

Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004) ............... 28

E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103 AM. J. PUB. HEALTH 27 (2013)...............................15

Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and Accomplishment of a Suicide Attempt?*, 70 J. CLINICAL PSYCHIATRY 19 (2009)................................15

Elise Hammond et al., *The Latest on Mass Shooting in Farmington, New Mexico*, CNN (May 17, 2023) .................................20

*Firearm Suicide in the United States*, Johns Hopkins Bloomberg Sch. of Pub. Health (last visited Nov. 3, 2025)...................17

Isabel Rosales et al., *6 People Face Murder Charges for the Sweet 16 Party Massacre That Left 4 Dead and 32 Injured*, CNN (Apr. 21, 2023) .............................................................20

J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 AM. J. PSYCHIATRY 1094 (2016) ...............................................17, 18

James Barron, *Nation Reels After Gunman Massacres 20 Children at School in Connecticut*, N.Y. TIMES (Dec. 14, 2012)....................................................................22

James Silver et al., Fed. Bureau of Investigation, U.S. Dep't of Just., *A Study of Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013* (2018)...........................................................................................30

Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. TIMES (Nov. 7, 2016) ...........................................................18

Jason Hanna et al., *Alleged Shooter at Texas High School Spared People He Liked, Court Document Says*, CNN (May 19, 2018) .................................................................22

Jay N. Giedd et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947 (2008) ...................................................14

Jenna Fisher et al., *Teen and Woman Killed in Shooting at St. Louis High School*, N.Y. TIMES (Oct. 24, 2022)............................ 21

Jennifer Mascia & Olga Pierce, *Youth Gun Suicide Is Rising, Particularly Among Children of Color*, THE TRACE (Feb. 24, 2022)..................................................................................... 16

Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJ. PREVENTION 26 (2013).............. 30

Katherine S. Newman et al., *Rampage: The Social Roots of School Shootings* (2004)...................................................................... 10

*Leading Causes of Death Reports, 2018 to 2023*, Ctrs. for Disease Control & Prevention, Web-Based Injury Statistics Query & Reporting System (WISQARS) (last visited Nov. 3, 2025) ........................................................................ 15

Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124 (2010)............................................................................................ 27

Lexi Lonas Cochran, *US School Shootings Reach New High, Doubled in Past Year*, THE HILL (Sep. 14, 2023) ................................ 23

Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449 (2013) ...... 25, 26, 27

Mark Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Monterey Park and Uvalde*, BUS. INSIDER (Jan. 23, 2023)............................................................. 21

Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENGL. J. MED. 989 (2008)....................... 17

Matthew Miller et al., *Firearm Prevalence and the Risk of Suicide*, 2 HARV. HEALTH POL'Y REV. 2 (Fall 2001) ............................ 17

Matthew Miller et al., *Suicide Mortality in the United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide*, 33 ANN. REV. PUB. HEALTH 393 (2012) .................................................. 18

Maya Rossin-Slater et al., *Local Exposure to School Shootings and Youth Antidepressant Use*, 117 PNAS 23484 (2020) ...................................................................... 24

Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 MINN. L. REV. 3049 (2024) .................................................................... 13

Merete Nordentoft et al., *Absolute Risk of Suicide After First Hospital Contact in Mental Disorder*, 68 ARCHIVES GEN. PSYCHIATRY 1058 (2011) ..................................... 14

Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220 (2014) ................................................. 27

Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS 2 (2019) ......................... 29

Nirmita Panchal & Sasha Zitter, *The Impact of Gun Violence on Children and Adolescents*, KFF (May 27, 2025) ........................... 10

Patricia Mazzei et al., *What We Know About the Florida State University Shooting*, N.Y. TIMES (Apr. 20, 2025) ...................... 19

*Reducing Suicides by Firearms*, Am. Pub. Health Ass'n (Nov. 12, 2018) ...................................................... 16

Rosanna Smart et al., RAND Corp., *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* (4th ed. 2024).......... 18, 29

Rose Kim et al., *Gun Violence in the United States 2023: Examining the Gun Suicide Epidemic*, Johns Hopkins Bloomberg Sch. of Pub. Health (2025) ................................................ 10

*S. Comm. on Public Safety: Hearing on SB 1100*, 2017-2018 Sess. (Cal. Apr. 17, 2018) ........................................................ 6

Sarah Rankin & Denise Lavoie, *Victims Identified in Deadly Shooting After High School Graduation Ceremony in Virginia*, KGW8 (June 7, 2023) ........................................... 20

SB 1100 Cal. S. Floor Analysis (May 26, 2018) ....................... 6

Sharifa Jackson & Corey Davis, *2 Arrested, 2 More Wanted in Connection with Mass Shooting at SEPTA Bus Stop That Injured 8 Teens*, 6ABC NEWS (Mar. 11, 2024) ........................... 20

Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLL. SURGEONS 150 (2019) ....................... 29

Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 SUICIDE & LIFE-THREATENING BEHAV. 49 (Supp. 2001) ............................... 15

U.S. Dep't of Health & Human Servs., *U.S. Surgeon General Issues Advisory on the Public Health Crisis of Firearm Violence in the United States* (June 25, 2024) ............................ 23, 24

William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, 17 J. STUD. ON ALCOHOL & DRUGS 108 (Supp. 2014) .............................. 31

Zach Schonfeld, *School Shootings at Highest Number in 20 Years: Research*, THE HILL (June 28, 2022) ........................... 23

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities.[2]  The organization was founded more than thirty years ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords.  Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amici* affirm that all parties have consented to the filing of this brief.  Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* affirm that no counsel for a party authored this brief in whole or in part; no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than *amici*, their members, or their counsel made such a monetary contribution.

