No. 25-2509

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

PWGG, LP, ET AL.,

*Plaintiffs-Appellants*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE
STATE OF CALIFORNIA, ET AL.,

*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court
for the Southern District of California (No. 3:19-cv-01226-L-AHG)
(Hon. M. James Lorenz)

———————————————

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE**

———————————————

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Erik P. Fredericksen
Everytown Law
450 Lexington Avenue
P.O. Box 4184
New York, NY 10163
(646) 324-8198
efredericksen@everytown.org

November 6, 2025

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 1

ARGUMENT ........................................................................................... 3

I.  19th-Century History Is a Crucial Part of the *Bruen-Rahimi* Analysis ............................................................................................ 3

   A.  Supreme Court and Circuit Precedent Bind this Court to Consider 19th-Century History ................................................ 3

   B.  If the Court Reaches the Time-Period Question, the Proper Focus Is the Reconstruction Era ............................................. 12

II.  This Court Should Consider Historical Context in Evaluating California's Age Restriction ......................................................... 23

   A.  Appreciating Historical Context Is Crucial to the *Bruen-Rahimi* Analysis ................................................................. 23

   B.  Historical Context Explains Why Age-Restriction Statutes First Proliferated in the Reconstruction Era ......................... 26

      1. Founding-Era Context ........................................................ 26

      2. 19th-Century Societal Changes ......................................... 28

      3. 19th-Century Regulatory Response ................................... 32

CONCLUSION ..................................................................................... 34

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024),
*cert. denied*, 145 S. Ct. 1900 (2025) ............................................*passim*

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ............................................................ 5

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) (en banc),
*cert. denied*, 145 S. Ct. 1534 (2025) ................................................... 8

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........................................................................28

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ......................................................................... 4

*Duncan v. Bonta*,
133 F.4th 852 (9th Cir. 2025) (en banc),
*petition for cert. filed*, No. 25-198 (Aug. 15, 2025) ................ 6, 7, 25, 34

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ...........................................................16

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) ....................................................................9, 33

*Frey v. City of New York*,
--- F.4th ----, 2025 WL 2679729 (2d Cir. Sept. 19, 2025) ....... 4, 8, 11, 14

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) ...........................................................16

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct 2778 (2025) .... 8

*Kipke v. Moore*,
No. 1:23-cv-01293, 2024 WL 3638025 (D. Md. Aug. 2, 2024),
*appeal docketed*, No. 24-1799 (4th Cir. Aug. 22, 2024) .......................22

*Koons v. Att'y Gen. N.J.*,
--- F.4th ----, 2025 WL 2612055 (3d Cir. Sept. 10, 2025),
*as amended* (Sept. 17, 2025) ............................................................ 7, 8

*LaFave v. County of Fairfax*,
No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024),
*aff'd in part and vacated in part on other grounds*,
149 F.4th 476 (4th Cir. 2025) ............................................................ 17

*Lara v. Commissioner Pennsylvania State Police*,
125 F.4th 428 (3d Cir. 2025),
*petition for cert. filed*, No. 24-1329 (June 30, 2025) ................ 7, 13, 21

*Mahanoy Area Sch. Dist. v. B. L.*,
594 U.S. 180 (2021) ............................................................................. 19

*McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
140 F.4th 568 (4th Cir. 2025),
*petition for cert. filed*, No. 25-24 (July 3, 2025) ........................... *passim*

*McCullen v. Coakley*,
573 U.S. 464 (2014) ............................................................................. 24

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ....................................................................... 15, 16

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ............................................................................. 19

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
680 F. Supp. 3d 567 (D. Md. 2023),
*appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023) ...................... 17

*Nat'l Rifle Ass'n v. Bondi*,
133 F.4th 1108 (11th Cir. 2025) (en banc), *petition for cert. filed sub
nom. Nat'l Rifle Ass'n v. Glass*, No. 24-1185 (May 16, 2025) ...... *passim*

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*,
72 F.4th 1346 (11th Cir. 2023) ............................................... 17, 18, 32

*Nev. Comm'n on Ethics v. Carrigan*,
564 U.S. 117 (2011) ............................................................................. 11

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) .......................................................................*passim*

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2771 (2025) ......... 9

*Pinales v. Lopez*,
765 F. Supp. 3d 1024 (D. Haw. 2025).................................................22

*Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
127 F.4th 583 (5th Cir. 2025) ........................................................8, 21

*Rhode v. Bonta*,
145 F.4th 1090 (9th Cir. 2025),
*petition for reh'g filed* (Aug. 7, 2025) ................................................. 6

*Rupp v. Bonta*,
723 F. Supp. 3d 837 (C.D. Cal. 2024),
*appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024).................17, 22

*Schoenthal v. Raoul*,
150 F.4th 889 (7th Cir. 2025),
*petition for cert. filed*, No. 25-541 (Oct. 31, 2025) ............................... 7

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) ............................................................ 6

*United States v. Duarte*,
137 F.4th 743 (9th Cir. 2025) (en banc) .................................2, 5, 7, 12

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012).............................................................16

United States v. Rahimi,
602 U.S. 680 (2024) ..................................................................*passim*

*United States v. Stennerson*,
150 F.4th 1276 (9th Cir. 2025) .......................................................... 6

*United States v. VanDyke*,
--- F.4th ----, 2025 WL 3000188 (9th Cir. Oct. 27, 2025) ..................... 2