[2] Giffords Law Center's website, www.giffords.org/lawcenter, is the premier clearinghouse for comprehensive information about federal, state, and local firearms laws and Second Amendment litigation nationwide.

reduce gun violence. Together with its partner organization Giffords, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights are consistent with gun-safety legislation and community violence prevention strategies.

Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.*, *District of Columbia* v. *Heller*, 554 U.S. 570 (2008); *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010); *Lara* v. *Evanchick*, 534 F. Supp. 3d 478 (W.D. Pa. 2021); *Mitchell* v. *Atkins*, 483 F. Supp. 3d 985 (W.D. Wash. 2020). Multiple courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019); *Md. Shall Issue* v. *Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018); *Stimmel* v. *Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta* v. *County of*

*San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring).[3]

*Amicus curiae* Brady Center to Prevent Gun Violence ("Brady") is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live. Brady also has a substantial interest in protecting the authority of democratically elected officials to address the nation's gun violence epidemic.

Brady has filed *amicus* briefs in many cases involving the regulation of firearms. *See, e.g.*, *United States* v. *Rahimi*, 602 U.S. 680 (2024). Multiple decisions have cited Brady's research and expertise on these issues. *See, e.g.*, *United States* v. *Hayes*, 555 U.S. 415, 426-27 (2009); *Nat'l Ass'n for Gun Rts.* v. *Lamont*, 685 F. Supp. 3d 63, 110 & n.52 (D. Conn. 2023); *Nat'l Ass'n for Gun Rts.* v. *City of San Jose*, 2023 WL

---

[3]     Giffords Law Center filed the last two briefs under its former name, the Law Center to Prevent Gun Violence.

4552284, at \*5-6 (N.D. Cal. July 13, 2023); *Hanson* v. *District of Columbia*, 671 F. Supp. 3d 1, 14-15 & n.8, 19-20 & n.10, 23 (D.D.C. 2023).

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

When people turn 18, they obtain access to certain privileges that were previously unavailable to them—for example, they can cast a ballot in a federal election or purchase a lottery ticket.[4] At the same time, other privileges remain unavailable, such as buying a beer or a pack of cigarettes.[5] States make these age-based distinctions for good reason: although 18-year-olds may be more mature than when they entered high school, scientific research reveals that their brains are still very much developing. Their prefrontal cortices—the part of the brain that governs impulsivity and emotional regulation—have not yet fully matured. Such modern research validates what common sense has reflected for many years: 18-to-20-year-olds are more prone to risk-taking, to impulsive behavior, and to deprioritizing long-term outcomes.

California lawmakers recognized this when they amended California Penal Code § 27510 ("Section 27510"), a 2011 law that previously restricted 18-to-20-year-olds from purchasing handguns, to

---

[4]    *See* U.S. CONST. amend. XXVI; Cal. Gov't Code § 8880.52(a).

[5]    *See* 23 U.S.C. § 158; Cal. Bus. & Prof. Code § 25658(a)-(b); 21 U.S.C. § 387f(d)(5); Cal. Bus. & Prof. Code § 22958(a).

also cover long guns (and thus assault rifles). Following the devastating February 2018 school shooting in Parkland, Florida, in which a 19-year-old gunman used an assault rifle to kill seventeen people and wound seventeen others, the California Legislature re-evaluated its age restrictions, including the distinction between handguns and long guns. SB 1100 Cal. S. Floor Analysis at 5 (May 26, 2018) (considering the Parkland massacre).[6] The Legislature considered the fact that 11,500 of the 26,682 guns listed as available for purchase in the California Department of Justice Automated Firearms Systems database were long guns. *S. Comm. on Public Safety: Hearing on SB 1100*, 2017-2018 Sess. (Cal. Apr. 17, 2018) (statement of then-Sen. Anthony Portantino).[7] The Legislature also considered the outsized role of long guns in youth suicides. *Assemb. Floor Hearing on SB 1100*, 2017-2018 Sess. (Cal. Aug. 28, 2018) (statement of then-Assemb. Rob Bonta) ("Data shows

---

[6]    SB 1100 bill analyses are available at http://leginfo.legislature. ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100.