*United States v. Vlha*,
142 F.4th 1194 (9th Cir. 2025),
*petition for cert. filed*, No. 25-5867 (Oct. 6, 2025)................................ 6

iv

*We the Patriots, Inc. v. Lujan Grisham*,
    697 F. Supp. 3d 1222 (D.N.M. 2023),
    *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024)............................18

*Wolford v. Lopez*,
    116 F.4th 959 (9th Cir. 2024), *cert. granted in part*,
    --- S. Ct. ----, 2025 WL 2808808 (Oct. 3, 2025) .........................5, 11, 25

*Worth v. Jacobson*,
    108 F.4th 677 (8th Cir. 2024),
    *cert. denied*, 145 S. Ct. 1924 (2025) .................................................8, 21

## OTHER AUTHORITIES

Barbara M. Tucker, *Liberty Is Exploitation: The Force of Tradition in
    Early Manufacturing*, 19 OAH Mag. of Hist. 21 (2005).....................29

Evan D. Bernick, *Fourteenth Amendment Confrontation*,
    51 Hofstra L. Rev. 1 (2022).................................................................18

James D. Schmidt, *"Restless Movements Characteristic of Childhood":
    The Legal Construction of Child Labor in Nineteenth-Century
    Massachusetts*, 23 L. & Hist. Rev. 315 (2005) ...................................30

Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep
    and Bear Arms, 1791-1868*, 108 Minn. L. Rev. 3049 (2024) ..............31

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the
    Fifth Amendment May Not Protect Against Regulatory Takings, But
    the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008)....18

Saul Cornell, *Common-Law Limits on Firearms Purchases by Minors:
    The Original Understanding*,
    173 U. Pa. L. Rev. Online 133 (2025) .................................................27

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the
    Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ........................19

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v.
    Bruen* (No. 20-843) ...............................................................................18

W.H. Kennedy, *Carrying Concealed Weapons*, New York Tribune
    (July 26, 1884) .....................................................................................32

William L. Pressly, *America's Paper Money: A Canvas for an Emerging Nation* 4 (2023) .....................................................................28

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly eleven million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a 20-year-old gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Court should uphold California's limited age restriction on firearm purchases for the reasons set out in the State's brief. California's law fits comfortably within a consistent regulatory tradition stretching from the founding era, through Reconstruction, to the present day. *See* Dkt. 27.1 ("State Br.") Section II.[2] Everytown submits this brief to expand on two points supporting affirmance.

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

[2] In addition to the tradition of age restrictions on firearm purchases, California's law is also consistent with the broader principle

*First*, in conducting the Second Amendment historical inquiry, this Court should give significant weight to 19th-century evidence. *Bruen*, *Rahimi*, this Court's decisions, and those of other circuits make clear that this is true regardless of which time period is the central focus of that inquiry—the founding era, when the Second Amendment was ratified, or the Reconstruction era, when the people made the right applicable to the states through the Fourteenth Amendment. This Court need not resolve the question of which period to prioritize because evidence from both supports the constitutionality of California's law. If, however, it chooses to do so, it should conclude that the historical analysis properly centers on the Reconstruction era and 1868, consistent with originalist principles and authority.

*Second*, following Supreme Court guidance and this Court's precedents, the Court should consider historical context in evaluating

---

that legislatures may disarm "categories of persons thought ... to present a special danger of misuse." *United States v. Duarte*, 137 F.4th 743, 759 (9th Cir. 2025) (en banc) (quoting *United States v. Rahimi*, 602 U.S. 680, 698 (2024)); *see also United States v. VanDyke*, --- F.4th ----, 2025 WL 3000188, at *2, *6-7 (9th Cir. Oct. 27, 2025) (upholding law under "categorical disarmament" principle from *Duarte*). In fact, the en banc majority in *Duarte* specifically relied on historical age restrictions as an example of this principle. *See* State Br. 39 (citing *Duarte*, 137 F.4th at 759 & n.14).

California's law. Here, that context—specifically, monumental societal changes in the 19th century—explains why founding-era common-law restrictions and Reconstruction-era statutes both form part of a consistent tradition in which those under 21 have never enjoyed an unfettered right to purchase firearms. California's law fits comfortably within that tradition.

## ARGUMENT

## I. 19th-century history is a crucial part of the *Bruen-Rahimi* analysis

California's law is supported by a consistent historical tradition from the founding era through Reconstruction and after, and the district court was correct to consider all of that history. *See* 1-ER-22. Plaintiffs, seeking to cut off the historical analysis, claim that the State's 19th-century evidence is "too late." Appellants' Br. 59. They are mistaken, regardless of whether the founding era or Reconstruction is the central focus of the historical inquiry.

### A. Supreme Court and Circuit precedent bind this court to consider 19th-century history

*Heller*, *Bruen*, and *Rahimi* all make clear that Reconstruction-era and later history is crucial to the Second Amendment analysis. *Heller* announced that post-ratification history "is a critical tool of

constitutional interpretation" and examined "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008). In doing so, it relied on "19th-century cases that interpreted the Second Amendment," "'discussion of the Second Amendment in Congress and in public discourse' after the Civil War," and "how post-Civil War commentators understood the right." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022) (describing and quoting *Heller*, 554 U.S. at 610, 614, 616-19).

*Bruen* "reaffirmed the appropriateness of relying on post-Founding history." *Frey v. City of New York*, --- F.4th ----, 2025 WL 2679729, at *5 (2d Cir. Sept. 19, 2025). It relied on mid-19th-century cases and statutes, *see* 597 U.S. at 51-57, and surveyed "public discourse surrounding Reconstruction," *id.* at 60. And in discussing sensitive places, *Bruen* indicated that "18th- *and 19th-century*" laws restricting the possession of guns in legislative assemblies, polling places, and courthouses satisfied its historical analysis. *Id.* at 30 (emphasis added).