[7]    Cal. Sen. Democrats, *Senator Portantino Presents SB 1100 to Senate Public Safety Committee*, at 01:23 (Apr. 17, 2018), https://www.youtube.com/watch?v=xplHPNAa9Mw.

about 38% of all suicides by people under 21 are committed with a gun, and more often than not a long gun is used rather than a handgun.").[8]

Faced with these deeply disturbing statistics, and entrusted with the grave responsibility to protect California residents, the Legislature made a policy choice and changed its laws to protect both those in the affected age group and the public at large. It amended Section 27510 to prohibit federally licensed firearms dealers ("FFLs") from transferring long guns to Californians under the age of 21, absent certain enumerated exceptions, such as allowing 18-to-20-year-olds with hunting licenses to purchase shotguns from FFLs, exempting law enforcement agents and active and reserve members of the Armed Forces, and allowing transfers of firearms to 18-to-20-year-olds by immediate family members. *See* Cal. Penal Code §§ 27510(b), 27875.

As the district court correctly held, Section 27510 is fully consistent with the Second Amendment. While the Second Amendment protects the right of "law-abiding" adults to keep and bear arms, *District*

---

[8] Cal. State Assemb., *Assembly Floor Session*, at 06:40:20 (Aug. 28, 2018), https://www.assembly.ca.gov/media/assembly-floor-session-20180828?format=video.

*of Columbia* v. *Heller*, 554 U.S. 570, 635 (2008), it coexists with the longstanding authority of federal and state governments to lawfully regulate firearm purchase, possession, and use, including by restricting certain categories of people from purchasing firearms.

In *New York State Rifle & Pistol Association, Inc.* v. *Bruen*, the Supreme Court adopted a two-step approach to evaluating Second Amendment claims. 597 U.S. 1, 17 (2022). First, the challenger must show that the relevant regulations implicate the plain text of the Second Amendment. *Id.*; *see also B & L Prods., Inc.* v. *Newsom*, 104 F.4th 108, 117 (9th Cir. 2024) (challenger must make showing at the first step). Then—if and only if the challenger makes this showing—the court moves to the second step and determines whether the modern challenged regulation is consistent with historical tradition. *Bruen*, 597 U.S. at 17. Under *Bruen*'s second step, there is no requirement that courts find the challenged regulation is "a dead ringer for historical precursors." *Id.* at 30. Rather, the government must merely identify a "well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original); *see Duncan* v. *Bonta*, 133 F.4th 852, 869, 881 (9th Cir. 2025) (en banc) (same), *petition for cert. filed*, No. 25-198 (U.S. Aug. 15, 2025).

-8-

In *United States* v. *Rahimi*, the Supreme Court further clarified the standard articulated in *Bruen*, explaining that at the second step, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." 602 U.S. 680, 692 (2024) (emphasis added). In conducting that analysis, courts "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the right are central to this inquiry." *Id.*; *see United States* v. *Duarte*, 137 F.4th 743, 755 (9th Cir. 2025) (en banc) (same), *petition for cert. filed*, No. 25-425 (U.S. Oct. 6, 2025).

This Court should affirm the district court's judgment in favor of Defendants-Appellees because Section 27510 is consistent with our nation's historical tradition of regulating firearms, including the tradition of regulating firearm access by "categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 602 U.S. at 698. *Amici* submit this brief to provide additional support demonstrating that Section 27510 follows the principles underpinning our nation's historical firearm regulations (including regulations of

individuals in the 18-to-20-year-old age group), and to highlight an established body of empirical research that likewise confirms that Section 27510 is analogous to historical regulations.[9]

Modern social science research demonstrates that 18-to-20-year-olds are at a heightened risk of suicide, and are disproportionately involved in gun violence, including mass shootings. Such impulsive acts are a major part of why gun violence is now the leading cause of death among children and adolescents.[10] Notably, access to firearms can determine whether a young person contemplating suicide or a mass shooting is able to carry out the act.[11] This grim reality underscores why

---

[9] The district court properly found that "Section 27510 is a commercial restriction that does not meaningfully impair 18-to-20-year-olds' access to firearms and is therefore not covered by the Second Amendment's plain text." 1-ER-11-14. *Amici*, however, focus on the separate longstanding tradition of regulating 18-to-20-year-olds' possession of and access to firearms.

[10] *See* Rose Kim et al., *Gun Violence in the United States 2023: Examining the Gun Suicide Epidemic*, Johns Hopkins Bloomberg Sch. of Pub. Health, 1 (2025), https://publichealth.jhu.edu/sites/default/files/2025-06/2023-cgvs-gun-violence-in-the-united-states.pdf; *see also* Nirmita Panchal & Sasha Zitter, *The Impact of Gun Violence on Children and Adolescents*, KFF (May 27, 2025), https://www.kff.org/mental-health/the-impact-of-gun-violence-on-children-and-adolescents/.

[11] *See infra* Section II.A; *see also* Katherine S. Newman et al., *Rampage: The Social Roots of School Shootings* 259-61, 270 (2004)

modest regulation of this age group's ability to purchase firearms is consistent with the principles underlying historical firearm regulations and thus comports with the Second Amendment.

**ARGUMENT**

## I.  SECTION 27510 IS CONSISTENT WITH THE HISTORICAL PRINCIPLE OF REGULATING GROUPS THAT POSE A HEIGHTENED RISK OF FIREARM VIOLENCE.