4

*Rahimi* then put the relevance of 19th-century evidence even further beyond doubt. It rested its decision *upholding* a challenged federal law in large part on laws passed between 1836 and 1868. *See* 602 U.S. at 696 (relying on Massachusetts surety statute from 1836); *id.* (invoking similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at 56 & n.23, citing 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws).

Following the Supreme Court, this Court has recognized the importance of 19th-century evidence. It has consistently looked to the periods surrounding "when the Second *and Fourteenth* Amendments were adopted" in conducting the *Bruen-Rahimi* historical analysis. *Duarte*, 137 F.4th at 755 (emphasis added); *see also Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (same); *Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024), *cert. granted on other grounds*, --- S. Ct. ----, 2025 WL 2808808 (Oct. 3, 2025) (same, for sensitive places cases).[3] And

---

[3] Notably, while the Supreme Court granted certiorari on the constitutionality of the private-property law at issue in *Wolford*, it denied certiorari on the question whether the Ninth Circuit correctly relied on Reconstruction-era history to uphold sensitive-places laws. *See*

5

it has emphasized that courts should rely on history from before, during, and after the founding era in discerning the long arc of a consistent historical tradition. *See Duncan v. Bonta*, 133 F.4th 852, 875-76 & n.6 (9th Cir. 2025) (en banc) (tracing consistent tradition from 18th through 19th century and later), *petition for cert. filed*, No. 25-198 (Aug. 15, 2025); *United States v. Stennerson*, 150 F.4th 1276, 1281, 1284-85 (9th Cir. 2025) (instructing that courts should consider evidence "after the founding" and relying on laws through 1890); *United States v. Vlha*, 142 F.4th 1194, 1197 (9th Cir. 2025) (providing similar guidance), *petition for cert. filed*, No. 25-5867 (Oct. 6, 2025); *see also United States v. Alaniz*, 69 F.4th 1124, 1129 & n.2 (9th Cir. 2023) (relying on tradition persisting through Reconstruction to reject Second Amendment challenge).[4] In fact, as California has emphasized, *see* State

---

Petition for a Writ of Certiorari ii, *Wolford v. Lopez*, No. 24-1046 (Apr. 1, 2025); State Br. 39 n.9.

[4] This Court has occasionally suggested that evidence from *long* after ratification is less valuable than evidence closer to ratification. *See Duncan*, 133 F.4th at 870; *Rhode v. Bonta*, 145 F.4th 1090, 1112, 1116 (9th Cir. 2025), *petition for reh'g filed* (Aug. 7, 2025). But this Court has not suggested that such evidence can be disregarded and has continually relied on a variety of post-ratification history. *Duncan*, for example, expressed caution about evidence long postdating ratification but then relied on evidence through the end of the 19th-century and

Br. 39, this Court has *already* relied on late 19th-century age

restrictions in upholding a law against a Second Amendment challenge.

*See Duarte*, 137 F.4th at 759 & n.14.

Numerous other circuits have likewise concluded that "the

government is not constrained to only Founding Era laws." *Schoenthal*

*v. Raoul*, 150 F.4th 889, 912-13 (7th Cir. 2025) (citation omitted),

*petition for cert. filed*, No. 25-541 (Oct. 31, 2025). The Second Circuit, for

example, has instructed that "evidence from the Reconstruction Era ...

is at least as relevant as evidence from the Founding Era" in a case

against a state. *Antonyuk v. James*, 120 F.4th 941, 988 n.36 (2d Cir.

2024), *cert. denied*, 145 S. Ct. 1900 (2025); *see also Koons v. Att'y Gen.*

*N.J.*, --- F.4th ----, 2025 WL 2612055, at *6-7 (3d Cir. Sept. 10, 2025), *as*

*amended* (Sept. 17, 2025) (clarifying that "the key periods" for the

historical analysis are "when the Second Amendment was adopted in

1791 *and* the Fourteenth in 1868" (cleaned up and emphasis added)).[5]

_____

noted that the tradition continued into the 20th century. *See* 133 F.4th
at 875-76 & n.6.

[5] Plaintiffs cite *Lara v. Commissioner Pennsylvania State Police*,
125 F.4th 428 (3d Cir. 2025), *petition for cert. filed*, No. 24-1329 (June
30, 2025), as support for discounting Reconstruction-era evidence. *See*
Appellants' Br. 39. But, as the Third Circuit has explained, *Lara*
recognized that post-ratification authorities can be a "critical tool of

7

And, regardless of which period is prioritized, those and other courts have taken a "long view ... of history," *Bianchi v. Brown*, 111 F.4th 438, 471 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1534 (2025), considering 19th-century and later evidence in upholding a variety of firearms regulations including age restrictions.[6]

---

constitutional interpretation," and held only that courts should privilege founding-era evidence if the two periods conflict. *Koons*, 2025 WL 2612055, at *7 n.7 (quoting *Lara*, 125 F.4th at 441). The Fifth Circuit, too, has rejected reliance on Reconstruction-era evidence specifically because it thought founding-era evidence affirmatively indicated a different conclusion. *See Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 127 F.4th 583, 599 (5th Cir. 2025) (concluding laws "were passed too late in time *to outweigh*" earlier evidence (emphasis added)). Similarly, the Eighth Circuit has suggested that Reconstruction-era evidence "carr[ies] less weight than Founding-era evidence," though it still evaluated Reconstruction-era laws. *Worth v. Jacobson*, 108 F.4th 677, 692-93, 696-97 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 1924 (2025). *But see infra* Section I.B (explaining why originalist principles support privileging Reconstruction-era evidence and further discussing these cases).