In *Rahimi*, the Supreme Court issued a critical clarification of how to analyze Second Amendment challenges.  The Court rejected the overly narrow interpretation of *Bruen* that some lower courts had mistakenly applied, which focused too strictly on matching any challenged modern law to a specific historical law.  As the Court explained, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791."  *Rahimi*, 602 U.S. at 691-92; *see id.* at 691 (*Heller* and *Bruen* "were not meant to suggest a law trapped in amber").  "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with *the principles* that underpin our regulatory tradition."  *Id.* at 692 (emphasis

---

(identifying access to guns as a necessary condition for mass school shootings).

added).  As the Court explained, "[w]hy and how the regulation burdens the right are central to this inquiry. . . . [I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations."  *Id.*

Section 27510 comports with the historical tradition of age-based laws in this country, as well as the historical tradition of regulating persons (including individuals aged 18 to 20) who are deemed to pose a heightened risk of harm when armed.  As both the Fourth and Eleventh Circuits recently concluded, age-based restrictions on firearms are relevantly similar to historical laws setting the age of majority at 21.  *See McCoy* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568, 575 (4th Cir. 2025), *petition for cert. filed*, No. 25-24 (U.S. July 3, 2025); *Nat'l Rifle Ass'n* v. *Bondi*, 133 F.4th 1108, 1117-23, 1130 (11th Cir. 2025) (en banc), *petition for cert. filed*, No. 24-1185 (U.S. May 16, 2025). The historical record establishes that during the Founding era, those under 21 were viewed as lacking "the reason and judgment necessary to be trusted with legal rights."  *Bondi*, 133 F.4th at 1117 (compiling sources).

-12-

As discussed further in Section II *infra*, those under the age of 21 are more impulsive and disproportionately prone to engage in gun violence when compared to other age groups. Thus, as respected commentators have explained, historical and modern laws like Section 27510 "have the same 'why': concerns about public safety resulting from minors' impulsivity and their improper usage of firearms." Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 MINN. L. REV. 3049, 3108 (2024). Because Section 27510 imposes "similar restrictions for similar reasons" as historical regulations—namely, preventing impulsive acts of gun violence by 18-to-20-year-olds by restricting access to firearms for this age group—it passes constitutional muster. *Rahimi*, 602 U.S. at 692.

## II. MODERN SOCIAL SCIENCE AND NEUROSCIENCE CONFIRM WHAT LEGISLATORS HAVE LONG RECOGNIZED: THAT 18-TO-20-YEAR-OLDS POSE A HEIGHTENED RISK OF FIREARM VIOLENCE.

Empirical evidence shows that 18-to-20-year-olds are at a heightened risk of death by suicide when they have access to firearms, and that increasing the minimum age required to purchase a firearm will actually save a substantial number of lives. This simple legislative act means that many youths who would be dead far before their time will

-13-

instead survive a highly dangerous period in their lives. Section 27510's temporally limited restriction on purchases of firearms by individuals in this age group is thus consistent with the historical principle of protecting the public from persons who pose a heightened risk of violence when armed. *See Bondi*, 133 F.4th at 1117-23; *id.* at 1150-53 (Rosenbaum, J., concurring) (discussing modern social science research that supports limiting firearm access for 18-to-20-year-olds).

### A. 18-to-20-Year-Olds Attempt Suicide at Disproportionately High Rates, and Access to Firearms Increases the Likelihood and Lethality of Those Suicide Attempts.

18-to-20-year-olds are at disproportionate risk of suicidal ideation and death by suicide, and unrestricted access to firearms significantly exacerbates this danger. Many major psychiatric conditions first develop in adolescence,[12] and "suicide risk increase[s] steeply during the first few years after [an individual's] first contact with psychiatric services."[13]

---

[12] Jay N. Giedd et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947, 952 (2008).

[13] Merete Nordentoft et al., *Absolute Risk of Suicide After First Hospital Contact in Mental Disorder*, 68 ARCHIVES GEN. PSYCHIATRY 1058, 1061 (2011).

18-to-20-year-olds' impulsivity and propensity toward negative emotional states, discussed further in Section II.C *infra*, compound the likelihood that they will die by suicide, which "is commonly an impulsive act by a vulnerable individual."[14]  One study found that, of 153 survivors of nearly lethal suicide attempts aged 13 to 34, close to 25% reported that *less than five minutes* passed between their decision to attempt suicide and the suicide attempt.[15]  In another study, 47.6% of people who were referred to a psychiatric hospital following a suicide attempt stated that ten minutes or less had passed between when they first began contemplating the act and the attempt.[16]

It is unsurprising, then, that suicide accounts for a higher percentage of deaths for 15-to-24-year-olds than for older age groups.[17]

---

[14]    E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103 AM. J. PUB. HEALTH 27, 27 (2013).

[15]    Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 SUICIDE & LIFE-THREATENING BEHAV. 49, 50-52 (Supp. 2001).

[16]    Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and Accomplishment of a Suicide Attempt?*, 70 J. CLINICAL PSYCHIATRY 19, 20 (2009).