[6] *See McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives,* 140 F.4th 568, 578-79 (4th Cir. 2025) (considering "later nineteenth-century history" in upholding age restriction), *petition for cert. filed*, No. 25-24 (July 3, 2025); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1121 (11th Cir. 2025) (en banc) ("*Bondi II*") (relying on "[m]id-to-late nineteenth-century laws consistent with [earlier] principles" in upholding age restriction), *petition for cert. filed sub nom. Nat'l Rifle Ass'n v. Glass*, No. 24-1185 (May 16, 2025); *Frey*, 2025 WL 2679729, at *5-6 ("comfortably rely[ing]" on post-founding history "[e]ven if the 1791 understanding primarily controls"); *Bianchi*, 111 F.4th at 465-71 (relying on 19th- and 20th-century evidence); *Hanson v. District of Columbia*, 120 F.4th 223, 237-40, 238 n.7 (D.C. Cir. 2024) (same), *cert.*

This focus on evidence from after the founding is perfectly consistent with the Supreme Court's methodology. The Court itself has recently reaffirmed that post-ratification practice can "embody a constitutional judgment—made by generations of legislators and by the American people as a whole—that commands our respect." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 494 (2025). And Justice Kavanaugh discussed the reasoning behind this methodology at length in *Rahimi*. As he explained, "the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text." 602 U.S. at 725 (Kavanaugh, J., concurring). In particular, James Madison "articulated the Framers' expectation and intent that post-ratification history would be a proper and important tool" of constitutional interpretation. *Id.* Justice Kavanaugh then traced that practice in Supreme Court cases from Chief Justice Marshall to Justice Scalia, collecting over thirty Supreme Court cases relying on post-ratification history from the early 1800s to the present day. *Id.* at 725-29. Justice Scalia, he observed, "'made extensive use of post-

---

*denied*, 145 S. Ct 2778 (2025); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46-48, 51-52 (1st Cir. 2024) (same), *cert. denied*, 145 S. Ct. 2771 (2025).

ratification history,'" including history that "extended 'far beyond the time of enactment,'" and "'had a very broad view of what traditions might be indicative of original meaning.'" *Id.* at 726 n.5 (citation omitted).

Justice Kavanaugh's observations are persuasive and consistent with the Court's instruction in *Bruen* that "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." 597 U.S. at 35-36 (cleaned up); *see also Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) (emphasizing that "postenactment history can be an important tool," including to "liquidate ambiguous constitutional provisions" (citation omitted)).

Appreciating the relevance of postenactment history also accords with common sense. If a regulation passed in the decades around Reconstruction did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in earlier decades, then it can be inferred that the regulation comports with the founding-era public understanding of the right. After all, "[p]rinciples of liberty

10

fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002)). In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era tradition also reflects the founding-era understanding. *See, e.g.*, *Frey*, 2025 WL 2679729, at *6 (observing that the Reconstruction-era understanding of individuals "born and educated in the early 19th century" is "uniquely 'instructive'" in an analysis "pegged to 1791" (quoting *Heller*, 554 U.S. at 614)). Such a presumption reflects and confirms the principle that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37. And considering later history is particularly warranted here, where the challenged law addresses "unprecedented societal concerns" that people in earlier periods would have had no reason to address through regulation. *Id.* at 27; *see infra* Section II; *cf. Wolford*, 116 F.4th at 980 ("[I]t is illogical to

11

expect a government to regulate a place before it existed in its modern form.").

In sum, under the precedents of the Supreme Court and this Court, Reconstruction-era and later history plays a crucial role in the *Bruen-Rahimi* historical analysis, regardless of what period is the primary originalist focus.

## B. If the Court Reaches the Time-Period Question, the Proper Focus Is the Reconstruction Era

The Supreme Court has expressly left open which time period to privilege in the Second Amendment analysis, because in both *Bruen* and *Rahimi* it found the public understanding of the right to have remained consistent throughout our nation's history. *See Rahimi*, 602 U.S. at 692 n.1; *Bruen*, 597 U.S. at 37-38. This Court has similarly left the question unresolved in the absence of a conflict between founding- and Reconstruction-era evidence, *see, e.g., Duarte*, 137 F.4th at 755 n.8, and it can do the same here. But if the Court chooses to address the issue, it should conclude that the proper focus of the inquiry is on the Reconstruction era and 1868, when the Fourteenth Amendment was ratified.

As a threshold matter, there is no conflict between founding-era and later evidence in this case, and so this Court should simply consider all the history before it, as the district court did and as the Fourth and Eleventh Circuits have in upholding age restrictions. *See supra* Section I.A; 1-ER-22; *McCoy*, 140 F.4th at 572, 578-79; *Bondi II*, 133 F.4th at 1116-17. While the Fifth Circuit has discerned a conflict in this context, that is only because it did not consider the full founding-era record of common-law restrictions. *See Bondi II*, 133 F.4th at 1128-29 (discussing shortcomings in Fifth Circuit's reasoning in *Reese*).[7] Here, Plaintiffs attempt to manufacture a conflict even with that fuller record, *see* Appellants' Br. 59, but that effort should be rejected.