[17]    *Leading Causes of Death Reports, 2018 to 2023*, Ctrs. for Disease Control & Prevention, Web-Based Injury Statistics Query & Reporting

From 2018 to 2023, suicide was the third most common cause of death among 18-to-20-year-olds.[18]  Furthermore, the upward trend in gun suicides among young people during this time has been especially acute with respect to youth of color:  between 2011 and 2020, the firearm suicide rate rose 35% among white teens.[19]  During the same period, it rose 88% among Native American teens and *more than doubled* among Black, Latino, and Asian teens.[20]

Given the rapidity with which suicidal ideation gives way to fatal action, "[a]ccess to firearms is a key risk factor for suicide."[21]  In fact, "at least a dozen U.S. case-control studies in the peer-reviewed literature . . . have found that a gun in the home is associated with an

---

System (WISQARS), https://wisqars.cdc.gov/lcd (last visited Nov. 3, 2025).

[18]     *Id.*

[19]     Jennifer Mascia & Olga Pierce, *Youth Gun Suicide Is Rising, Particularly Among Children of Color*, THE TRACE (Feb. 24, 2022), https://www.thetrace.org/2022/02/firearm-suicide-rate-cdc-data-teen-mental-health-research/.

[20]     *Id.*

[21]     *Reducing Suicides by Firearms*, Am. Pub. Health Ass'n (Nov. 12, 2018), https://www.apha.org/policy-and-advocacy/public-health-policy-briefs/policy-database/2019/01/28/reducing-suicides-by-firearms.

increased risk of suicide.  The increase in risk is large, typically [two] to [ten] times that in homes without guns."[22]  Those prone to "act impulsively . . . are more likely to be affected by availability of the means at hand," which explains why "the preponderance of current evidence indicates that gun availability is a risk factor for suicide, especially among youth."[23]

The inherent lethality of firearms compounds the increased risk of suicide posed by firearm access.  Firearm suicide is the suicide method with the highest fatality rate.  The odds of dying by suicide are *140 times greater* when a gun is used as opposed to any other common method.[24]  In other words, while 4% of non-firearm suicide attempts are

---

[22]    Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENGL. J. MED. 989, 990 (2008); *see Firearm Suicide in the United States*, Johns Hopkins Bloomberg Sch. of Pub. Health, https://publichealth.jhu.edu/center-for-gun-violence-solutions/firearm-suicide (last visited Nov. 3, 2025).

[23]    Matthew Miller et al., *Firearm Prevalence and the Risk of Suicide*, 2 HARV. HEALTH POL'Y REV. 2, 34 (Fall 2001).

[24]    J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide:  Even More Lethal Than We Knew*, 173 AM. J. PSYCHIATRY 1094, 1098 (2016).

fatal, 85% of suicide attempts with a gun are fatal[25]—a highly troubling statistic. In 2021, more than half of the 2,735 suicide deaths among 16-to-20-year-olds involved firearms.[26]

The relevant data establishes that restricting 18-to-20-year-olds' ability to purchase firearms does save lives. Research shows that fewer than 3% of people who survive one suicide attempt later die by suicide.[27] Although "[s]uicide attempters often have second thoughts, . . . when a method like a gun works so effectively, there's no opportunity to reconsider."[28] A young person's access to firearms when contemplating a suicide attempt therefore often determines whether that person will live or die.

---

[25]    Matthew Miller et al., *Suicide Mortality in the United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide*, 33 ANN. REV. PUB. HEALTH 393, 397 (2012).

[26]    Rosanna Smart et al., RAND Corp., *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* 62 (4th ed. 2024), https://www.rand.org/pubs/research_reports/RRA243-9.html.

[27]    Bostwick et al., *supra* note 24, at 1098.

[28]    Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. TIMES (Nov. 7, 2016), https://www.nytimes.com/2016/11/08/well/live/after-a-suicide-attempt-the-risk-of-another-try.html.

B.   **18-to-20-Year-Olds Are Increasingly the Perpetrators of Mass Shootings.**

When young people are given unrestricted power to purchase any kind of firearm, the consequences are too often deadly.  Indeed, our nation has faced a disturbing and continuous wave of mass shootings over the past few years, many involving perpetrators in the age range governed by Section 27510.  *See Bondi*, 133 F.4th at 1152 & n.11 (Rosenbaum, J., concurring) ("[T]hose under the age of 21 are responsible for some of the most deadly mass shootings in United States history.").  It is entirely consistent with historical tradition and the Second Amendment for states to pass laws combatting such serious and unprecedented threats to public safety.

For example, earlier this year, a 20-year-old was arrested as the accused gunman in the April 17, 2025 mass shooting at Florida State University that left two dead and six injured.[29]  Just last year, an 18-year-old was arrested for his involvement in a mass shooting at a bus

---

[29]   Patricia Mazzei et al., *What We Know About the Florida State University Shooting*, N.Y. TIMES (Apr. 20, 2025), https://www.nytimes.com/2025/04/17/us/florida-state-university-shooting-explainer.html.

stop in Philadelphia that left eight teenagers injured.[30]  And the year before that, in 2023, a 19-year-old and two 20-year-olds were charged in a mass shooting at a Sweet 16 birthday party in Dadeville, Alabama that killed four people and injured 32 others, many of them high school students, in April;[31] an 18-year-old gunman killed three people and wounded six others in Farmington, New Mexico, with a firearm purchased shortly after his 18th birthday in May;[32] and a 19-year-old killed two and injured five others with a handgun outside a high school graduation in Richmond, Virginia in June.[33]

---

[30]    Sharifa Jackson & Corey Davis, *2 Arrested, 2 More Wanted in Connection with Mass Shooting at SEPTA Bus Stop That Injured 8 Teens*, 6ABC NEWS (Mar. 11, 2024), https://6abc.com/northeast-high-school-septa-bus-stop-shooting-philadelphia/14514093/.