*First*, there is no conflict based on any supposed lack of regulation at the founding. As an initial matter, the founding era did have relevantly similar regulation, including common-law restrictions. *See* State Br. 28-34 & n.7. But in any case, legislative silence followed by later regulation is not a contradiction. It simply means that

---

[7] In *Lara*, where the Third Circuit likewise treated founding-era and Reconstruction-era evidence as conflicting, it understood the defendants to be "claiming" that there was a conflict. *See* 125 F.4th at 439 & n.17.

13

jurisdictions had not "maximally exercised their power to regulate" in the earlier period. *See Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring); *Antonyuk*, 120 F.4th at 969; *see also Frey*, 2025 WL 2679729, at *6 (observing that a court should not find a contradiction "if the Founding-era history does not point with some certainty in one direction or another"). And this is especially true when (as here) historical context explains why earlier legislatures would not have needed or thought to enact a particular form of regulation. *See infra* Section II.

*Second*, there is no conflict based on founding-era militia and related laws, as Plaintiffs suggest. *See* Appellants' Br. 46-48, 59. Far from conferring any right, those laws imposed an *obligation* to carry arms in a highly supervised context. *See Bondi II*, 133 F.4th at 1127 (criticizing reliance on militia laws as "mistak[ing] the duty of some minors to serve in the militia for a right to purchase firearms"). And as California has explained, the laws generally relied on parents to supply firearms to their children under 21, or exempted that age group from the firearms requirement (or from militia service more broadly). *See* State Br. 32-34; *McCoy*, 140 F.4th at 578; *Bondi II*, 133 F.4th at 1120.

14

Founding-era militia laws simply are not evidence that anyone thought it would be unconstitutional to restrict the ability of those under 21 to purchase firearms. With no conflict between founding-era and Reconstruction-era tradition, this Court need not decide which period to privilege in its historical analysis.

If this Court resolves that question, however, it should hold that 1868 is the proper focus based on originalist principles. In a case involving a state law, that conclusion follows directly from the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35). The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.* at 37. Accordingly, focusing on 1868 in a case challenging a state law is the only way to answer the originalist question: How did the people understand the right at the time they adopted it?

The Supreme Court's decision in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), reinforces this conclusion. *McDonald* analyzed at

15

length the public understanding around 1868 before holding that the Second Amendment constrains the states. *See id.* at 770-78. That approach is hard to square with a belief that only the 1791 understanding informs the content of the right: "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 120 F.4th at 973.

Even before *Bruen*, courts recognized that the Reconstruction era should be the primary focus of historical inquiry when evaluating state and local gun laws. *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *see also United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).[8]

---

[8] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework. Those analyses generally remain good law. *Bruen* rejected the second step (means-end scrutiny), but explained that the first "is broadly consistent with *Heller*." 597 U.S. at 19.

After *Bruen*, several well-reasoned, persuasive decisions from other courts have continued to "recogniz[e] the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era," in cases involving state or local laws. *LaFave v. County of Fairfax*, No. 1:23-cv-01605, 2024 WL 3928883, at *8 (E.D. Va. Aug. 23, 2024), *aff'd in part and vacated in part on other grounds*, 149 F.4th 476 (4th Cir. 2025); *see Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) ("*Bondi I*") ("[H]istorical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era."), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023);[9] *Rupp v. Bonta*, 723 F. Supp. 3d 837, 851, 876-78 (C.D. Cal. 2024) (reaching same conclusion), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024); *Md. Shall Issue, Inc. v. Montgomery Cnty.*, 680 F. Supp. 3d 567, 582-83 (D. Md. 2023) (agreeing with *Bondi I*), *appeal*

---

[9] Despite being vacated for rehearing en banc, *Bondi I*'s robust reasoning and authorities remain persuasive. *See Antonyuk*, 120 F.4th at 973-74 (finding *Bondi I* persuasive on this point after vacatur). The en banc Eleventh Circuit subsequently reached the same ultimate conclusion as the panel, but declined to resolve the time-period question "because the law of both [the founding and Reconstruction] eras restricted the purchase of firearms by minors." *Bondi II*, 133 F.4th at 1116-17.

*docketed*, No. 23-1719 (4th Cir. July 10, 2023); *We the Patriots, Inc. v. Lujan Grisham*, 697 F. Supp. 3d 1222, 1234 (D.N.M. 2023) (agreeing with *Bondi I* and *Maryland Shall Issue*), *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024). And as noted, still more courts, including this one, have concluded that Reconstruction-era evidence is at least as important as founding-era evidence. *See supra* pp. 5-8.

The conclusion that the 1868 understanding should govern in a case against a state is far from radical. It is the answer former Solicitor General Paul Clement, as counsel for New York's NRA affiliate, gave when asked by Justice Thomas during oral argument in *Bruen*.[10] It is also the position of prominent originalist scholars "across the political spectrum." *Bondi I*, 61 F.4th at 1322 n.9 (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see Bondi II*, 133 F.4th at 1154 (same) (Rosenbaum, J., concurring).[11] Both Justice

---

[10] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

[11] *See also, e.g.*, Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45

18

Thomas and Justice Scalia have expressed similar views. *See Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 212 (2021) (Thomas, J., dissenting) ("While the majority entirely ignores the relevant history, I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to what ordinary citizens at the time of the Fourteenth Amendment's ratification would have understood the right to encompass." (cleaned up)); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (calling for "further evidence of common practice in 1868, since I doubt that the Fourteenth Amendment time-warped the post-Civil War States back to the Revolution"). Simply put, a faithful originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

This conclusion raises the additional question, not directly presented in this case, as to the correct temporal focus in challenges to *federal* laws. The originalist answer to that question is more complex,

---

San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").