[31]    Isabel Rosales et al., *6 People Face Murder Charges for the Sweet 16 Party Massacre That Left 4 Dead and 32 Injured*, CNN (Apr. 21, 2023), https://www.cnn.com/2023/04/19/us/dadeville-alabama-birthday-party-shooting-wednesday/index.html.

[32]    Elise Hammond et al., *The Latest on Mass Shooting in Farmington, New Mexico*, CNN (May 17, 2023), https://www.cnn.com/us/live-news/farmington-new-mexico-shooting-05-16-23.

[33]    Sarah Rankin & Denise Lavoie, *Victims Identified in Deadly Shooting After High School Graduation Ceremony in Virginia*, KGW8 (June 7, 2023), https://www.kgw.com/article/news/nation-world/2-dead-after-high-school-graduation-shooting/507-c72162c9-bf0e-4f68-bb7e-d999647b31f9.

Continuing this troubling pattern, 2022 was riddled with many of its own tragic firearm incidents involving young perpetrators. On May 14, 2022, an 18-year-old gunman killed ten people and wounded three others at a supermarket in Buffalo, New York;[34] ten days later, on May 24, an 18-year-old killed 19 children and two teachers at an elementary school in Uvalde, Texas;[35] and on October 24, 2022, a 19-year-old killed two people and wounded seven others at his former high school in St. Louis, Missouri.[36]

Some of the deadliest school shootings in our nation's history have been committed by young people under 21:[37]  the May 18, 2018 Santa Fe, Texas high school shooting in which a 17-year-old killed nine

---

[34]     *A Partial List of Mass Shootings in the United States in 2022*, N.Y. TIMES (Jan. 24, 2023), https://www.nytimes.com/article/mass-shootings-2022.html.

[35]     *Id.*

[36]     Jenna Fisher et al., *Teen and Woman Killed in Shooting at St. Louis High School*, N.Y. TIMES (Oct. 24, 2022), https://www.nytimes.com/2022/10/24/us/st-louis-high-school-shooting.html.

[37]     Mark Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Monterey Park and Uvalde*, BUS. INSIDER (Jan. 23, 2023), https://www.businessinsider.com/deadliest-mass-shootings-in-us-history-2017-10/.

students and one teacher, and injured ten others;[38] the February 14, 2018 Parkland, Florida shooting perpetrated by a 19-year-old, which the California Legislature specifically considered in amending Section 27510; the December 14, 2012 Newtown, Connecticut elementary school shooting, in which a 20-year-old killed 20 schoolchildren and six staff members;[39] and the April 20, 1999 Littleton, Colorado shooting at Columbine High School, in which an 18-year-old and a 17-year-old killed 12 fellow students and a teacher.[40]

Today, gun violence by young people under 21 in schools is, tragically, even more commonplace than the list of high-profile mass shootings suggests. According to recent analyses, there were more than 70 school shootings annually between the 2018-19 and 2021-22 school

---

[38] Jason Hanna et al., *Alleged Shooter at Texas High School Spared People He Liked, Court Document Says*, CNN (May 19, 2018), https://www.cnn.com/2018/05/18/us/texas-school-shooting.

[39] James Barron, *Nation Reels After Gunman Massacres 20 Children at School in Connecticut*, N.Y. TIMES (Dec. 14, 2012), https://www.nytimes.com/2012/12/15/nyregion/shooting-reported-at-connecticut-elementary-school.html.

[40] *Columbine High School Shootings Fast Facts*, CNN (Apr. 1, 2025), https://www.cnn.com/2013/09/18/us/columbine-high-school-shootings-fast-facts.

years.[41]  These shootings have only become more frequent:  the 2020-21 school year set a record with 93 shootings that caused injury or death, and the 2021-22 school year nearly doubled that record with 188.[42]

Gun violence has become so pervasive that in June 2024, the United States Surgeon General declared firearm violence a national public health crisis.[43]  The Surgeon General's report notes that firearm violence is now the leading cause of death among children and

---

[41]    Zach Schonfeld, *School Shootings at Highest Number in 20 Years: Research*, THE HILL (June 28, 2022), https://thehill.com/policy/national-security/3539820-school-shootings-at-highest-number-in-20-years-research/; Lexi Lonas Cochran, *US School Shootings Reach New High, Doubled in Past Year*, THE HILL (Sep. 14, 2023), https://thehill.com/homenews/education/4204651-us-school-shootings-reach-new-high-doubled-in-past-year.

[42]    Cochran, *supra* note 41.