19

because the Second Amendment has bound the federal government since 1791, and yet *Bruen* stated that individual rights applicable against the states and against the federal government "have the same scope." 597 U.S. at 37.

But *Bruen* itself charted the path through this complexity. After identifying the issue, it cited scholars Akhil Amar and Kurt Lash, who have explained that the 1868 understanding should apply to both levels of government. *See id.* at 37-38 (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)). As Professor Lash wrote (and as quoted in *Bruen*), adoption of the Fourteenth Amendment "'invested those original 1791 texts [of the Bill of Rights] with new 1868 meanings.'" *Id.* at 38 (citation omitted). The Court's choice to highlight only these two scholars is compelling evidence that it considered them to be correct,

20

and thus that Reconstruction should be the central focus of the historical inquiry in challenges to both state and federal laws.[12]

Plaintiffs nevertheless insist that *Bruen* "strongly supports the conclusion that the Founding era is the primary benchmark" for the historical analysis, relying on the Third Circuit's and Eighth Circuit's decisions in *Lara*, 125 F.4th at 438-43, and *Worth*, 108 F.4th at 692-93. Appellants' Br. 43. Those decisions, however, seriously overstate *Bruen*'s reasoning. Instead of engaging with originalist principles, *Lara* based its conclusion on a "general assumption" in several Supreme Court cases cited by *Bruen*. *Lara*, 125 F.4th at 440 (citing *Bruen*, 597 U.S. at 37). *Worth* pointed to this same assumption to conclude that Reconstruction-era laws "carry less weight than Founding-era evidence." 108 F.4th at 692-93, 697.[13] But the Supreme Court has made

---

[12] *Bruen* identified no scholarship or other authority explaining how an originalist could accept the contrary position—inflicting upon the states an understanding of the Second Amendment different from the one the Reconstruction generation believed it was extending to them.

[13] The Fifth Circuit in *Reese* also relied on this assumption to discount Reconstruction-era laws, without even acknowledging it was only an assumption. *See* 127 F.4th at 599-600.

clear that this general assumption did not resolve the time-period issue—otherwise, it would have simply said so in *Bruen* and *Rahimi*.

Moreover, the cases *Bruen* cited in describing that assumption did not address the significance of the Fourteenth Amendment's ratification for this issue. They cannot have resolved the question that *Bruen* and *Rahimi* expressly left open. *See Bruen*, 597 U.S. at 37-38; *Rahimi*, 602 U.S. at 692 n.1. Thus, *Lara*, *Worth*, and *Reese* are not persuasive. *See, e.g.*, *Antonyuk*, 120 F.4th at 974 (rejecting similar reasoning in earlier opinion in *Lara*); *Pinales v. Lopez*, 765 F. Supp. 3d 1024, 1042-44 (D. Haw. 2025) (disagreeing with *Lara*, *Worth*, and *Reese*); *Kipke v. Moore*, No. 1:23-cv-01293, 2024 WL 3638025, at *5 (D. Md. Aug. 2, 2024) (finding earlier opinion in *Lara* "unconvinc[ing]"), *appeal docketed*, No. 24-1799 (4th Cir. Aug. 22, 2024); *Rupp*, 723 F. Supp. 3d at 877-78 (declining to follow earlier opinion in *Lara* because, "[r]ather than elevate an assumption to a holding, the Court thinks it best to address the issue from first principles").

\* \* \*

In sum, this Court should follow Supreme Court caselaw and its own precedent in considering evidence from the Reconstruction era and

22

beyond as part of this nation's historical tradition of firearm regulation—regardless of which time period is central to the Second Amendment inquiry. But if it chooses to settle the time-period issue, it should hold that 1868 is the focus.

## II. This Court Should Consider Historical Context in Evaluating California's Age Restriction

This Court should consider historical context in evaluating California's law, as the district court correctly did and as the Fourth and Eleventh Circuits have done in upholding similar age restrictions. *See* 1-ER-18-20; *McCoy*, 140 F.4th at 576, 579; *Bondi II*, 133 F.4th at 1117-18, 1122, 1128-29. That context reinforces that California's law is consistent with historical tradition—a tradition that has evolved in its particulars in response to changing societal conditions, but that has remained unchanged regarding an important principle: Individuals under 21 have never enjoyed an unfettered right to independently purchase firearms.

### A. Appreciating historical context is crucial to the *Bruen-Rahimi* analysis

Historical context is a critical part of the *Bruen-Rahimi* analysis. As the Supreme Court has explained, "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied

23

the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27. And since "[s]tates adopt laws to address the problems that confront them," *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (quoting *Burson v. Freeman*, 504 U.S. 191, 207 (1992)), understanding our regulatory tradition requires appreciating the changing nature of those problems. Historical context is especially significant when, as here, a case "implicat[es] unprecedented societal concerns or dramatic technological changes," thus requiring a "more nuanced approach" to history. *Bruen*, 597 U.S. at 27. But it is also important even when a problem has persisted since the founding. Legislatures do not always "maximally exercise[] their power to regulate," *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring), and context can help explain the reasons behind apparent legislative inaction.