[43]    U.S. Dep't of Health & Human Servs., *U.S. Surgeon General Issues Advisory on the Public Health Crisis of Firearm Violence in the United States* (June 25, 2024), https://www.hhs.gov/about/news/2024/06/25/us-surgeon-general-issues-advisory-public-health-crisis-firearm-violence-united-states.html [archived at https://files.giffords.org/wp-content/uploads/2025/03/US-Surgeon-Generals-2024-Advisory-on-Firearm-Violence.pdf]; *see AMA Calls Gun Violence "a Public Health Crisis,"* AMA (June 14, 2016), https://www.ama-assn.org/press-center/ama-press-releases/ama-calls-gun-violence-public-health-crisis.

adolescents, and that more than half of U.S. adults or their family members have experienced a firearm-related incident in their lives.[44]

In addition to the victims killed or injured in school shootings, there are tragic lasting effects on youth who experience these traumatic incidents: one study found that in the two years following a fatal school shooting, antidepressant use by youths aged 19 and younger in the area increased by 21.3%,[45] a statistic that underscores the vulnerability of youth, particularly given the risk of suicide discussed in Section II.A *supra*.

### C. 18-to-20-Year-Olds Are Generally More Impulsive Than Older Cohorts.

The disturbing numbers described above are, to some extent, unsurprising given the empirical research demonstrating that 18-to-20-year-olds' brains are still developing, making them more likely to engage in risky behaviors. Scientific research establishes that the brain does not finish developing until young people reach their mid-to-late twenties.[46]

---

[44]   U.S. Dep't of Health & Human Servs., *supra* note 43.

[45]   Maya Rossin-Slater et al., *Local Exposure to School Shootings and Youth Antidepressant Use*, 117 PNAS 23484, 23486 (2020).

[46]   Adam Winkler & Cara Natterson, *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST (Jan. 6, 2016),

As the Supreme Court has recognized, "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." *Graham* v. *Florida*, 560 U.S. 48, 68 (2010). One of the *last* parts of the brain to mature is the prefrontal cortex, which is responsible for impulse control, judgment, and long-range planning. *See id.* (citing Brief for American Medical Association et al. at 16-24; Brief for American Psychological Association et al. at 22-27).[47] The prefrontal cortex matures well after the limbic system, which controls basic emotions like fear, anger, and pleasure, resulting in a period of reduced self-control in the late teens and early twenties.[48]

Accordingly, 18-to-20-year-olds are prone to taking risks and deprioritizing long-term outcomes. *See, e.g.*, *Horsley* v. *Trame*, 808 F.3d

---

https://www.washingtonpost.com/posteverything/wp/2016/01/06/there-a-simple-way-to-fight-mass-shootings-raise-the-gun-age ("The scientific literature over the past two decades has demonstrated repeatedly that the brain does not fully mature until the mid-to-late 20s.").

[47] *See also* Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 453, 456 (2013) ("Behavioral control requires a great involvement of cognitive and executive functions. These functions are localized in the prefrontal cortex, which matures independent of puberty and continues to evolve up until 24 years of age.").

[48] *See id.* at 453.

1126, 1133 (7th Cir. 2015) ("The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable." (quoting Declaration of Ruben C. Gur, Ph.D.)); *Bondi*, 133 F.4th at 1151 (Rosenbaum, J., concurring) ("[T]he biological evidence shows that 'the adolescent brain is structurally and functionally vulnerable to environmental stress' and 'risky behavior' in a way that the fully developed brain wouldn't be." (quoting Arain et al., *supra* note 47, at 458)).[49]  Indeed, even without our modern biological proof, the Founders' generation understood that those under 21 years of age lacked a developed sense of reason and judgment.  *See Bondi*, 133 F.4th at 1117-18.

---

[49]  *See also, e.g.*, *Miller* v. *Alabama*, 567 U.S. 460, 471 (2012) (noting that juveniles "have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking" (internal quotation marks and citation omitted)); *Nat'l Rifle Ass'n of Am.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 210 n.21 (5th Cir. 2012) ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over.").

Adolescents also are uniquely prone to negative emotional states.[50] Adolescent responses to "frequent" negative states "tend to be more intense, variable and subject to extremes relative to adults."[51] And adolescents are more likely to *act* on negative emotions like stress or rage because their limbic systems have matured while their cerebral cortices (*i.e.*, impulse control centers) are still developing.[52] Because the behavior-regulating functions of their brains are still developing, 18-to-20-year-olds are indisputably at a higher risk of perpetrating and suffering from gun violence when they have unrestricted access to purchasing firearms.[53]

---

[50] Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124, 125 (2010).

[51] *Id.*

[52] *See* Arain et al., *supra* note 47, at 458 ("[T]he adolescent brain is structurally and functionally vulnerable to environmental stress . . . .").

[53] *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014) ("Adolescents commit more crimes per capita than children or adults in the United States and in nearly all industrialized cultures. Their proclivity toward . . . risk taking has been suggested to underlie the inflection in criminal activity observed during this time.").