This Court has observed these principles in prior cases by paying careful attention to context in evaluating historical analogues for modern firearms laws. In upholding firearms restrictions at parks, for example, it emphasized that such restrictions arose "[a]s soon as green spaces began to take the shape of a modern park," cautioning that it would be "illogical to expect a government to regulate a place before it

24

existed in its modern form." *Wolford*, 116 F.4th at 980, 982. Similarly, the en banc majority in *Duncan* carefully considered when particular weapons emerged and proliferated, finding a pattern in which, "[a]s new weapons gained popularity and notoriety for their criminal use, legislatures imposed significant restrictions on them." 133 F.4th at 875; *see id.* at 881 (reasoning that legislatures are not "limited to precisely the same restrictions when addressing new technology").[14]

Here, historical context is crucial for understanding why statutory age restrictions first proliferated in the mid-to-late 19th century, in comparison to an earlier regime of common-law limitations. Plaintiffs advance a series of misguided claims arising from their failure to appreciate this context. They suggest, for example, that there were "zero restrictions of any kind on 18-to-20-year-olds, period" around the founding, Appellants' Br. 16; that common-law limits on that group amounted to no more than "a father or mother's decision" about their

---

[14] Importantly, *Duncan* considered historical context when applying "*Rahimi*'s straightforward approach," although it found that the "more nuanced" approach would also apply. 133 F.4th at 874. Here too, historical context is important—and California's law is constitutional—regardless of whether the "more nuanced" approach applies.

access to firearms, *id.* at 58; and that the need for 19th-century statutory restrictions implies that the common law actually did not restrict access to firearms by those under 21, *id.* at 59.

Those claims are baseless, for reasons the State's brief outlines and the following subsection demonstrates in further detail. *See* State Br. 41-42. The historical record shows that at the founding, the common law—the predominant form of regulation—formed a pervasive and significant legal restriction on the ability to purchase firearms for those under 21. Those limitations, combined with the social conditions of the time, obviated any need for statutory regulations. But those same limitations then loosened over the course of the 19th century amid a constellation of dramatic societal changes, leading to an unprecedented youth gun violence problem—and, in turn, to a flurry of statutory age restrictions.

### B. Historical context explains why age-restriction statutes first proliferated in the Reconstruction era

#### 1. Founding-era context

California has explained that common-law restrictions at the founding form a relevant tradition supporting the state's law. *See* State Br. 28-32. At the same time, the common law is also an explanation for

the relative *legislative* silence on age restrictions at the founding. As the district court recognized, the common law and social conditions at the founding "obviated more specific regulation." 1-ER-19. The infancy doctrine imposed a "severe burden" amid the "credit economy" of the founding era. *McCoy*, 140 F.4th at 576; *see also Bondi II*, 133 F.4th at 1118 ("In that era, contracts were more important for the basic transactions of society than today." (cleaned up)); Saul Cornell, *Common-Law Limits on Firearms Purchases by Minors: The Original Understanding*, 173 U. Pa. L. Rev. Online 133, 134-37 (2025). And the reliance on common-law doctrine rather than statute was typical of the period: "Because of the common-law tradition, statutes were a 'comparatively infrequent' source of law through the mid-19th century." 1-ER-20 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 3 (2012)); *see Bondi II*, 133 F.4th at 1128 (collecting authorities for the predominance of common law in early America).

Importantly, the infancy doctrine was not simply a quirk of contract law that imposed an "incidental restriction," Appellants' Br. 50, on those under 21. It was part of a broader legal regime in which that

group was subject to the near-total control and supervision of their parents and "depended on their parents' consent to exercise rights and deal with others in society." *Bondi II*, 133 F.4th at 1118; *see also* 1-SER-118 (Cornell Decl. ¶ 41) ("[T]reating infants as autonomous legal actors capable of having the right to keep, bear, and acquire arms is profoundly anachronistic."); *cf. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 834 (2011) (Thomas, J., dissenting) (describing tradition that "imposed age limits on all manner of activities that required judgment and reason"). In those circumstances, legislatures simply had no reason to concern themselves with those under 21 independently acquiring guns.

### 2. 19th-century societal changes

Common-law limits on persons under 21 loosened in the 19th century, however, alongside drastic societal changes. The 19th century saw the United States transform from an agrarian, "primarily rural society" to an "increasingly centralized, urban-industrial society buffeted by the imperatives of mass production." 2-SER-292-93 (Spitzer Decl. ¶ 24). Industrialization and the Jacksonian market revolution—together with the development of a national currency, *see* William L.

28

Pressly, *America's Paper Money: A Canvas for an Emerging Nation* 4 (2023)—"transformed American life, making a host of consumer goods … widely available for the first time." 1-SER-154 (Cornell Decl. ¶ 112). Firearms suddenly became "more easily accessible to customers than they had ever been before." 1-SER-266 (Rivas Decl. ¶ 48).

Industrialization and related changes also transformed "American life" more generally, "from politics to the legal system, from the family to social values." 2-SER-293 (Spitzer Decl. ¶ 24). As "child labor outside of the home" became more common, *see id.*, those under 21 gained increasing independence and—with their own wages—purchasing ability. *See id.*; Barbara M. Tucker, *Liberty Is Exploitation: The Force of Tradition in Early Manufacturing*, 19 OAH Mag. of Hist. 21, 24 (2005) ("Paternalism and the force of traditional social relations gave way under changing conditions."); *see also Bondi II*, 133 F.4th at 1139 (Rosenbaum, J., concurring) (explaining that "[i]ndustrialization … resulted in less family 'control' over Under-21s" as they moved "from farm life … to cities to work").

Meanwhile, these sweeping changes led courts to "gradually abandon[]" common-law restrictions on the rights of those under 21,

29

ultimately "creat[ing] a new set of rules and legalities about children's wage work," and leading to a conception of them as "legal persons, capable of making contracts for work in their own right." James D. Schmidt, *"Restless Movements Characteristic of Childhood": The Legal Construction of Child Labor in Nineteenth-Century Massachusetts*, 23 L. & Hist. Rev. 315, 318, 335 (2005). All this "meant that Under-21s could now purchase cheap, widely available guns." *Bondi II*, 133 F.4th at 1139 (Rosenbaum, J., concurring).