### D. Minimum-Age Laws Have Proven Effective at Reducing Gun Violence Among Minors.

Under the *Bruen* and *Rahimi* framework, courts must examine both "why" the legislature enacted the challenged law and "how" the challenged law operates. Section 27510 "has the same 'why' as" historical laws setting the age of majority at 21: these laws recognize that people under 21 "lack the judgment and discretion to purchase firearms responsibly." *Bondi*, 133 F.4th at 1122-23. The California Legislature relied on the substantial body of social science evidence establishing that age-based restrictions are effective at combatting gun violence.

Studies have confirmed a connection between age-based regulations like Section 27510 and a decline in firearm-related adolescent deaths—particularly those due to suicide. For instance, a 2004 study found that state laws raising the minimum legal age to purchase a handgun to 21 were associated with a 9% decline in firearm suicide rates among 18-to-20-year-olds.[54] Another comprehensive report issued just last year on the science of gun policy found "supportive

---

[54] Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 598 (2004).

evidence that increasing the minimum age required to purchase a firearm above the threshold set by federal law can reduce firearm suicides among young people."[55]

Age-based regulations also have proven effective in reducing gun violence among young people, including in the 18-to-20-year-old range. A 2019 study found that 18-to-21-year-olds made up more than two-thirds (68.7%) of the 21,241 firearm-related deaths among U.S. children and adolescents from 2011 to 2015, but that every 10-point increase in a score measuring the strength of a state's gun laws "decreases the firearm-related mortality rate in children by 4%."[56] Another study using the same gun-law scores found that the pediatric firearm mortality rate among children under 20 was almost twice as high in the quartile of states with the weakest laws than in the quartile of states with the strongest laws.[57]

---

[55] Smart et al., *supra* note 26, at xiii.

[56] Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS 2, 3 & tbl. 1 (2019).

[57] Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLL. SURGEONS 150, 152 (2019).

Notably, research demonstrates that most mass shooters obtain their weapons lawfully. In a report examining active shootings from 2000 to 2013, the FBI concluded that "only very small percentages [of shooters] obtain[ed] a firearm illegally,"[58] indicating that, rather than being sophisticated participants in the black market for firearms, perpetrators seek easy and lawful access to weapons. Indeed, a survey of convicted gun offenders in 13 states found that 17% of the offenders would have been prohibited from obtaining firearms at the time of the crime if the minimum legal age for purchasing a firearm in that state had been 21 years, a finding that "underscore[s] the importance of minimum-age restrictions."[59]

The same concerns regarding minors' heightened impulsiveness, discussed at length in Section II.C *supra*, motivated the passage of laws in all 50 states establishing 21 as the minimum legal age

---

[58] James Silver et al., Fed. Bureau of Investigation, U.S. Dep't of Just., *A Study of Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013*, at 7 (2018), https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view.

[59] Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJ. PREVENTION 26, 29-30 (2013).

for alcoholic beverage consumption. Studies confirm that these laws led to significant reductions in deaths from car crashes involving minor drivers.[60]

Lawmakers therefore can and have rationally concluded that commercial restrictions on purchasing firearms will deter suicidal and criminal use of firearms—precisely the type of reasonable conclusion that is consistent with our nation's history and tradition of firearms regulations. *See Bondi*, 133 F.4th at 1122-23. The bottom line here is that nothing in the Second Amendment can legitimately be read to bar states from passing laws "to stop immature and impulsive individuals . . . from harming themselves and others with deadly weapons." *Id.* at 1130.

## CONCLUSION

For the foregoing reasons, and those set forth by Defendants-Appellees, Section 27510 survives Plaintiffs-Appellants' challenge to its constitutionality under *Rahimi*'s historical principles test. A temporal restriction on 18-to-20-year-olds' ability to purchase firearms (the "how")

---

[60] William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, 17 J. STUD. ON ALCOHOL & DRUGS 108, 109 (Supp. 2014).

in order to protect the public from individuals who pose a heightened risk of causing harm when armed (the "why") is entirely consistent with a long history of analogous public safety regulations. This "why" is further confirmed by modern neuroscience and social science research on the risk of death when individuals under the age of 21 have easy access to firearms. Thus, both the "how" and "why" of Section 27510 are consistent with the principles underlying historical firearm regulations. This Court should affirm the district court's opinion upholding this important law.

Dated:  November 6, 2025

William T. Clark
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
244 Madison Avenue, Ste. 147
New York, NY 10016

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA 94104

*Of counsel for* Amicus Curiae
*Giffords Law Center to Prevent
Gun Violence*

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
BRADY CENTER TO PREVENT
GUN VIOLENCE
840 First Street NE, Suite 400
Washington, DC 20002

*Of counsel for* Amicus Curiae
*Brady Center to Prevent Gun
Violence*

Respectfully submitted,

/s/ *Leonid Traps*

Leonid Traps
   *Counsel of Record*
Madeline B. Jenks
Lisa Wang
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
trapsl@sullcrom.com

Robert A. Sacks
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067

*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Leonid Traps*
Leonid Traps
*Counsel for* Amici Curiae

November 6, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-2509

I am the attorney or self-represented party.

**This brief contains** | 5,871 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Leonid Traps | **Date** | 11/6/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*