The industry supplying those guns was also undergoing monumental changes, as "developments in firearm technology and production placed concealable pistols within easy reach of persons under twenty-one." 1-SER-243 (Rivas Decl. ¶ 12). Technological developments and increased manufacturing capacity led for the first time to widely available concealable handguns suitable for impulsive misuse, unlike earlier, muzzle-loaded firearms. *See* 1-SER-194-95, 205-11 (Roth Decl. ¶ 18, 30-36); *id.* at 115-16, 154, 166-68 (Cornell Decl. ¶¶ 37, 111, 138-41). Firearms became "more lethal and more widely available to consumers" than ever before. *Id.* at 242 (Rivas Decl. ¶ 9). The Civil War, in particular, spurred "an unprecedented infrastructure

to manufacture staggeringly large quantities of pistols," in order to meet wartime demand. *Id.* at 255 (Rivas Decl. ¶ 30). Once the war ended, the country was left with an enormous surplus of guns that would then flood the civilian market: "[T]he net result was more and cheaper pistols spread throughout the country." *Id.* The new independence and purchasing ability of individuals under 21 thus met with an unprecedented market for newly lethal firearms, "some expressly marketed to young people." Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 Minn. L. Rev. 3049, 3094 (2024).

Ultimately, this confluence of novel societal concerns and technological developments created a perfect storm of sorts, leading to an unprecedented youth gun violence problem in the mid-to-late 19th century. News reports and editorials across the country evidenced public outcry over harrowing stories of unintentional shootings, impulsive homicides, and other gun incidents with minors under 21. *See* 1-SER-260-61 (Rivas Decl. ¶ 38); Walsh & Cornell, *Age Restrictions*, 108 Minn. L. Rev. at 3094 & nn. 194-95 (noting that this crisis "drew notice by jurists, journalists, and physicians"). One New York coroner, for

31

example, wrote in 1884 that "[a] good deal of the crime in this city can be traced to the habit of boys and young men carrying pistols," *see* W.H. Kennedy, *Carrying Concealed Weapons*, New York Tribune (July 26, 1884), at 4, while other articles of the time lamented "a 19-year-old son shoot[ing] and kill[ing] his father," and an 18-year-old "shoot[ing] a 14-year-old girl before turning the gun on himself," among other tragedies. *Bondi I*, 61 F.4th at 139 & nn.1-5 (collecting these and other "stories … ripped from … the Reconstruction Era headlines").

### 3. 19th-century regulatory response

The public clamored for a legislative solution, and their representatives answered. *See* 1-SER-267 (Rivas Decl. ¶ 49). Reflecting the more general shift from an era of common law to one of increasing statutory codification, the response took the form of statutes, unlike in the 18th century. "When the common-law regime became less effective at restricting minors' access to firearms, statutes increasingly did the work." *Bondi II*, 133 F.4th at 1122. By the end of the 19th century, at least 19 states and the District of Columbia had enacted age restrictions directly analogous to California's. *See* State Br. 35.

This new wave of regulations was widely approved and accepted as constitutional. The laws "were celebrated by the public and went largely unchallenged," suggesting that Americans viewed the laws as consistent with the Second Amendment. *McCoy*, 140 F.4th at 579 (citing Patrick J. Charles, *Armed in America: A History of Gun Rights From Colonial Militias to Concealed Carry* 156 (2019)). Since there were generally "no disputes regarding the lawfulness of such prohibitions," this Court can "assume it settled" that they were understood as constitutional. *Bruen*, 597 U.S. at 30; *cf. Free Speech Coalition*, 606 U.S. at 494 (emphasizing that laws' legitimacy can be "so uncontroversial that the need for a judicial decision upholding them has never arisen"). Indeed, as California has emphasized, the one court that appears to have considered the question—the Tennessee Supreme Court in 1878— upheld an age restriction. *See* State Br. 37 (citing *State v. Callicutt*, 69 Tenn. 714 (1878)). Any suggestion that these laws deviated from constitutional tradition is unfounded.

\* \* \*

The 19th-century proliferation of age restrictions is thus "readily explainable by understanding the profound changes in American state

33

and society during this time period." 2-SER-292 (Spitzer Decl. ¶ 24). Reconstruction-era legislatures acted consistent with traditional principles in order to respond to unprecedented societal problems. At the founding, common-law restrictions and social conditions meant that those under 21 could not independently purchase firearms. When those conditions changed, as soon as youth access to guns and youth gun violence emerged as serious public concerns, states acted quickly with statutory regulations like California's law. *Cf. Duncan*, 133 F.4th at 876 (explaining similar pattern of regulatory responses to new weapons uses). With a proper understanding of context, the historical record is clear and consistent: those under 21 have never had an unfettered right to purchase firearms. California's limited age restriction fits comfortably within that historical tradition.

## CONCLUSION

This Court should affirm the district court's judgment.

34

Dated: November 6, 2025       Respectfully submitted,

<u>/s/ Erik P. Fredericksen</u>
Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Erik P. Fredericksen
Everytown Law
450 Lexington Avenue
P.O. Box 4184
New York, NY 10163
efredericksen@everytown.org

*Counsel for amicus curiae*
*Everytown for Gun Safety*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 25-2509

I am the attorney or self-represented party.

**This brief contains** | 6,863 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⬤ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Erik P. Fredericksen | **Date** | 11/06/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*